# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                      No. CR 19-0077 JB

MICHAEL JAMES NISSEN,

        Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) the Motion for Discovery of Grand Jury Minutes, filed December 30, 2019 (Doc. 98)("Grand Jury Motion"); (ii) the Motion for Leave to Amend by Addendum, filed January 15, 2020 (Doc. 106)("Motion to Amend"); (iii) the Motion to Dismiss Information on Two Counts of Convictions for Lack of Jurisdiction, filed January 24, 2020 (Doc. 109)("MTD"); (iv) the Motion for Judgment of Acquittal After Guilty Verdict, or, In the Alternative, For a New Trial, filed January 24, 2020 (Doc. 110)("Acquittal Motion"); (v) the Motion for Acquittal, or to Dismiss Information on Two Counts for Prosecutorial Misconduct, filed January 27, 2020 (Doc. 111)("Second Acquittal Motion"); (vi) the Notice of Motion for Acquittal, Overturn Guilty Verdict, or Dismiss Information of Conviction of Counts I and II, filed February 6, 2020 (Doc. 112)("Third Acquittal Motion"); and (vii) the Motion to Dismiss Information of Illegal Convictions on Counts I and II for Federal Abuse of Arbitrary Power and Judicial Misconduct, filed February 19, 2020 (Doc. 113)("Second MTD").  The Court held a hearing on March 23, 2020.  The primary issues are: (i) whether the Court has subject-matter jurisdiction over this case and personal jurisdiction over Defendant Michael J. Nissen; (ii) whether Nissen is entitled to a transcript of the Grand Jury proceedings that resulted in his indictment;

(iii) whether Nissen may amend the Motion to Dismiss for Lack of Jurisdiction, filed May 15, 2019 (Doc. 24)("Jurisdictional MTD"), despite the fact that the Court has already ruled on the Jurisdictional MTD; (iv) whether Nissen's motions to dismiss and for acquittal are timely; (v) whether Counts I and II of the Indictment, filed January 10, 2019 (Doc. 11), charge the same offense such that Nissen's conviction under both Counts at a jury trial violate Nissen's rights under the Double Jeopardy Clause of the Fifth Amendment to the Constitution of the United States of America; (vi) whether Nissen had a right to appear before a Grand Jury before his indictment; (vii) whether Nissen's conviction for violating 18 U.S.C. § 875(c) is invalid, because § 875(c) violates the Commerce Clause of the Constitution of the United States of America; (viii) whether § 875(c) unconstitutionally criminalizes thought; (ix) whether the evidence introduced at trial supports Nissen's two-count conviction; (x) whether the Court properly denied Nissen's oral motion for an acquittal at trial; (xi) whether the Court erred in its Memorandum Opinion and Order, __ F. Supp. 3d __, 2020 WL 108488, filed January 9, 2020 (Doc. 101)("MOO"), in which the Court held that sufficient evidence supported Nissen's conviction, Nissen is not entitled to a bill of particulars, the Court has subject-matter jurisdiction, and Nissen's conviction does not violate his First Amendment rights; (xii) whether § 875(c) is an ex post facto law, because Nissen alleges that it prohibits conduct committed before its enactment; and (xii) whether the Assistant United States Attorneys ("AUSAs") prosecuting this case violated Nissen's rights under the First, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth, Eleventh, and Fourteenth Amendments to the Constitution. The Court concludes that: (i) the Court has subject-matter jurisdiction, because the evidence introduced at trial demonstrates that Nissen transmitted threats in interstate commerce while in New Mexico; (ii) Nissen is not entitled to a transcript of the Grand Jury proceedings, because Nissen has not shown a particularized need for the transcript, and because Nissen has not shown that grounds may

exist to dismiss the Indictment because of a matter that occurred before the Grand Jury; (iii) Nissen may not amend the Jurisdictional MTD, because the Court has denied that motion; (iv) Nissen's Acquittal Motion, Second Acquittal Motion, and Third Acquittal Motion are untimely under rule 29 of the Federal Rules of Criminal Procedure, because several months have passed since Nissen's conviction and Nissen has not shown good cause for delay; (v) the Indictment charges separate offenses in Counts I and II, and so does not violate Nissen's rights against double jeopardy; (vi) Nissen did not have a right to appear before the Grand Jury; (vii) section 875(c) is a valid exercise of Congress' powers under the Commerce Clause; (viii) section 875(c) does not criminalize thought, but rather true threats; (ix) the United States introduced sufficient evidence to support Nissen's conviction; (x) the Court properly denied Nissen's oral motion for acquittal, because the evidence supports Nissen's conviction; (xi) the Court did not err in the MOO; and (xii) the AUSAs prosecuting this case have not violated any of Nissen's rights.  Accordingly, the Court denies Nissen's motions.

## **FACTUAL BACKGROUND**

The Court takes its background facts from the Criminal Complaint, filed December 19, 2018 (Doc. 1);[1] from the Affidavit of Peter John Nystrom Ubbelohde (executed December 19, 2018), filed December 19, 2018 (Doc. 1-1)("Ubbelohde Aff."); Nissen's MTD, and the evidence introduced at trial.  The Court must, in deciding most of Nissen's post-trial motions, construe the trial evidence in the light most favorable to the United States.  The Court therefore will be stating largely the United States' version of events, as supported by the trial evidence.

---

[1]The United States filed a Complaint on December 19, 2018, and a two-count Indictment on January 10, 2019.

This case deals with alleged threats Nissen communicated to New Mexico State Police ("NM State Police") officers and dispatch employees on November 2 and 26, 2018.  See Ubbelohde Aff. ¶¶ 6, 8, at 2-3; MTD at 1.  On the evening of November 2, 2018, an NM State Police officer stopped Nissen on Interstate 40 in Torrance County, New Mexico, near mile marker 194 and issued several traffic citations.  See MTD at 1.  About a half-hour later, NM State Police dispatch received "multiple phone calls from telephone number (505) 819-1806 and caller ID listing Michael Nissen."  Ubbelohde Aff. ¶ 6, at 3.  In the calls, a male caller said that an NM State Police officer had just given him several citations.  See Ubbelohde Aff. ¶ 6, at 3.  The caller then said:

> You guys got some of the stupidest fucking pigs on the road.  The next time someone violates me like that on the road, I'm gonna put a bullet in that fucking pig's head . . . .  He violated my Fourth Amendment constitution, he violated my Second and my First Amendment and the next time he does it I'm gonna plea the Fifth, but next time I'm gonna take my revolver out and put that motherfucker drop dead.

MTD at 1.  Later that month, NM State Police Internal Affairs personnel received an email from johnny2bravo1@gmail.com further complaining about the November 2, 2018, encounter on Interstate 40.  See Ubbelohde Aff. ¶ 7, at 3; MTD at 2.  On November 26, 2018, a NM State Police "District 5 administrative assistant received a call from phone number (505) 819-1806.  During the call, the male caller became verbally combative and threatened to shoot the [NM State Police] employee in the head."  Ubbelohde Aff. ¶ 8, at 3.

On December 13, 2018, Nissen visited the Bernalillo County Sheriff's Office and spoke with Sheriff's Deputies to complain about the NM State Police.  See MTD at 2.  Nissen said that he was stopped near mile marker 194 on Interstate 40, and that, after the stop, he called NM State Police dispatch "just to get it done and then it got a little crazy . . . .  I didn't make no threatening

calls, but I kept calling them about the law."  MTD at 2.  Nissen also told Bernalillo County Sheriff's Deputies that he "owned multiple firearms including rifles and a revolver."  Ubbelohde Aff. ¶ 9, at 3.  The Ubbelohde Aff. states that Nissen told the Bernalillo County Sheriff's Deputies that he "carries his revolver on the streets and carrying his gun concealed is to protect himself from rouge [sic] cops."  Ubbelohde Aff. ¶ 9, at 3-4.

## PROCEDURAL BACKGROUND

A federal Grand Jury indicted Nissen in early 2019.  See Indictment at 1.  The Indictment charges Nissen with two violations of 18 U.S.C. § 875(c).  See Indictment at 1.  The Indictment's Count 1 asserts that, "[o]n or about November 2, 2018, in Torrance County, in the District of New Mexico, the defendant, MICHAEL JAMES NISSEN, transmitted in interstate and foreign commerce communications containing a threat to injure the person of another [i]n violation of 18 U.S.C.§ 875(c)."  Indictment at 1 (bold omitted).  The Indictment's Count 2 asserts that, "[o]n or about November 26, 2018, in Bernalillo County, in the District of New Mexico, the defendant, MICHAEL JAMES NISSEN, transmitted in interstate and foreign commerce communications containing a threat to injure the person of another [i]n violation of 18 U.S.C. § 875(c)."  Indictment at 1 (bold omitted).

1. **The Trial.**

The Court held a jury trial on August 6 and 7, 2019.  See Transcript of Jury Trail Volume 1 at 4:6-9 (taken August 6, 2019)(Court), filed December 5, 2019 (Doc. 94)("Aug. 6 Tr."); Transcript of Jury Trial Volume 2 at 79:1-6 (taken August 7, 2019)(Court), filed December 5, 2019 (Doc. 95)("Aug. 7 Tr.").  At the close of the United States' case in chief, Nissen moved for a directed verdict.  See Aug. 7 Tr. at 5:15-17 (Mkhitarian).  Nissen first asserted an argument under the First Amendment to the Constitution of the United States, averring that the NM State Police

officers "agreed that Nissen was making political arguments with regard to their jurisdiction over him." Aug. 7 Tr. at 5:18-20 (Mkhitarian). Nissen argued that he made his statements "in regard to future violations, not unlike threats that are made every day, [for example] 'if you break into my house you know I will kill you,' things like [these] are made every day and are protected by free speech." Aug 7. Tr. at 6:4-10 (Mkhitarian). On this point, Nissen also observed that "no specific person was mentioned" in his Count 1 statements, which, along with the conditional nature of the threat and its political substance, Nissen argued, renders the statement not a true threat. See Aug. 7 Tr. at 6:13-19 (Mkhitarian). Accordingly, Nissen requested that the Court dismiss the Indictment's Count 1. See Aug 7. Tr. at 6:22-24 (Mkhitarian). The United States responded, pointing to the Court's jury instruction that describes true threats as "serious statement[s] expressing intent to instill fear which, under the circumstances, would cause apprehension in a reasonable person, as distinguished from mere political argument, idle talk, exaggeration, or something said in a joking manner." Aug 7. Tr. at 8:1-6 (Mysliwiec). The United States argued that "there is nothing joking or idle about the threats by an armed man to shoot people in the face," and that, even if Nissen subjectively did not intend to shoot anyone, the statement is a true threat and thus the Court should submit the issue for the jury's decision. Aug 7. Tr. at 8:8-11 (Mysliwiec). The United States then argued that Nissen "subjectively intended" the Count 1 statements as a threat: "[W]hen you look at the evidence . . . Mr. Nissen was upset that he had been traffic stopped," and "believed State Police don't have any right to write him tickets or haul him into court." Aug 7. Tr. at 8:23-9:9 (Mysliwiec).

The Court indicated its conclusion that the Tenth Circuit's pattern jury instructions on § 875(c) reflect that the jury gets to decide whether speech amounts to a true threat. See Aug 7. Tr. at 10:19-11:2 (Court). The Court noted that the evidence, taken in the light most favorable to

the verdict, was sufficient for a reasonable jury to conclude beyond a reasonable doubt that Nissen is guilty of the two Counts, and so was inclined to deny the rule 29 motion.  See Aug 7. Tr. at 11:13-18 (Court).  The Court stated it would, however, take Nissen's motion under advisement. See Aug 7. Tr. at 11:23-25 (Court).  On August 7, 2019, the jury convicted Nissen on both counts. See Aug. 7. Tr. at 79:1-4 (Court).

2.      **The MOO.**

Through counsel, Nissen filed a series of motions contesting the Court's subject-matter jurisdiction, see Jurisdictional MTD, requesting a bill of particulars, see Defendant Michael J. Nissen's Motion for Bill of Particulars, filed April 24, 2019 (Doc. 22)("MBP"), and contesting his indictment's validity under the First Amendment, see Motion to Dismiss Indictment, filed May 15, 2019 (Doc. 25)("May 15 MTD").  Although Nissen filed these motions before trial, at a hearing, Nissen deferred arguing the Jurisdictional MTD and the Motion to Dismiss Indictment, and later converted them into motions for a directed verdict at trial.  See MOO, 2020 WL 108488, at *5.  Although the Court provisionally denied those motions at trial, the Court denied each of these motions along with Nissen's oral motion for acquittal in a thirty-six-page memorandum opinion.  See MOO, 2020 WL 108488, at *1.

The Court first held that the Indictment sufficiently apprised Nissen of the essential elements of the crimes charged, and of the crimes against which he must defend, and so denied the MBP.  See MOO, 2020 WL 108488, at *12.  Next, the Court decided that the United States introduced sufficient evidence for a reasonable jury to conclude that Nissen is guilty of each count, denying the Jurisdictional MTD, the Motion to Dismiss Indictment, and the oral motion for a directed verdict.  See MOO, 2020 WL 108488, at *12. Specifically, the Court held that the United States proved that Nissen transmitted a communication in interstate commerce, thereby affording

the Court subject-matter jurisdiction and satisfying § 875(c)'s interstate commerce element.  See MOO, 2020 WL 108488, at *13-14.  The Court also held that the jury reasonably concluded that Nissen intentionally transmitted a true threat.  See  MOO, 2020 WL 108488, at *14.  Given Nissen's statements and the context in which he made them, the Court held that the jury reasonably concluded that Nissen knowingly and willfully transmitted a true threat.  See MOO, 2020 WL 108488, at *14-15 (stating that "Nissen's gun possession, his language, and the reactions of those who heard his threats all support the jury's finding that Nissen intended to communicate a threat," and holding that a reasonable person would construe Nissen's statements as "'serious expression[s] of an intent to commit an act of unlawful violence to a particular individual or group of individuals.'" (quoting United States v. Wheeler, 776 F.3d 740, 743 (10th Cir. 2015))).  Accordingly, the Court denied Nissen's motions and affirmed his conviction.  See MOO, 2020 WL 108488, at *16.

### 3.  The Pro Se Motions.

Beginning on December 30, 2019, and continuing through February, 2020, Nissen filed a series of motions raising a wide range of issues.  See generally Criminal Docket No. CR 19-0077. As far as the Court can tell, Nissen filed each of the motions at issue without counsel's assistance. As each of the Motions are handwritten, see, e.g., MTD at 1, the Court has difficulty divining each motion's precise argument and objective.  The Court summarizes, to the best extent that it can, each motion below.

### a.  The Grand Jury Motion.

In the Grand Jury Motion, Nissen cites "rules 6, 12, and 16 of the Federal Rules of Criminal Procedure" and requests that the Court compel the United States to disclose information pertaining to the Grand Jury proceedings giving rise to the Indictment.  Grand Jury Motion at 1 (capitalization

altered).   Specifically, Nissen requests: (i) "THE NAMES AND ADDRESSES OF ALL ATTORNEY'S [sic] FOR THE GOVERNMENT APPEARING BEFORE, PRESENTING EVIDENCE TO, OR MAKING STATEMENTS TO, THE GRAND JURY"; (ii) "A STATEMENT AS TO WHETHER ANY UNSWORN WITNESSES OR UNAUTHORIZED PERSONS WERE PRESENT IN THE GRAND JURY ROOM"; (iii) "A STATEMENT AS TO WHEN THE GRAND JURY FIRST COMMENCED ITS DUTIES, AND A COPY OF ANY DOCUMENTS OR ORDERS RELATING TO OR EXTENDING ITS LEGAL AUTHORITY OR TERM"; and (iv) a "TRANSCRIPT OF THE GRAND JURY MINUTES."  Grand Jury Motion at 1-2.

####    b.    The Motion to Amend.

In the Motion to Amend, Nissen "wishes to seek an addendum to defendant[']s declaration in support of motions to dismiss et al."  Motion to Amend at 1.  Specifically, Nissen "wishes to assert" a lengthy quote from the Mobile Telecommunications Sourcing Act, 4 U.S.C. §§ 116-26. Motion to Amend at 1 (capitalization altered).   The Court reproduces Nissen's requested quotation:[2]

> MOBILE TELECOMMUNICATIONS SOURCING ACT'S DEFINITION AS [SIC] FOLLOWS: "PRIMARY USE IS IN NEW MEXICO IF: 1) THE MOBILE TELECOMMUNICATIONS SERVICES ORIGINATE AND TERMINATE IN THE SAME STATE, REGARDLESS OF WHERE THE SERVICE ORIGINATE[S], TERMINATE[S] IN THE SAME STATE, REGARDLESS OF WHERE THE SERVICE ORIGINATE[S], TERMINATE[S], OR PASS[ES] THROUGH."  "HOME SERVICE PROVIDER," "MOBILE TELECOMMUNICATIONS SERVICES," "CUSTOMER," AND "PLACE A PRIMARY USE" HAVE THE MEANING GIVEN IN THE "MOBILE TELECOMMUNICATIONS SOURCING ACT." . . .

---

[2]As far as the Court can tell, Nissen does not directly and faithfully quote the statute, but rather pieces together words, phrases, and sentencing from the Mobile Telecommunications Sentencing Act.  The Court nonetheless reproduces Nissen's quoted passage, as it is the basis for his request to amend.

"IF A COURT OF COMPETENT JURISDICTION ENTERS A FINAL JUDGMENT ON THE MERITS THAT, 1) ARE [SIC] BASED ON FEDERAL LAW, AND 20 IS NO LONGER SUBJECT TO APPEAL[,] AND 3) SUBSTANTIALLY LIMITS OR IMPAIRS THE ESSENTIAL ELEMENTS OF SECTION 116 THOUGH 126 OF THIS TITLE ARE INVALID AND HAVE NO LEGAL EFFECT AS OF THE DATE OF ENTRY OF SUCH JUDGMENT."

IN CONTINUANCE TO []47 U.S.C. § 153[], "COMMON CARRIERS," OR CARRIER MEANS ANY PERSON ENGAGED AS A COMMON CARRIER FOR HIRE, IN "INTERSTATE" OR "FOREIGN" COMMUNICATION BY WIRE OR RADIO OR "INTERSTATE" OR "FOREIGN" RADIO TRANSMISSION OF ENERGY, EXCEPT WHERE REFERENCE IS MADE TO COMMON CARRIER NOT SUBJECT TO THIS CHAPTER IN TITLE II OF THE FCA.  CONGRESS FURTHER PROVIDED THAT ALL CHARGES FOR COMMUNICATION SERVICES "SHALL BE JUST AND REASONABLE AND ANY SUCH CHARGE, PRACTICE, CLASSIFICATION, OR "REGULATION," THAT IS SUBJECT OR UNREASONABLE IS HEREBY DECLARED TO BE "UNLAWFUL." HENCE, BY ENACTING TITLE II OF THE FCA, CONGRESS IS UNLAWFUL.

ALL CHARGES, PRACTICES, CLASSIFICATIONS AND "REGULATIONS" FOR AND IN CONNECTION WITH SUCH COMMUNICATIONS SERVICE, SHALL BE JUST AND REASONABLE AND ANY SUCH CHARGE, PRACTICE, CLASSIFICATION, OR "REGULATION" THAT IS UNJUST OR UNREASONABLE IS HEREBY DECLARED TO BE "UNLAWFUL": PROVIDED, THAT COMMUNICATIONS BY WIRE OR RADIO SUBJECT TO THIS ACT MAY BE CLASSIFIED INTO DAY, NIGHT, REPEATED, UNREPEATED LETTER, COMMERCIAL PRESS, GOVERNMENT AND SUCH OTHER CLASSES ET AL[.]

WHEREFORE, THE DEFENDANT PRAYS FOR AN ORDER OF THE COURT FOR COMPLETE DISMISSAL OF COUNTS I AND II OF THIS INFORMATION AND GRANT SUCH FURTHER RELIEF AS THE COURTS DEEM JUST AND PROPER IN THE INTEREST OF JUSTICE AND IN ACCORDANCE WITH THE SUPREME LAW OF THE LAND TO WIT THE UNITED STATES CONSTITUTION INCLUDING ITS ARTICLES AND AMENDMENTS AND MAY GOD BLESS AMERICA.

Motion to Amend at 1-3.

### c.     The MTD.

Nissen filed the MTD on January 24, 2020.  See MTD at 1.  Nissen contends that the "COURT HAS NO JURISDICTION OR VENUE."  MTD at 2.  Nissen then contends that the Indictment's Counts I and II "CHARGE THE SAME OFFENSE" in violation of the Fifth Amendment's Double Jeopardy Clause.  MTD at 2.  Next, Nissen alleges that, on December 18, 2018, Nissen "WAS NEVER NOTIFIED OR SUBPOENAED AND NEVER COMPELLED TO APPEAR BEFORE THE GRAND JURY."  MTD at 2.  Nissen further alleges that the United States never notified Nissen that "HE WAS BEING INVESTIGATED," such that the "USE OF ANY AND ALL EVIDENCE OBTAINED DIRECTLY OR INDIRECTLY FROM [the Grand Jury proceedings] IS VIOLATIVE OF THE DEFENDANT[']S PRIVILEGES AGAINST SELF-INCRIMINATION."  MTD at 3.  Nissen then contends that § 875(c) is unconstitutional as exceeding Congress' Commerce Clause powers.  See MTD at 3.  Finally, Nissen avers that § 875(c) "IMPERMISSIBLY CRIMINALIZES MERE THOUGHT ABSENT ANY CRIMINAL INTENT OR ANY OVERT STEP IN FURTHERANCE OF CRIMINAL INTENT."  MTD at 3.

### d.     The Acquittal Motion.

Nissen also filed the Acquittal Motion on the January 24, 2020.  See Acquittal Motion at 1.  Nissen first asserts that the jury's "VERDICT IS CONTRARY TO THE WEIGHT OF THE EVIDENCE," and that the evidence against him "CONSISTED MERELY OF THE UNCORROBORATED TESTIMONY OF ACCOMPLICES IN A CONSPIRACY TO VIOLATE DEFENDANT'S CIVIL RIGHTS."  Acquittal Motion at 1-2.  Nissen then contends that the Court erred in its MOO.  See Acquittal Motion at 2.  Finally, Nissen posits that "EXCESSIVE AND UNNECESSARY ISSUES WERE SUBMITTED TO THE JURY, RESULTING IN THEIR

CONFUSION AND RESULTING IN THE DEFENDANT NOT HAVING A FAIR TRIAL." Acquittal Motion at 3. Nissen requests that the Court either acquit Nissen or order a new trial. See Acquittal Motion at 3.

    **e.**  **The Second Acquittal Motion.**

    Nissen filed the Second Acquittal Motion three days after filing the MTD and the Acquittal Motion. See Second Acquittal Motion at 1. Nissen requests "an order of acquittal or dismissing the information of Counts I and II against him." Second Acquittal Motion at 1 (capitalization altered). Nissen asserts that § 875(c) is an "ex post facto law," and therefore "illegal and unlawful." Second Acquittal Motion at 1-2 (capitalization altered). Nissen then asserts that the Court should dismiss the Indictment, because "the prosecution was brought selectively and for an improper purpose." Second Acquittal Motion (capitalization altered). Next, Nissen avers that the "evidence upon which the Grand Jury indictment is based . . . is an illegal, fact lagging [sic] prosecutorial misconduct presumption of a call log which isn't sufficient to support subject matter jurisdiction over the in personam of Defendant to bring forth an indictment related to interstate and foreign commerce." Second Acquittal Motion at 2-3 (capitalization altered). Nissen also contends that the Indictment "lacks Grand Jury foreperson signature which is required for constitutionality under federal criminal procedure rule 6(c) . . . ." Second Acquittal Motion at 3 (capitalization altered). Finally, Nissen asserts that the United States violated Nissen's rights under the First, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth, Eleventh, and Fourteenth Amendments to the Constitution of the United States. See Second Acquittal Motion at 3. Nissen asks that the Court "does what is morally and ethically correct . . . and acquit[] or dismiss[] the [Indictment]." Second Acquittal Motion at 3 (capitalization altered).

f.      **The Third Acquittal Motion.**

Nissen filed the Third Acquittal Motion of February 6, 2020.  See Third Acquittal Motion at 1.  Nissen begins by arguing that the Religious Freedom Restoration Act, Pub. L. No. 103-141, 107 Stat. 1488 (November 16, 1993), codified at 42 U.S.C. §§ 2000bb through 2000bb-4 ("RFRA"), "restore[s] the compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398 . . . (1963) and Wisconsin v. Yoder, 406 U.S. 205 . . . (1972) . . . ."  Third Acquittal Motion at 2 (capitalization altered).  Although Nissen does not assert expressly any religious belief or practice, the Court understands Nissen to contend that RFRA affords him a defense against the Indictment. See Third Acquittal Motion at 3-4.  Nissen provides a lengthy paragraph explaining "the constitutional authority for Congress to enact the law as grounded in Congress's power to enforce the Fourteenth Amendment pursuant to § 5 of that Amendment."  Third Acquittal Motion at 3-4 (citing, e.g., Oregon v. Mitchell, 400 U.S. 112 (1970); South Carolina v. Katzenbach, 383 U.S. 301 (1966)(capitalization altered)).  Nissen then asks that the Court acquit him or overturn his conviction, "and grant such further relief as the Courts deem just, proper and equitable in the interest of justice, and in accordance with the supreme law of the land to wit the United States constitution including its articles and amendments, and may God bless America."  Third Acquittal Motion at 4 (capitalization altered).

g.      **The Second MTD.**

Nissen filed the Second MTD on February 19, 2020.  See Second MTD at 1.  Nissen "respectfully moves the honorable crown Court" to "order a dismissal of information of illegal convictions . . . for federal abuse of arbitrary power and judicial misconduct."  Second MTD at 1 (capitalization altered).  Nissen alleges that the Court "has overstepped constitutional law of due

process and equal protection of the law guaranteed to all Americans regardless to [sic] the federal maritime common law practice."  Second MTD at 1-2 (capitalization altered).  Nissen reasserts some of his references to the Mobile Telecommunications Sourcing Act, but now asserts that statute is "unenforceable and unlawful."  Second MTD at 4.  Nissen then refers to the First Amendment's Free Exercise and Establishment Clauses, as well as the Fifth and Fourteenth Amendments' Due Process Clauses.  See Second MTD at 5.  Nissen also contends that "New Mexico State Police Officer Jordan Burd" illegally confiscated Nissen's shotgun at the traffic stop which gave rise to the offense that the Indictment charges in Count I.  Second MTD at 10 (capitalization altered).  Nissen discusses these constitutional provisions' functions, but does not elaborate on how they apply to him.  See Second MTD at 5.  Nissen also refers to substantive due process rights, the Equal Protection Clause, and "the inherent powers . . . such as the powers of a people to establish a form of government, of a father to control his children."  Second MTD at 7 (capitalization altered).  Next, Nissen contends that the communications for which he was indicted did not cross state lines, although Nissen does not demonstrate why.  See Second MTD at 9 (capitalization altered).

Nissen then cites various statutory provisions pertaining to the definition of "national" and citizenship, as well as the "Pennoyer [v. Neff, 95 U.S. 714 (1878)] rule."  Second MTD at 9 (capitalization altered).  Nissen avers that he is a "non citizen national sovereign of a free and independent state."  Second MTD at 11.  Next, Nissen writes: "Twenty-Third Amendment to the United States Constitution Repealed August 1978.  Tyranny rule of the de facto, despotic, monarchy federal crown court of the District of Columbia[.]  It's unlawful and illegal by way of United States Constitution, and the Declaration of Independence."  Second MTD at 12

(capitalization altered).  Nissen then contends that the Court violated the Monroe Doctrine.  <u>See</u> Second MTD at 13.

Turning to § 875(c) and his conviction's merits, Nissen asserts that the statute requires a threat to injure or harm another person.  <u>See</u> Second MTD at 13.  Nissen asserts that, in a communication which gave rise to the Indictment, he merely made "reference[] to a pig of the four legged hoofed family."  Second MTD at 13-14 (capitalization altered).  Nissen also contends that his being shackled to the counsel's table at trial prejudiced the jury against him, tainting the guilty verdict.  <u>See</u> Second MTD at 13.  Nissen closes with two paragraphs in which he discusses maritime law.  <u>See</u> Second MTD at 17-18.  Nissen attaches to the Second MTD the trial's transcript in its entirety -- 235 pages -- with Nissen's handwritten notations and commentary peppered throughout.  <u>See</u> Second MTD at 20-259.  For example, at a margin near a line in which the United States quotes Nissen, Nissen writes the "Defendant does not argue with this Hearsay[.] Conspiracy."  Nissen MTD at 32 (referencing Transcript of Jury Trial (taken August 5-6, 2019), filed December 5, 2019 (Doc. 95)("Trial Tr."), and writing near Trial Tr. at 13:3-19 (Mysliwiec)).  The Court reviewed those comments to the best of the Court's ability.  Nissen also writes "I have a right to petition the government for a redress of grievances" near a section of the Transcript in which the United States discusses Nissen's threat in its opening argument.  MTD at 46 (writing near Trial Tr. at 27:16-25).

### h.    The Response.

The United States responds.  <u>See</u> United States' Response to Numerous *Pro Se* Motions at 1, filed February 28, 2020 (Doc. 119)("Response").  The United States contends that the evidence that it presented at trial "conclusively showed that Defendant threatened to kill other people, that he did so in phone calls that went to Plano, Texas before being delivered to the District of New

Mexico, and that he made those threats wanting to be taken seriously (which is to say, they were true threats)."  Response at 4.  The United States accordingly asserts that Nissen's convictions are valid.  See Response at 4-5.  The United States argues generally that the Court should deny Nissen's motions, because Nissen "is represented by counsel, and because [the motions] are meritless."  Response at 1.  The United States first argues that Nissen's counsel has a "duty to review Defendant's requests and decide which of them is sufficiently meritorious to bring to the Court's attention."  Response at 1 (citing United States v. Hill, 526 F.2d 1019, 1025 (10th Cir. 1975)).  The United States contends that Nissen must "make a clear and unequivocal decision" to represent himself, which he has not done.  Response at 1 (citing Faretta v. California, 422 U.S. 806, 835 (1957); United States v. Mackovich, 209 F.3d 1227, 1236 (10th Cir. 2000)).

Next, the United States argues that Nissen's motions are "meritless," Response at 2, and that they consist of arguments that Nissen should direct at the United States Court of Appeals for the Tenth Circuit, see Response at 4.  The United States responds to each of Nissen's arguments to the extent that it can.  See generally Response.  The United States characterizes the motions as "a 'hodgepodge of unsupported assertions, irrelevant platitudes, and legalistic gibberish.'" Response at 2 (quoting Crain v. C.I.R., 737 F.2d 1417, 1418 (5th Cir. 1984)).  The United States contends that Nissen's citations to the Mobile Telecommunications Sourcing Act are irrelevant, because that statute pertains to taxes and fees for mobile phone users, and so has "nothing to do with the criminal penalties imposed for violating 18 U.S.C. § 875(c), which are not taxes, charges, or fees levied for telephone service."  Response at 2 (citing 4 U.S.C. § 116(a)).

The United States then avers that, while Nissen's jurisdictional arguments are timely, the Court already ruled on the Jurisdictional MTD, and Nissen "has not correctly requested reconsideration of that order, nor has he pointed out any mistake of law, change in circumstances,

or manifest injustice that would result from the Court's choice not to reconsider the opinion and order . . . ."  Response at 2 (citing MOO at 1-2).  The United States contends, however, that the rest of Nissen's arguments are generally untimely under rules 29(c) and 33(b) of the Federal Rules of Criminal Procedure, and the United States asserts that Nissen has not "[e]ven attempted to show good cause for the lateness of his filing."  Response at 3-4 (citing Fed. R. Crim. P. 29(c), 33(b)).

As for Nissen's venue argument, the United States notes that it introduced evidence at trial that Nissen's telephone calls were "both made and received in the District of New Mexico, making venue proper here."  Response at 3.  The United States similarly argues that the Indictment's two Counts refer to conduct that occurred on different dates and in separate places, negating Nissen's double jeopardy argument.  See Response at 3.  The United States contends further that Nissen has no right to address the Grand Jury that indicted him, see Response at 3 (citing D.N.M.LR-Cr. 47.7), and asserts that Nissen forfeits nearly all of his arguments because he "merely list[s]" those arguments instead of arguing or analyzing them, Response at 3 (citing  United States v. Elliott, 684 F. App'x 685, 687 (10th Cir. 2017)(unpublished)("Forfeiture occurs when the [movant] fails to timely and adequately present the argument in district court."); United States v. Brune, 767 F.3d 1009, 1019 (10th Cir. 2014)).  As for Nissen's apparent religious objections, the United States notes that Nissen does not describe how his "conduct was, in any way, based on religious beliefs," negating Nissen's claim under RFRA.  Response at 4-5.  Additionally, in response to Nissen's assertion that he is a "'non citizen national sovereign,'" the United States notes that Nissen was born in New Mexico in 1955 and is therefore a United States citizen.  Response at 5 (quoting Second MTD at 11).  The United States also disagrees with Nissen's contention that the Court violated the Monroe Doctrine, noting that the Monroe Doctrine discouraged European involvement in the Western Hemisphere and did not implicate federal jurisdiction.  See Response

at 6.  As for Nissen's argument that his being shackled biased the jury against him, the United

States argues that the Court "ordered . . . limited restraint after thorough briefing and analysis,"

and contends that there is no evidence that the jury saw Nissen's shackles.  Response at 6.

The United States also asks that the Court caution Nissen that "his behavior makes him

potentially liable for an upward sentencing departure under [United States Sentencing Guidelines

Manual] § 5K2.0 for obstruction of justice, or a variance for the same reasons."  Response at 2

(citing United States v. Jagim, 978 F.2d 1032, 1039 (8th Cir. 1992); United States v. Taylor, 509

F. App'x 205, 211-12 (4th Cir. 2013)(unpublished); United States v. Goldberg, 937 F. Supp. 1121,

1133-34 (M.D. Pa. 1996)(McClure, J.)).  Finally, the United States asserts that Nissen's counsel,

Joe Romero[3] "appears to be completely blameless in these pro se filings."  Response at 6.  The

United States accordingly requests that the Court deny Nissen's motions.  See Response at 6.

### i.    The Discovery Response.

The United States responds to Nissen's Grand Jury Motion.  See Discovery Response at 1.

The United States contends that rules 6, 12, and 16 of the Federal Rules of Criminal Procedure,

which Nissen cites in the Grand Jury Motion, "do not authorize[] and certainly do not compel" the

materials that Nissen seeks.  Discovery Response at 1.  The United States posits that Nissen

violates D.N.M.LR-CR 47.7 for improper citation to authority, and that the Court may deny the

Grand Jury Motion on that basis.  See Discovery Response at 1.  The United States then says that,

"as far as [it] can tell, there is no relief [Nissen] could receive from obtaining those materials, he is

not entitled to review them, and the United States is not authorized to disclose them to him."  Discovery

---

[3]Mr. Romero is Nissen's appointed counsel pursuant to the Criminal Justice Act, 18 U.S.C. § 3006A.  By the Court's count, Mr. Romero is Nissen's fifth attorney in this matter.  See, e.g., Order at 1, filed March 6, 2020 (Doc. 122).

Response at 1. The United States also says that it disclosed all questions asked of the Grand Jury witnesses as well as their answers as part of its Jencks Act,[4] 18 U.S.C. § 3500, disclosure. See Discovery Response at 1 n.1. The United States closes by asserting that, because counsel represents Nissen, he should not benefit from the solicitude that the Court typically affords pro se parties. See Discovery Response at 2.

**j.    The Hearing.[5]**

---

[4]In Jencks v. United States, 353 U.S. 657 (1957), the Supreme Court of the United States held that a

> criminal action must be dismissed when the Government, on the ground of privilege, elects not to comply with an order to produce, for the accused's inspection and for admission in evidence, relevant statements or reports in its possession of government witnesses touching the subject matter of their testimony at trial.

353 U.S. at 672. In so holding, the Supreme Court recognized that the rationale of the criminal cases is that, because the government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense. 353 U.S. at 671. Congress later codified the Jencks v. United States into 18 U.S.C. § 3500. See United States v. Kimoto, 588 F.3d 464, 475 (7th Cir. 2009)(explaining that "the Jencks Act, 18 U.S.C. § 3500[,] . . . was enacted in response to the Supreme Court's holding in Jencks v. United States, 353 U.S. 657 . . .").

"The Jencks Act requires the government to disclose to criminal defendants any statement made by a government witness that is 'in the possession of the United States' once that witness has testified." United States v. Lujan, 530 F. Supp. 2d 1224, 1232 (D.N.M. 2008)(Brack, J.)(quoting 18 U.S.C. §§ 3500(a) & (b)). The Jencks Act "manifests the general statutory aim to restrict the use of such statements to impeachment." Palermo v. United States, 360 U.S. 343, 349 (1959). The Jencks Act's purpose is "not only to protect Government files from unwarranted disclosure but also to allow defendants materials usable for the purposes of impeachment." United States v. Smaldone, 544 F.2d 456, 460 (10th Cir. 1976)(citing Palermo v. United States, 360 U.S. at 352).

[5]On February 21, 2020, Nissen filed a 42 U.S.C. § 1983 action against the Court. See Nissen v. Browning, No. CIV 20-0151 PJK, Complaint for Violation of Civil Rights, filed February 21, 2020 (Doc. 1)("Complaint"). In the Complaint, Nissen contends that the Court violated Nissen's "First, Fourth, Fifth, Eighth, Tenth[,] Elev[e]nth, Fourteenth, [and] Twenty-Third Constitutional Amendments" Complaint at 3. The Honorable Paul J. Kelly, United States

The Court held a hearing on March 23, 2020.  See Draft Transcript of Motion Hearing at 1:4 (taken March 23, 2020)(Court)("Tr.").[6]  Although Nissen, who is incarcerated, was set for transport to the Court for the hearing, Nissen refused the United States Marshal's Service's medical protocols set in place to minimize the spread of COVID-19.  See Tr. at 3:10-15 (Court).  The Court received an email that morning from Anthea Nevarrez, Deputy United States Marshal, which the Court read into the record, informing the Court that Nissen "'refused pretransport medical protocols set in place for COVID-19.  This was despite verbal attempts at obtaining compliance from faculty staff.  This defendant is known for both physical and verbal resistance.  As such, he will not be transported to the courtroom.'"  Tr. at 3:15-22 (Court)(quoting Email from Anthea Nevarrez to Carolyn Wright (dated March 23, 2020), filed March 23, 2020 (Doc. 129)).  Accordingly, Nissen participated in the hearing telephonically.  See Tr. at 2:1-3 (Court, Nissen).

Nissen's counsel, Joe Romero, began by noting that he had attempted to dissuade Nissen from pursuing the motions by writing a "7-page, single spaced memo" outlining his positions.  Tr.

_____

Circuit Judge for the United States Court of Appeals for the Tenth Circuit, sitting by designation, dismissed the Complaint on March 11, 2020.  See Nissen v. Browning, No. CIV 20-0151, Order at 1, filed March 11, 2020 (Doc. 3).  Judge Kelly held that the Complaint is "frivolous and fails to state a claim on which relief may be granted."  Order at 2.  Judge Kelly noted that, to the extent that Nissen invokes Bivens v. Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971), "his claims would fail because they would involve an extension of Bivens in a new context against a new category of defendants."  Order at 2 (citing Hernandez v. Mesa, 140 S. Ct. 735, 742-33 (2020).  Judge Kelly also notes that "official capacity claims against a federal district judge generally are barred by sovereign immunity."  Order at 2 (citing Smith v. Krieger, 389 F. App'x 789, 795 (10th Cir. 2010)(unpublished))  Judge Kelly concludes that judges' judicial functions are absolutely immune against individual-capacity suits.  See Order at 2 (citing Peterson v. Timme, 621 F. App'x 536, 542 (10th Cir. 2015)).  "In any event," Judge Kelly held, "Mr. Nissen has an adequate remedy at law, an appeal or postconviction motion, thereby precluding [his requested] relief."  Order at 2 (citing Switzer v. Coan, 261 F.3d 985, 991 (10th Cir. 2001)).

    [6]The Court's citation refers to the unedited draft transcript.  Accordingly, page and line numbers are subject to slight change in the final edited version.

at 4:25-5:2 (Romero).  Nissen interrupted Mr. Romero, and asserted that, "under the code of conduct, you're supposed to do as I ask, and represent me in the form I wish and seek this done. You are not doing it." Tr. at 5:19-22 (Nissen).  Nissen expressed a similar view throughout the hearing, asserting his displeasure at not being physically present with his attorney.  See, e.g., Tr. at 6:24-7:7 (Nissen).  Nissen would not permit Mr. Romero to speak, asserting that Mr. Romero speaking without Nissen physically present violates Nissen's due process and equal protection rights.  See, e.g., Tr. at 6:11-18 (Nissen).  When the Court told Nissen that he was invited to attend in person, but refused the transport protocol, Nissen asserted that he refused for religious reasons, and that holding the hearing without his physical presence violates his First Amendment religious rights.  See Tr. at 6:24-7:7 (Court, Nissen).

Nissen refused throughout the hearing to allow others, including the Court, to speak without interruption.  See, e.g., Tr. at 9:13-20 (Mysliwiec, Nissen, Court).  The Court Reporter noted that she could not transcribe the hearing while Nissen spoke over the Court and the attorneys, see Tr. at 9:12-13 (Reporter), so the Court instructed its courtroom deputy to mute Nissen's microphone when it was others' turn to speak, see Tr. at 9:17-18 (Court).  Nissen objected, stating: "You're violating my rights again, Lord Baron Browning." Tr. at 13:7-8 (Nissen).  Nissen then objected that he is receiving ineffective assistance of counsel, referring to "Mr. Romero, Esquire, which is illegal by Article 1, Section 9, Clause No. 8, no title of nobility should be given to anybody by any king or prince, period." Tr. at 15-13-16 (Nissen).  Nissen then contended that he is a "sovereign of the United States of America," and therefore immune from prosecution. Tr. at 16:8-11 (Nissen).

Turning to the motions, Mr. Romero noted that the United States disclosed the Grand Jury transcript to Nissen and his counsel at the time well before the trial.  See Tr. at 18:21-19:10

(Romero).  Mr. Romero said that he reviewed the transcript and "didn't see anything actionable." Tr. at 19:6-7 (Romero).  Mr. Romero also noted that, at trial, Nissen's former counsel cross-examined the United States' witnesses whether Nissen transmitted his communications in interstate commerce.  See Tr. at 19:17-19 (Romero).  The United States then declined to add any argument beyond its briefing.  See Tr. at 20:4-6 (Mysliwiec).  The Court then orally denied the Grand Jury Motion, noting that Nissen had already received the requested materials and has not shown any need for them.  See Tr. at 20:11-14 (Court).

The Court turned to the Motion to Amend, and indicated that it studied the Mobile Telecommunications Sourcing Act and could not divine how that statute applies to § 875(c).  See Tr. at 24:23-25:9 (Court).  Mr. Romero declined to add any argument to the Motion to Amend. See Tr. at 25:12-14 (Romero).  The United States declined to add any argument beyond its briefing. See Tr. at 25:16-20 (Mysliwiec).  Nissen did not accept the Court's invitation to argue the Motion to Amend, asserting instead that the Court and the United States were violating his constitutional rights.  See Tr. at 24:3-7 (Nissen, Court).  The Court orally denied the Motion to Amend.  See Tr. at 25:9-11 (Court).

Turning to the MTD, the Court noted that it had previously addressed its subject-matter jurisdiction and noted that Nissen raises no new arguments regarding its jurisdiction.  See Tr. at 26:22-25 (Court).  The Court noted that Nissen does not identify any mistake of law, change in circumstances, or manifest injustice that would compel the Court's reconsideration of the MOO. See Tr. at 27:1-4 (Court).  The Court also asserted that venue is proper, because Nissen's communications, for which he was tried and convicted, originated in New Mexico.  See Tr. at 27:4-5 (Court).  As for Nissen's double jeopardy assertion, the Court said that two separate acts, occurring on separate dates and directed at separate individuals, form the bases for the Indictment's

two Counts.  <u>See</u> Tr. at 27:12-18 (Court).  The Court further noted that, although Nissen did not appear before the Grand Jury, defendants typically do not have such a right.  <u>See</u> Tr. at 27:19-21 (Court).  Finally, the Court noted that, despite Nissen's argument against extraterritorial application of the United States' laws, Nissen's conduct occurred entirely in New Mexico.  <u>See</u> Tr. at 28:1-4 (Court).  Accordingly, the Court denied the MTD.  <u>See</u> Tr. at 27:6-8 (Court).

The Court then turned to the Motion for Acquittal.  <u>See</u> Tr. at 27:10-12 (Court).  The Court invited Nissen to argue the Motion for Acquittal, <u>see</u> Tr. at 28:16-18 (Court), but Nissen declined, asserting that the Court was "violating the law with [its] arbitrary abuse of powers," Tr. at 29:6-7 (Nissen).  Mr. Romero and the United States declined to add anything to the Motion for Acquittal.  <u>See</u> Tr. at 29:14-19 (Romero, Court, Mysliwiec).  The Court then stated that the Motion for Acquittal is untimely, because Nissen filed it five months after his conviction, and concluded that Nissen has not demonstrated any excuse for the motion's untimeliness.  <u>See</u> Tr. at 29:23-30:4 (Court).  As for the motion's merits, the Court noted that Nissen complains of the Court's ruling, orders, and memorandum opinions -- argument more properly raised on appeal before the Tenth Circuit.  <u>See</u> Tr. at 30:10-14 (Court).  The Court also concluded that the evidence introduced at trial is enough to justify Nissen's conviction.  <u>See</u> Tr. at 30:15-16 (Court).  The Court also discussed Nissen's allegations that the Assistant United States Attorneys prosecuting this case acted improperly, noting that Nissen does not specify any misconduct.  <u>See</u> Tr. at 30:23-31:4 (Court).  Accordingly, the Court denied the Motion for Acquittal.  <u>See</u> Tr. at 31:6-10 (Court).

The Court turned to the Second Acquittal Motion, but Nissen interrupted the Court, asserting: "You're violating my constitutional Fifth, Sixth, and Fourteenth Amendments, along with my First." Tr. at 31:12-16.  <u>See id.</u> at 31:8-11 (Court).  The Court invited Nissen to argue the Second Acquittal Motion, but Nissen did not respond, instead repeating his allegation that the

Court was violating his constitutional rights.  See Tr. at 31:8-11 (Court, Nissen).  The Court nonetheless discussed the Second Acquittal Motion's merits and noted that, despite Nissen's ex post facto allegation, § 875(c) became law before the charged conduct in August, 2018.  See Tr. at 32:17-23 (Court).  The Court also noted that Nissen asserts no new arguments in the Second Acquittal Motion, does not specify any misconduct by the Assistant United States Attorneys, and does not justify the motion's untimeliness.  See Tr. at 32:24-33:4 (Court).  Accordingly, the Court denied the Second Acquittal Motion.  See Tr. at 33:1-7 (Court).

Turning to the Third Acquittal Motion, Nissen stated: "Yes, the perjury that you allowed in your courtroom, which is highlighted, all the hidden evidence and what you did to the lawyers to tell them to be quiet about the interstate foreign commerce, how it can only be regulated, oh, I saw what you did."  Tr. at 33:11-16 (Nissen).  Nissen then declined the Court's invitation to elaborate on his Religious Freedom Restoration Act argument, asserting instead that the Court, the Assistant United States Attorney, and Mr. Romero are "treasonous."  Tr. at 34:3 (Nissen).  See id. at 33:17-24 (Court, Nissen).  Mr. Romero and the United States declined to add any argument.  See Tr. at 34:8-12 (Romero, Court, Mysliwiec).  The Court then stated that it had studied carefully the Third Motion for Acquittal and the attached transcript, and concluded that Nissen has not identified any religious aspect to his threatening communications, making it difficult for the Court to understand Nissen's First Amendment and Religious Freedom Restoration Act contentions.  See Tr. at 35:1-10 (Court).  Accordingly, the Court denied the Third Motion for Acquittal.  See Tr. at 35:9-11 (Court).

The Court turned to the Second MTD.  See Tr. at 36:3-6 (Court).  The Court invited Nissen to argue the Second MTD, but Nissen only repeated his allegation that the Court was violating his rights.  See Tr. at 36:7-19 (Court, Nissen).  Neither Mr. Romero nor the United States had anything

to add to the Second MTD.  See Tr. at 36:21-25 (Court, Romero, Mysliwiec).  The Court again

invited Nissen to argue the Second MTD, see Tr. at 37:3-5 (Court), and Nissen responded:

> You've already heard me and you're just going to dismiss it because you're
> violating my constitutional rights.  You know the law, you know how it's written.
> You're not adhering to it.  My First Amendment rights of Freedom of Restoration
> Act clearly says it.  I was in here and I left by it because of my First Amendment
> rights.  That's why we're on the phone.  But you continue to violate my First
> Amendment constitution, right along with the rest of it, Mr. Browning.  You're not
> even worthy of your title.  You're just a human.

Tr. at 37:8-18 (Nissen).  The Court then indicated that it addressed, in the MOO, most of what

Nissen alleges in the Second MTD, including whether any political commentary in the

communications for which Nissen was convicted rendered that speech protected or outside

§ 875(c)'s scope.  See Tr. at 37:21-24 (Court).  The Court also noted that the Monroe Doctrine is

inapposite, because that concept relates to the United States' early efforts at inhibiting European

influence in the Western Hemisphere.  See Tr. at 37:24-38:4 (Court).  The Court also noted that,

at trial, the Court ordered very limited restraint and took care to ensure that the jury could not see

that Nissen was restrained.  See 38:9-14 (Court).  The Court further said that such restraint may

have prevented Nissen from prejudicing his own trial.  See Tr. at 40:1-4 (Court).  At that point, a

Deputy United States Marshal informed the Court that Nissen had hung up the telephone and ended

his telephonic appearance.  See Tr. at 38:16-18 (Court).  The Court then denied the Second MTD.

See Tr. at 40:4-5 (Court).

The Court noted that Nissen had filed a motion for leave to proceed in forma pauperis.  See

Tr. at 40:6-8 (Court).  The Court, the United States, and Mr. Romero agreed that Nissen probably

intended to file that motion in connection with his civil rights complaint and not in this case.  See

Tr. at 40:15-23 (Romero); id. at 41:10-18 (Romero, Mysliwiec, Court).  The Court then denied

that motion, because Nissen has Court-appointed counsel pursuant to the Criminal Justice Act

of 1964, 18 U.S.C. § 3006A, and because Judge Kelly had dismissed Nissen's civil case.  See Tr. at 41:21-24 (Court).

Although Nissen had left the hearing, the Court then directed a statement to Nissen and asked that a transcript of the hearing be sent to him.  See Tr. at 43:22-44:4 (Court).  The Court asked Mr. Romero, in addition to providing the full transcript to Nissen, to print out the Court's statement and give it to Nissen separately.  See Tr. at 44:1-3 (Court).  The Court stated:

> Mr. Nissen, one of the things I wanted to tell you is that I know you have a lot of concerns and you're upset with the way I've handled the trial and the way things have occurred here in the courtroom, not only today, but during your trial, and perhaps even pretrial.  The thing is that I've done the best I can.  And I know that you have a right to go to the Tenth Circuit.  But the only way you're going to get relief is not continue to probably file motions in front of me and to continue to be uncooperative with Mr. Romero.  The only way that you're going to get some relief is to let me sentence you so that I can enter a final judgment and you can appeal it.  And you can appeal it without any cost to you.  And if you can't afford to appeal, then the court clerk will file the notice of appeal for you.  But we can't do that until I sentence you.
>
> So my strong counsel to you is to let the Court get done with sentencing you, let us enter the final judgment so that you can get to the Tenth Circuit in Denver and argue all the things that are wrong with what I've done.  It's unlikely that more motions are going to help you in any way.  And this is the way it's normally done.  I've sentenced thousands of people at this point in my career.  And you're the first person to sue me.  So I've never been sued before, and that's not the proper way to raise arguments at this stage.
>
> Right now, you can appeal to the Tenth Circuit.  And if I've done anything wrong here, they'll reverse me, and you'll come back down here to the district court.  And then, even if you don't get success on the motion -- or the appeal, you can file what is called a 2255, which is basically the federal habeas corpus.  And that's where you really raise ineffective assistance claims.  But you can raise other constitutional claims as well.
>
> So before you sue me or file other motions or things like that, really think about what we need to get done is to sentence you so that you can get up to Denver and you can talk to new judges, a new court, about what occurred here.  And you can explain to them all the errors that you think I committed, and all the things -- misconduct that you think I and the Government committed, and all the ineffective assistance.  So I would encourage you to not file more motions without Mr.

Romero's agreement; that you let me sentence you, and then you go to Denver and explain everything you want to explain to Denver about what went wrong here.

So I've asked Mr. Romero to take these pages and send them to you in a special letter, because this is what I wanted to say to you, that I understand, lots of defendants think I got things wrong, and sometimes I do. And you have a right to get to Denver. But the only way we're going to get you to Denver is to let me sentence you and enter a final judgment, so that can you head on up to Denver.

Tr. at 44:4-46:13 (Court).

## RELEVANT LAW REGARDING RFRA

Under RFRA, the federal "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," except that the federal "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person (1) is in furtherance of a compelling state interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a)-(b). "Government" is defined in part as "a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States." 42 U.S.C. § 2000bb-2(1).

Further, "a person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000bb-1(c). Congress therefore has expressly legislated that plaintiffs may sue federal agencies under RFRA. Finally, RFRA applies "to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993." 42 U.S.C. § 2000bb-3(a).

The Supreme Court of the United States has explained that a plaintiff carries the initial burden of showing a prima facie RFRA case, namely that the United States' action "would (1)

substantially burden (2) a sincere (3) religious exercise." Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 428 (2006)(Roberts, C.J.). After a plaintiff makes such a showing, the burden shifts to the United States to show that "application of the burden to the person (1) is in furtherance of a compelling state interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a)-(b). See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. at 428-29. The Supreme Court has clarified that "the burdens at the preliminary injunction stage track the burdens at trial." See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. at 429.

## LAW REGARDING THE DOUBLE JEOPARDY CLAUSE

The Fifth Amendment guarantees that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. This amendment protects individuals not only from "successive prosecutions, but also [from] successive punishments for the same offense." United States v. Morris, 247 F.3d 1080, 1083 (10th Cir. 2001)(citing United States v. Dixon, 509 U.S. 688, 696 (1993)).

The Double Jeopardy Clause often comes up in the context of multiplicity -- when a single indictment charges multiple offenses covering the same act or behavior. The United States Court of Appeals for the Tenth Circuit's "jurisprudence establishes that multiplicitous sentences violate the Double Jeopardy Clause." United States v. McCullough, 457 F.3d 1150, 1162 (10th Cir. 2006)(internal quotation marks omitted). "Multiplicity refers to multiple counts of an indictment which cover the same criminal behavior." United States v. McCullough, 457 F.3d at 1162 (quoting United States v. Johnson, 130 F.3d 1420, 1424 (10th Cir. 1997)). "Although multiplicity is not fatal to an indictment, multiplicitous counts which may result in multiplicitous convictions are

considered improper because they allow multiple punishments for a single criminal offense." United States v. McCullough, 457 F.3d at 1162 (internal quotation marks omitted).

The issue of multiplicity may arise when, for example, an indictment levies multiple assault charges against a defendant stemming from two episodes concerning a prison guard occurring close in time, see United States v. Segien, 114 F.3d 1014, 1022 (10th Cir. 1997)(discussing multiple 18 U.S.C. § 111 charges), abrogated on other grounds by Jones v. United States, 526 U.S. 227 (1999), or simultaneously mailing to the IRS several different false documents in support of a single tax return, see United States v. Bettenhausen, 499 F.2d 1223, 1234 (10th Cir. 1974). In such situations, the central question is often whether the underlying conduct is part of the same transaction or comprises distinct episodes that can be punished separately. See, e.g., United States v. Neha, No. 04-1677, 2007 WL 7017193, at *2-3 (D.N.M. Feb. 18, 2007)(Browning, J.)(concluding that the offenses charged in four counts constituted separate acts and were not multiplicitous charges for the same offensive conduct, because there was more than one rape, because the defendant was the principal in one rape, and the aider and abettor in the other, and because the alleged crimes likely did not occur at the same time).

The issue of multiplicity may also arise when the defendant is charged with violations of multiple criminal statutes for the same underlying acts or omissions. See United States v. Patterson, 760 F. Supp. 2d 1116, 1120 (D.N.M. 2009)(Browning, J.). When confronting such a situation, courts employ a two-step test: "A person may be prosecuted for more than one crime based on the same conduct (1) if each crime requires proof of a fact that the other does not, or (2) if Congress has clearly expressed its intent to impose cumulative punishment for the same conduct under different statutory provisions." United States v. Pearson, 203 F.3d 1243, 1267-68 (10th Cir. 2000)(citations omitted). When, as is often the case, there is no clearly discernible congressional

intent to impose cumulative punishment, courts use the rule of statutory construction described in Blockburger v. United States, 284 U.S. 299 (1932)("Blockburger").  See United States v. Greene, 239 F. App'x 431, 436 (10th Cir. 2007)(unpublished)(citing United States v. Morehead, 959 F.2d 1489, 1506 (10th Cir. 1992), aff'd on reh'g en banc sub nom. United States v. Hill, 971 F.2d 1461 (10th Cir. 1992)).

The Blockburger rule is often known as the "same elements test." United States v. Pearson, 203 F.3d at 1268.  "The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." Blockburger, 284 U.S. at 304.  "A single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other." Blockburger, 284 U.S. at 304 (internal quotation marks omitted).

When confronted with a multiplicitous indictment, a trial court has the discretion to dismiss the multiplicitous counts or to require the government to elect between the multiplicitous counts before trial, or to vacate one of the multiplicitous convictions after trial.  See United States v. Johnson, 130 F.3d at 1426 (citing United States v. Throneburg, 921 F.2d 654, 657 (6th Cir. 1990)). If the trial court allows multiplicitous charges to go to the jury, however, the options are more limited: "Where multiplicitous convictions are found, 'the only remedy . . . is . . . to vacate one of the underlying convictions as well as the . . . sentence based upon it.'" United States v. Barrett, 496 F.3d 1079, 1095 (10th Cir. 2007)(alterations in original)(quoting Rutledge v. United States, 517 U.S. 292, 301-02 (1996)).  The risk inherent in a failure to dispose of multiplicitous charges before trial is that it "may falsely suggest to a jury that a defendant has committed not one but

several crimes." United States v. Johnson, 130 F.3d at 1426 (internal quotation marks omitted). "Once such a message is conveyed to the jury, the risk increases that the jury will be diverted from a careful analysis of the conduct at issue, and will reach a compromise verdict or assume the defendant is guilty on at least some of the charges." United States v. Johnson, 130 F.3d at 1426 (internal quotation marks omitted).

The Double Jeopardy Clause also applies to successive punishments or successive prosecutions for the same offense. See United States v. Mintz, 16 F.3d 1101, 1104 (10th Cir. 1994). Thus, an indictment may violate the Double Jeopardy Clause if it charges a defendant with a crime for which the defendant has already been convicted or acquitted. See, e.g., United States v. Mintz, 16 F.3d at 1106 ("Since Defendants were indicted for the same conspiracy in Florida and this charge was dismissed with prejudice, to subject Defendants to a trial on the same charge in Kansas would violate the Double Jeopardy Clause of the Constitution.").

As the Supreme Court has noted, in the related context of determining when a jury instruction for a lesser-included offense may be given, an elements test is "certain and predictable," because "the elements approach involves a textual comparison of criminal statutes and does not depend on inferences that may be drawn from evidence introduced at trial." Schmuck v. United States, 489 U.S. 705, 720 (1989). See United States v. Greene, 239 F. App'x at 436 (discussing Schmuck v. United States in context of the Blockburger test). The Supreme Court has clarified, however, that the Blockburger v. United States test applies only to charges or convictions asserting violations of separate statutes, and not to separate subsections of the same criminal provision. See Sanabria v. United States, 437 U.S. 54, 70 n.24 (1978)(noting that the Blockburger test is used "to determine whether a single transaction may give rise to separate prosecutions, convictions, and/or punishments under separate statutes").

As an example of the elements test at work, in United States v. Greene, the defendant was charged and convicted for both tax evasion and making a false statement for the same act of filing a form.  See 239 F. App'x at 436.  The Tenth Circuit held that the convictions were not multiplicitous, because tax evasion required proof of a substantial tax deficiency and an intent to evade taxes, neither of which the other charge required, while the false filing count required proof of knowingly signing a false statement under oath, which was not an element of tax evasion.  See United States v. Greene, 239 F. App'x at 437-38.  By contrast, in United States v. Morehead, 959 F.2d 1489 (10th Cir. 1992), the Tenth Circuit found convictions under both 18 U.S.C. § 856(a)(1) and 18 U.S.C. § 856(a)(2) to be multiplicitous.  See 959 F.2d at 1506-08.  The 18 U.S.C. § 856(a)(2) charge required proof that the defendant knowingly maintained a house for marijuana trafficking, while the 18 U.S.C. § 856(a)(2) charge required proof that the defendant knowingly managed or controlled a house, and rented, leased, or made it available for drug trafficking.  See United States v. Morehead, 959 F.2d at 1507.  The Tenth Circuit held that managing or controlling, and maintaining, were the same, and that, thus, the 18 U.S.C. § 856(a)(2) charge had an additional element -- renting or leasing -- that was not in 18 U.S.C. § 856(a)(1), but that 856(a)(1) did not contain any element that was not part of 18 U.S.C. § 856(a)(2).  Accordingly, the counts were multiplicitous.  See United States v. Morehead, 959 F.2d at 1507.

## LAW REGARDING MOTIONS TO DISMISS IN CRIMINAL CASES

The Federal Rules of Criminal Procedure contain no analog for summary judgment under rule 56 of the Federal Rules of Civil Procedure.  See United States v. China Star, Inc., 375 F. Supp. 2d 1291, 1293 (D.N.M. 2005)(Browning, J.)("Under Tenth Circuit law, the Court is not free to determine, like on a motion for summary judgment under the Federal Rules of Civil Procedure, whether a genuine issue of material fact exists.").  "Generally, the strength or weakness of the

government's case, or the sufficiency of the government's evidence to support a charge, may not be challenged by a pretrial motion." United States v. Hall, 20 F.3d 1084, 1087 (10th Cir. 1994). When testing an indictment's sufficiency before trial, an indictment's allegations are taken as true, and courts should not consider evidence outside of the indictment. See United States v. Hall, 20 F.3d at 1087. See also United States v. Tafoya, 376 F. Supp. 2d 1257, 1260 (D.N.M. 2005)(Browning, J.). Accordingly an indictment is legally sufficient so long as it:

> (1) contains the essential elements of the offense intended to be charged, (2) sufficiently apprises the accused of what he must be prepared to defend against, and (3) enables the accused to plead an acquittal or conviction under the indictment as a bar to any subsequent prosecution for the same offense.

United States v. Hall, 20 F.3d at 1087. The Tenth Circuit has, however, carved out an exception to that general rule for cases "where the underlying facts [are] essentially undisputed and the government fail[s] to object to the district court's resort to evidence beyond the four corners of the indictment." United States v. Hall, 20 F.3d at 1087. "Under this scenario, a pretrial dismissal is essentially a determination that, as a matter of law, the government is incapable of proving its case beyond a reasonable doubt." United States v. Hall, 20 F.3d at 1088 (emphasis in original).

The Federal Rules of Criminal Procedure permit defendants, however, to assert defects other than evidentiary insufficiency before trial, because rule 12(b) allows parties to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). See Fed. R. Crim. P. 12(b)(1) advisory committee note to 2014 amendments ("The more modern phrase 'trial on the merits' is substituted for the more archaic phrase 'trial of the general issue.' No change of meaning is intended."). That "Rule 47 applies to a pretrial motion," Fed R. Crim. P. 12(b)(1), means that the Court may consider evidence outside of the indictment, see Fed. R. Crim. P. 47(d)

## LAW REGARDING MOTIONS FOR JUDGMENT OF ACQUITTAL

Rule 29 of the Federal Rules of Criminal Procedure provides:

(a)     Before Submission to the Jury.  After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction.   The court may on its own consider whether the evidence is insufficient to sustain a conviction.  If the court denies a motion for a judgment of acquittal at the close of the government's evidence, the defendant may offer evidence without having reserved the right to do so.

(b)     Reserving Decision.  The court may reserve decision on the motion, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict. If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved.

(c)     After Jury Verdict or Discharge.

(1)     Time for a Motion.  A defendant may move for a judgment of acquittal, or renew such a motion, within 7 days after a guilty verdict or after the court discharges the jury, whichever is later.

(2)     Ruling on the Motion.  If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal. If the jury has failed to return a verdict, the court may enter a judgment of acquittal.

(3)     No Prior Motion Required.  A defendant is not required to move for a judgment of acquittal before the court submits the case to the jury as a prerequisite for making such a motion after jury discharge.

(d)     Conditional Ruling on a Motion for a New Trial.

(1)     Motion for a New Trial.  If the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed. The court must specify the reasons for that determination.

(2)     Finality.  The court's order conditionally granting a motion for a new trial does not affect the finality of the judgment of acquittal.

(3)     Appeal.

(A)     Grant of a Motion for a New Trial.  If the court conditionally grants a motion for a new trial and an appellate court later reverses the judgment of acquittal, the trial court must proceed with the new trial unless the appellate court orders otherwise.

(B)     Denial of a Motion for a New Trial.  If the court conditionally denies a motion for a new trial, an appellee may assert that the denial was erroneous.  If the appellate court later reverses the judgment of acquittal, the trial court must proceed as the appellate court directs.

Fed. R. Crim. P. 29 (bold omitted).  In Jackson v. Virginia, 443 U.S. 307 (1979), the Supreme Court noted that the long-settled practice of allowing federal courts to enter judgments of acquittal when evidence is insufficient to sustain a conviction "only . . . highlight[s] the traditional understanding in our system that the application of the beyond-a-reasonable-doubt standard to the evidence is not irretrievably committed to jury discretion."  443 U.S. at 317 n.10.  A judgment of acquittal thus enables a federal district court to protect a defendant's due process rights by removing from jury consideration a charge with respect to which no rational trier of fact could find guilt beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S. at 317-19.

In deciding a motion for judgment of acquittal, the court must ask "only whether taking the evidence -- both direct and circumstantial, together with the reasonable inferences to be drawn therefrom -- in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt."  United States v. McKissick, 204 F.3d 1282, 1289 (10th Cir. 2000).  The court relies on the jury, "as the fact finder, to resolve conflicting testimony, weigh the evidence, and draw inferences from the facts presented."  United States v. McKissick,

204 F.3d at 1289.   See United States v. Brooks, 438 F.3d 1231, 1236 (10th Cir. 2006)("Furthermore, it is not our duty to weigh conflicting evidence nor to consider the credibility of witnesses.").   The court must refrain from "examining the evidence in 'bits and pieces'" and must instead "evaluate the sufficiency of the evidence by 'consider[ing] the collective inferences to be drawn from the evidence as a whole.'"   United States v. Brooks, 438 F.3d at 1236 (quoting United States v. Wilson, 107 F.3d 774, 778 (10th Cir. 1997))(alteration in United States v. Wilson).

The court's role is to determine whether the evidence, if believed, would establish each element of the crime.   See United States v. Delgado-Uribe, 363 F.3d 1077, 1081 (10th Cir. 2004)(citing United States v. Vallo, 238 F.3d 1242, 1247 (10th Cir. 2001)).   "[T]he evidence necessary to support a verdict 'need not conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt.'"   United States v. Wood, 207 F.3d 1222, 1228 (10th Cir. 2000)(quoting United States v. Wilson, 182 F.3d 737, 742 (10th Cir. 1999)).   The court should enter a judgment of acquittal only if no reasonable juror could have found the defendant guilty.   See United States v. Carter, 130 F.3d 1432, 1439 (10th Cir. 1997)("We will not overturn a jury's finding unless no reasonable juror could have reached the disputed verdict." (citing United States v. Chavez-Palacios, 30 F.3d 1290, 1294 (10th Cir. 1994); United States v. Hoenscheidt, 7 F.3d 1528, 1530 (10th Cir. 1993)).   The court should not find that there is enough evidence to support a conviction, however, if a conviction can only be "obtained by piling inference upon inference.   'An inference is reasonable only if the conclusion flows from logical and probabilistic reasoning.'"   United States v. Valadez-Gallegos, 162 F.3d 1256, 1262 (10th Cir. 1998)(quoting United States v. Taylor, 113 F.3d 1136, 1144 (10th Cir. 1997); and citing United States v. Jones, 44 F.3d 860, 865 (10th Cir. 1995)).   The Tenth Circuit stated in United States v. Summers, 414 F.3d 1287 (10th Cir. 2005):

The rule prohibiting the stacking of inference upon inference merely indicates that at some point along a rational continuum, inferences may become so attenuated from underlying evidence as to cast doubt on the trier of fact's ultimate conclusion.  In other words, "the chance of error or speculation increases in proportion to the width of the gap between underlying fact and ultimate conclusion where the gap is bridged by a succession of inferences, each based upon the preceding one." United States v. Shahane, 517 F.2d 1173, 1178 (8th Cir. 1975).

United States v. Summers, 414 F.3d at 1294-95.

## LAW REGARDING GRAND JURY TRANSCRIPTS

In recognition of the Grand Jury's status as an independent institution, courts afford Grand Jury proceedings a presumption of regularity.  See United States v. Johnson, 319 U.S. 503, 512-13 (1943).  "This presumption attaches even after the Grand Jury has returned an initial indictment. After all, superseding indictments setting forth new charges or adding new defendants are familiar fare." United States v. Flemmi, 245 F.3d 24, 28 (1st Cir. 2001).  A "'Grand Jury proceeding is accorded a presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the Grand Jury process.'" United States v. R. Enters., Inc., 498 U.S. 292, 301 (1991)(quoting United States v. Mechanik, 475 U.S. 66, 75 (1986)(O'Connor, J., concurring)). To be entitled to production, the defendant must show a "particularized need" for the documents that outweighs the public policy of Grand Jury secrecy.  United States v. Warren, 747 F.2d 1339, 1347 (10th Cir. 1984).  The particularized need requirement, however, is not satisfied when a party attempts to engage in a fishing expedition in the hopes of discovering useful material.  See United States v. Kim, 577 F.2d 473, 478 (9th Cir. 1978).  "A simple desire for the Grand Jury transcripts in the unsubstantiated hope that something might turn up is insufficient to require disclosure." United States v. Battle, 1997 WL 447814, at *18 (D. Kan. June 27, 1997)(Crow, J.).

In Douglas Oil. Co. v. Petrol Stops Northwest, 441 U.S. 211 (1979), the Supreme Court sets forth the standard for reviewing whether Grand Jury transcripts should be produced:

Parties seeking Grand Jury transcripts under Rule 6(e) must show that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed. Such a showing must be made even when the Grand Jury whose transcripts are sought has concluded its operations. . . . For in considering the effects of disclosure on Grand Jury proceedings, the courts must consider not only the immediate effects upon a particular Grand Jury, but also the possible effect upon the functioning of future grand juries. . . . [T]he interests in Grand Jury secrecy, although reduced, are not eliminated merely because the Grand Jury has ended its activities.

Douglas Oil, Co. v. Petrol Stops Nw., 411 U.S. at 222 (footnotes omitted).

"Despite the strong policy of maintaining the secrecy of Grand Jury proceedings, in certain situations disclosure of Grand Jury minutes and transcripts is appropriate where justice demands." United States v. Pottorf, 769 F. Supp. 1176, 1180 (D. Kan. 1991)(Saffels, J.). The decision whether the district court should release Grand Jury transcripts is committed to the district court's sound discretion. See In re Lynde, 922 F.2d 1448, 1451 (10th Cir. 1991).

"The rule is as exacting when the defendant asks for the protected materials in order to challenge the propriety of the Grand Jury proceedings." United States v. Battle, 1997 WL 447814, at *18. "Before disclosure of the Grand Jury transcripts, which would corroborate the Defendants' arguments[,] can be ordered, the Defendants must offer evidence of a 'substantial likelihood of gross or prejudicial irregularities in the conduct of the Grand Jury.'" United States v. Cannistraro, 800 F. Supp. 30, 50 (D.N.J. 1992)(Lechner, J.)(quoting United States v. Budzanoski, 462 F.2d 443, 454 (3d Cir. 1972)). Mere speculation over what may have occurred is not enough to meet this burden or to overcome the presumption of regularity attached to Grand Jury proceedings. See United States v. Santoro, 647 F. Supp. 153, 172-73 (E.D.N.Y. 1986)(McLaughlin, J.), rev'd on other grounds, United States v. Davidoff, 845 F.2d 1151 (2d Cir. 1988).

"Notwithstanding the presumption of regularity, prosecutors do not have carte blanche in Grand Jury matters." United States v. Flemmi, 245 F.3d at 28. "However, a party asserting a claim of Grand Jury abuse must shoulder a heavy burden. One way to carry this burden is to show that the government used the Grand Jury principally to prepare pending charges for trial." United States v. Flemmi, 245 F.3d at 28. The United States may not use the Grand Jury solely to bolster its case, "although this may be an incidental benefit." United States v. Gibbons, 607 F.2d 1320, 1328 (10th Cir. 1979)("[I]t is improper to use the Grand Jury for the primary purpose of strengthening the Government's case on a pending indictment or as a substitute for discovery."). "However, where there is another legitimate purpose behind the Grand Jury investigation, the proceeding would not be improper merely because the Government may derive an incidental benefit." United States v. Gibbons, 607 F.2d at 1328 (holding that the defendant did not show an abuse of the Grand Jury system, because he did "not demonstrate[ ] that [a witness'] testimony before the Grand Jury was for the sole or dominant purpose of preparing a pending indictment for trial"). Accord United States v. Woods, 544 F.2d 242 (6th Cir. 1976)("[S]o long as it is not the sole or dominant purpose of the Grand Jury to discover facts relating to (a defendant's) pending indictment, the Court may not interfere with the Grand Jury's investigation.").

These propositions are more simply stated than applied. See United States v. Flemmi, 245 F.3d at 28. In United States v. Flemmi, the United States Court of Appeals for the First Circuit recognized that

> there is a fine line between an improper "trial preparation" use of a Grand Jury and a proper "continuing investigation" use. This fine line is difficult to plot and, in most instances, determining whether a prosecutor has overstepped it will depend on the facts and circumstances of the particular case.
>
> To assist in the inquiry, courts have devised certain proxies. Thus, if a Grand Jury's continuing indagation results in the indictment of parties not

previously charged, the presumption of regularity generally persists.  United States v. Gibbons, 607 F.2d 1320, 1328-29 (10th Cir. 1979).  So too when the Grand Jury's investigation leads to the filing of additional charges against previously indicted defendants.  In re Grand Jury Proceedings (Johanson), 632 F.2d 1033, 1041 (3d Cir. 1980).  These are purposes befitting the accepted institutional objectives of the Grand Jury, and their presence bears convincing witness to the propriety of the prosecutor's stewardship.  See United States v. Sasso, 59 F.3d 341, 351-52 (2d Cir. 1995); In re Maury Santiago, 533 F.2d 727, 730 (1st Cir. 1976); United States v. Dardi, 330 F.2d 316, 336 (2d Cir. 1964).

United States v. Flemmi, 245 F.3d at 28.

## ANALYSIS

The Court denies each of Nissen's motions.  Nissen generally cites constitutional provisions without elaborating how those provisions apply to him or entitle him to relief.  See, e.g., Second Acquittal Motion at 1-2 (stating that ex post facto laws are illegal and that § 875(c) is an ex post facto law, and so § 875(c) is "illegal and unlawful under the United States Constitution" (capitalization altered)).  The Court has reviewed carefully Nissen's motions, however, and addresses each argument insofar as an argument is made.  The Court concludes that Nissen's motions are generally untimely, save for his jurisdictional arguments.  Nonetheless, the Court also concludes that Nissen does not establish any error or change of law that compels the Court to reconsider to the MOO.  Finally, the Court concludes that Nissen does not point to any rule of criminal procedure, statute, or constitutional provision that entitles him to relief.  Accordingly, the Court denies the motions.

## I.   NISSEN IS NOT ENTITLED TO ANY GRAND JURY MATERIALS.

Nissen requests: (i) the "names and addresses of all government attorneys" who appeared before or presented evidence to the Grand Jury; (ii) "a statement as to whether any unsworn witnesses or unauthorized persons were present in the grant jury room"; (iii) information on when the Grand Jury commenced its duties; and (iv) "a transcript of the Grand Jury minutes."  Grand

Jury Motion at 1-2 (capitalization altered).  Nissen does not specify why he seeks these materials and does not allege specifically any improprieties in the Grand Jury proceedings.  The Court divines from Nissen's request, however, that Nissen suspects that unauthorized or unsworn witnesses appeared before the Grand Jury.  In a separate motion, Nissen also complains that he was not summoned to appear before the Grand Jury.  See Second Acquittal Motion at 3.  Nissen also requests, in a separate motion, any call logs that the United States gathered in investigating Nissen before his indictment.  See Second MTD at 3.

The United States' duty to disclose in criminal cases arises from at least three sources: (i) rule 16 of the Federal Rules of Criminal Procedure; (ii) the Due Process Clause of the Fifth Amendment; and (iii) the Jencks Act.  Put roughly, rule 16 requires the United States to disclose items material to the defense, items it intends to use in its case-in-chief, and items it obtained from the defendant.  See Fed. R. Crim. P. 16.  The Due Process Clause requires the United States to furnish information in its possession to the defense that is favorable to the accused.  See Brady v. Maryland, 373 U.S. 83 (1963).  Finally, the Jencks Act requires the United States to disclose statements that its witnesses made if those statements are in the United States' possession and relate to those witnesses' trial testimony, after those witnesses have testified at trial.

Rule 16 provides that, upon a defendant's request, the United States must disclose, among other materials, "the defendant's recorded testimony before a Grand Jury relating to the charged offense."  Fed. R. Crim. P. 16(1)(B)(iii).  Criminal defendants may not, however, embark on a "broad or blind fishing expedition among documents possessed by the Government."  Jencks v. United States, 353 U.S. at 667 (quoting Gordon v. United States, 344 U.S. 414, 419 (1953)).  Further, Grand Jury proceedings are "'accorded a presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the Grand Jury process.'"  United

States v. R. Enters., Inc., 498 U.S. at 301 (quoting United States v. Mechanik, 475 U.S. at 75).  To

obtain Grand Jury transcripts under rule 6(e), Nissen must show that this material is necessary to

avoid a possible injustice "in another proceedings, and that the need for disclosure is greater than

the need for continued secrecy, and that [his] request is structured to cover only material so

needed."  Douglas Oil, Co. v. Petrol Stops Nw., 411 U.S. at 222.  Nissen does not demonstrate

what injustice would result from his lack of access to the Grand Jury transcript or any other records

of its proceedings.  Further, Nissen received certain Grand Jury materials already as part of the

United States' disclosure pursuant to the Jencks Act.  See Discovery Response at 1 n.1.  To the

extent that Nissen alleges impropriety in the Grand Jury proceedings, he carries a heavy burden.

"One way to carry this burden is to show that the government used the Grand Jury principally to

prepare pending charges for trial."  United States v. Flemmi, 245 F.3d at 28.  There is no allegation

or evidence that the United States so used the Grand Jury proceedings.  Because Nissen

demonstrates no need for the Grand Jury materials at this point, and because he received relevant

Grand Jury materials in the United States' Jencks disclosure, Nissen is not entitled to his requested

materials.

Nissen also complains that he was never summoned to appear before the Grand Jury.  See

MTD at 2.  The Court understands Nissen to argue that his inability to appear and testify before

the Grand Jury violates his Fifth Amendment rights against self-incrimination.  See MTD at 2.

The Fifth Amendment provides, in part, that "[n]o person shall be held to answer for a capital, or

otherwise infamous crime, unless on a presentment of a Grand Jury."  U.S. Const. amend. V.  The

Grand Jury typically plays two roles in the federal criminal justice system:  (i) it assists the United

States in investigating possible crimes by issuing subpoenas; and (ii) it ensures that indictments

will issue only on sufficient evidence.  See United States v. Williston, 862 F.3d 1023, 1031 (10th

Cir. 2017)("The grand jury functions as both a shield and a sword."). By tradition, the Grand Jury

operates in secret. See United States v. Procter & Gamble Co., 356 U.S. 677, 681 (1958)("[W]e

start with a long-established policy that maintains the secrecy of the grand jury proceedings in the

federal courts."). Accordingly, neither potential defendants nor their counsel has a right to appear

before a Grand Jury unless subpoenaed. See United States v. Williams, 504 U.S. 36, 51-54 (1992).

Nissen's assertion that not compelling him to appear before the Grand Jury is a Fifth Amendment

violation, therefore, lacks a sound basis in the applicable law and in the case's facts.

## II.   THE MOBILE TELECOMMUNICATIONS SOURCING ACT DOES NOT AFFORD NISSEN ANY RELIEF.

In the Motion to Amend, Nissen quotes several of the Mobile Telecommunications

Sourcing Act's provisions and asserts that the statute requires the Court to acquit him. See Motion

to Amend at 1-2. Specifically, Nissen wishes to amend one of his earlier motions to dismiss -- he

does not provide which -- to include the Mobile Telecommunications Sourcing Act argument. See

Motion to Amend at 1. As the Honorable John Broomes, United States District Judge for the

United States District Court for the District of Kansas, describes,

> In 1989, the United States Supreme Court limited states' authority to tax interstate telephone calls by holding that a state could only tax a call if it originated or terminated in the state and was charged to an in-state address. [People ex rel. Schneiderman v. Sprint Nextel Corp., 42 N.E.3d 655, 657 (N.Y. 2015)](citing Goldberg v. Sweet, 488 U.S. 252 (1989)). This rule subsequently became problematic with the spread of mobile phones, with calls sometimes being subject to taxation by multiple jurisdictions, and with the advent of flat-rate voice plans, which made it difficult to determine which mobile calls to tax. This prompted Congress to enact the Mobile Telecommunications Sourcing Act, 4 U.S.C. § 116 et seq., which adopted a "sourcing" rule that said the only state that can impose a sales tax on calls is the state of the customer's place of primary use. Id.

In re Sprint Nextel Derivative Litig., No. 12-2242-JWB-KGG, __ F. Supp. 3d __, 2020 WL

534500, at *1 n.5 (D. Kan. Feb. 3, 2020)(Broomes, J.). The Mobile Telecommunications Sourcing

Act thus authorizes state taxation for wireless telecommunication charges at the customer's "place of primary use," 4 U.S.C. §§ 121 and 122, and provides rules for determining how states and local governments may treat charges and taxes for mobile telecommunication services, see 4 U.S.C. §§ 116 to 126.

Although Nissen does not so state expressly, the Court assumes Nissen's argument to be that, because the Mobile Telecommunications Sourcing Act specifies that New Mexico has taxing authority over calls by customers whose primary place of use is in New Mexico, his communications did not transmit through interstate commerce and, therefore, § 875(c)'s jurisdictional element is unsatisfied.  The Mobile Telecommunications Sourcing Act does not, however, govern how mobile telecommunications physically travel across state lines.  The Court has already discussed in detail that Nissen's call transmitted in interstate commerce, because it was routed via a switch in Texas.  See MOO, 2020 WL 108488, at *13 (summarizing evidence that Nissen's communications were necessarily routed through Plano, Texas, despite originating in New Mexico, and that Nissen's communications thus traveled in interstate commerce, as § 875(c) requires).  At trial, the United States presented evidence that Nissen's telephone calls necessary traveled through a routing computer system in Texas, before arriving at the New Mexico State Police Department in Albuquerque.  See MOO, 2020 WL 108488, at *13.  The Mobile Telecommunications Sourcing Act thus has no bearing on whether Nissen transmitted his threatening communications in interstate commerce.  Accordingly, the Court denies the Motion to Amend.

III.    **NISSEN'S ACQUITTAL MOTIONS ARE UNTIMELY**.

Rule 29(c)(1) of the Federal Rules of Criminal Procedure provides that motions for a judgment of acquittal following a jury's guilty verdict must be made within fourteen days of the

verdict.  See Fed. R. Crim. P. 29(c)(1).  Rule 33 provides that all motions for a new trial save those that allege newly discovered evidence must be filed within fourteen days after a guilty verdict. See Fed. R. Crim. P. 33(b).  At Nissen's trial, the jury returned a guilty verdict on August 7, 2019. See MOO, 2020 WL 108488, at *5.  With the exception of the Grand Jury Motion, Nissen filed each of his motions in 2020.  See Motion to Amend at 1; MTD at 1; Acquittal Motion at 1; Second Acquittal Motion at 1; Third Acquittal Motion at 1; Second MTD at 1.  District courts typically lack jurisdiction to rule on untimely motions for acquittal or for a new trial.  See, e.g., Carlisle v. United States, 517 U.S. 416, 433 (1996)(concluding that district courts have "no authority to grant . . . motion[s] for judgment of acquittal filed one day outside the time limit prescribed by Rule 29(c)"); Rowlette v. United States, 392 F.2d 437, 439 (10th Cir. 1968).  Nissen filed his motions over four months after the jury returned a verdict finding him guilty of two counts of violating § 875(c).  Nissen does not allege any newly discovered evidence that would render his verdict incorrect or unjust.  Accordingly, the Court denies the MTD, the Acquittal Motion, the Second Acquittal Motion, the Third Acquittal Motion, and the Second MTD as untimely.[7]

---

[7]The Court also would deny Nissen's motions were they timely.  In considering a motion for judgment of acquittal under rule 29, the Court views the evidence "in the light most favorable to the government, and without weighing conflicting evidence or considering the credibility of witnesses, determine[s] whether that evidence, if believed, would establish each element of the crime."  United States v. Fuller, 751 F.3d 1150, 1153 (10th Cir. 2014)(quotations omitted).  First, Nissen's RFRA argument lacks a sound basis in law or in the case's facts.  RFRA provides that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," except that the "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person (1) is in furtherance of a compelling state interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a)-(b).  RFRA requires a threshold inquiry whether the challenged governmental action substantially burdens the claimant's religious exercise.  See, e.g., Diaz v. Collins, 114 F.3d 69, 71 (5th Cir. 1997).  Only upon such a showing does the burden shift to the United States to demonstrate that its complained-of action serves a compelling interest.  See Diaz v. Collins, 114 F.3d at 71.

Here, Nissen does not specify any religious practice or belief that directed him to transmit through interstate commerce threats to murder law enforcement employees.  Nissen's RFRA assertion in the Third Acquittal Motion is the first reference to Nissen's religion in the record.  See Third Acquittal Motion at 2.  Accordingly, the United States' prosecution of Nissen for violating § 875(c) does not burden his religion, and Nissen's RFRA claim lacks legal and factual bases.

Second, Nissen's double jeopardy argument similarly fails.  The Indictment alleges two counts of violating § 875(c).  See Indictment at 1.  Count I charges: "On or about November 2, 2018, in Torrance County, in the District of New Mexico, the defendant, Michael James Nissen, transmitted in interstate and foreign commerce communications containing a threat to injure the person of another."  Indictment at 1 (capitalization altered and emphasis omitted).  Count 2 alleges: "On or about November 26, 2018, in Bernalillo County, in the District of New Mexico, the Defendant, Michael James Nissen, transmitted in interstate and foreign commerce communications containing a threat to injure the person of another."  Indictment at 1 (capitalization altered and emphasis omitted).  Nissen appears to allege that both Counts charge the same conduct and that, therefore, his conviction on both Counts violates the Fifth Amendment's Double Jeopardy Clause.  See MTD at 2.

Nissen thus alleges multiplicity -- when a single indictment charges multiple offenses covering the same act or behavior.  See United States v. McCullough, 457 F.3d at 1162 ("Multiplicity refers to multiple counts of an indictment which cover the same criminal behavior." (quoting United States v. Johnson, 130 F.3d at 1424)).  The central question is whether the underlying conduct is part of the same transaction or comprises distinct episodes that can be punished separately.  See, e.g., United States v. Neha, 376 F. Supp. 2d 1227, 1230 (D.N.M. 2005)(Browning, J.).  Although Nissen may have called the New Mexico State Police Dispatch to express his anger about the same subject -- a New Mexico State Police Officer stopping Nissen in violation of what Nissen perceives to be his sovereign rights -- Nissen made those calls on separate days, from separate locations, and directed threats at separate people.  See MOO, 2020 WL 108488, at *14.  The Indictment thus alleges two separate violations of § 875(c) and is, therefore, not multiplicitous.  The Court would therefore deny Nissen's double jeopardy argument.

Third, Nissen's ex post facto argument is unviable.  An ex post facto law is "any law which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed."  Raymer v. Enright, 113 F.3d 172, 174 (10th Cir. 1997)(quoting Weaver v. Graham, 450 U.S. 24, 28 (1981)).  As the Court discussed in the MOO, "Congress enacted the statute was in 1934 and last amended it in 1939."  MOO, WL 108488, at *8.  Nissen transmitted his threats in August, 2018.  Accordingly, Nissen's actions were punishable when they were committed, and no intervening law or rule imposes additional punishment beyond what was prescribed in 2018.  Accordingly, the Court would deny Nissen's ex post facto argument.

Fourth, Nissen's free speech argument is unviable.  Nissen asserts that § 875(c) "criminalizes mere thought."  MTD at 3.  Nissen is correct that the First Amendment guarantees freedom of thought.  See, e.g., Wooley v. Maynard, 430 U.S. 705, 714 (1977).  Section 875(c) does not punish thought, however; it punishes transmitting true threats in interstate commerce.  See MOO, 2020 WL 108488, at *10.  The First Amendment does not protect true threats.  See, e.g., Virginia v. Black, 538 U.S. 343, 359 (2003).  The jury concluded that Nissen intentionally transmitted true threats.  See MOO, 2020 WL 108488, at *14-*15.  Accordingly, § 875(c) does not criminalize mere thought, and Nissen's conviction does not violate the First Amendment.

Fifth, Nissen's ineffective assistance of counsel argument is unviable, because Nissen does not raise that argument at the correct procedural juncture. Nissen appears to complain that his trial counsel did not follow his preferred strategy and argument. See Second MTD at 10. Nissen does not, however, elaborate this argument beyond asserting that he was denied effective assistance of counsel. See Second MTD at 10. Ineffective assistance of counsel claims are brought properly in collateral proceedings, not in direct appeals. See United States v. Galloway, 56 F.3d 1239, 1241 (10th Cir. 1995). The Tenth Circuit has extended this principle to motions for a new trial. See, e.g., United States v. Carbajal-Moreno, 136 F. App'x 163, 165 (10th Cir. 2005)(unpublished)("Our insistence that, except in extraordinary circumstances, defendants must bring ineffective assistance of counsel claims in collateral proceedings extends to motions for a new trial."). "Proceedings adjudicating claims raised in § 2255 motions provide the best avenue for deciding assertions of ineffective assistance of counsel." United States v. Carbajal-Moreno, 136 F. App'x at 166. This is because ineffective assistance of counsel claims require a district court to develop an evidentiary record for appellate review, and the Tenth Circuit declined to require district courts to hold evidentiary hearings on motions for new trial. See United States v. Carbajal-Moreno, 136 F. App'x at 166.

Even were the Court to entertain Nissen's ineffective assistance claims here, Nissen is not entitled to a new trial or any other relief. To establish his right to seek relief "as part of the original criminal proceedings (rather than by way of collateral attack) on the grounds of ineffective assistance of counsel," Nissen must "identify specific facts and circumstances outside the record which, if proven, would entitle him to a new trial." United States v. Sands, 968 F.2d 1058, 1066 (10th Cir. 1992). Nissen identifies no specific facts pertinent to his counsel's performance beyond a generalized and conclusory assertion in the Second MTD, as well as handwritten notations in the 239-page trial transcript's margins. See generally Second MTD. Although the Court has reviewed carefully Nissen's handwritten notations, it sees nothing that rises beyond commentary to the level of argument. Accordingly, Nissen's ineffective assistance of counsel claim is unviable.

Sixth, Nissen's argument that he did not receive a fair trial because he was shackled is meritless. See Second MTD at 13. Nissen contends that his being shackled "is a due process and equal protection of the laws violations, which created prejudice against Defendant." Second MTD at 13. At a pretrial hearing, the Court considered extensively the issue of Nissen's restraint. See Draft Transcript of Motions Hearing at 2:3-10:5 (taken August 1, 2019)("Aug. 1 Tr."). Before trial, the United States Marshals Service recommended that Nissen "remained shackled during his trial" "[b]ased on his past behavior of being extremely aggressive towards [Marshals] and attorneys." Email from Sean Cozart to Carol Bevel at 1 (dated August 1, 2019), filed August 5, 2019 (Doc. 61). The Court heeded the United States Marshal's security recommendation but did so only after considering extensively how to maintain courtroom security while ensuring that the jury could not see or notice Nissen's restraints. See Aug. 1. Tr. at 4:1-4 (Court); id. at 4:17-10 (Court). The Court also considered alternatives, such as a "Band-It," Aug. 1 Tr. at 5:1-12 (Cozart), an electronic shock device, but the Court noted that such devices are visible to the jury and may fail, either by inadvertently shocking the defendant or not working when needed, see Aug. 1 Tr. at 5:22-6:4 (Court). The United States Marshal also noted that, "if [Nissen] causes something, he does something to where a deputy activates the Band-It, everybody will know about it." Aug. 1 Tr. at 7:12-17 (Cozart). Accordingly, the Court decided to heed the United States Marshal's recommendation. See Aug. 1. Tr. at 66:4 (Court). The Court also discussed placing a skirting

around the both counsels' tables so that the shackles would not be visible to the jury, see Aug 1 Tr. at 66:3-7 (Court), and reenacted the shackles' placement on its courtroom deputy to guarantee that the shackles would not be visible to the venire.  See Aug. 1 Tr. at 66:23-67:14 (Court, Clerk). The Court also directed the United States Marshals to place tape around the shackles to minimize any noise that Nissen's moving might cause.  See Tr. at 67:13-15 (Court, Cozart).  Finally, the Court directed counsel not to stand for the Court or for the jury, which might draw the jury's attention to Nissen's restraint.  See Tr. at 68:16-22 (Court).  There is no indication in the record that the jury noticed Nissen's restraints at trial.

A trial judge has near unfettered discretion to orchestrate courtroom proceedings in the way he or she deems fit, so long as it does not offend a defendant's constitutional rights.  See, e.g., Sheppard v. Maxwell, 384 U.S. 333, 359 (1966)("The carnival atmosphere at trial could easily have been avoided since the courtroom and courthouse premises are subject to the control of the court.").  "It is the judge's responsibility to exercise control over the courtroom and take security precautions . . ."  Martinez v. Winner, 771 F.2d 424, 434 (10th Cir. 1985).

> It is a judge's duty to order some type of precaution if he or she believes there might be some sort of trouble.  Usually this sort of thing is delegated to the United States Marshal or to court security officers, but the judge remains ultimately responsible, and this responsibility directly concerns his duty to see that cases are decided in a peaceful and dignified atmosphere.

Martinez v. Winner, 771 F.2d at 434.

The Supreme Court has admonished certain courtroom practices that affected defendant's fair-trial rights.  See Holbrook v. Flynn, 475 U.S. 560, 562, 570 (1986)(addressing whether seating "four uniformed state troopers" in the row of spectators' seats immediately behind the defendant at trial denied the defendant his right to a fair trial, and holding that such seating was not so inherently prejudicial it denied the right to a fair trial); Estelle v. Williams, 425 U.S. 501, 502, 512 (1976)(considering "whether an accused who is compelled to wear identifiable prison clothing at his trial by a jury is denied due process or equal protection of the laws," and holding that "the State cannot, consistently with the Fourteenth Amendment [to the Constitution of the United States], compel an accused to stand trial before a jury while dressed in identifiable prison clothes").  The "Williams-Flynn" standard -- developed from Estelle v. Williams and Holbrook v. Flynn -- thus demands of a trial judge that courtroom proceedings -- that the state sponsors -- do not result in an inherent prejudice to a criminal defendant.  Carey v. Musladin, 549 U.S. 70, 76-77 (2006).  That standard, then, can be "a guide for trial judges . . . .  [I]ts general formulation is enough to [further] tell trial judges that it applies to the behavior of courtroom visitors."  Carey v. Musladin, 549 U.S. at 82 (Souter, J., concurring in the judgment).

Here, Nissen was dressed in a suit at trial, and there is no indication that the jury noticed that he was restrained.  "[T]he decision to impose appropriate means in restraining, even to the extent of shackling, a defendant lies within the informed discretion of the trial court and will not be disturbed on appeal unless that discretion was clearly abused."  United States v. Hack, 782 F.2d 862, 867 (10th Cir. 1986).  The Court took pains to balance courtroom safety with Nissen's right to a fair trial.  Because there is no indication that the jury noticed Nissen's restraint, the Court

concludes that it did not sacrifice Nissen's right to a fair trial in ensuring a safe courtroom. Accordingly, Nissen's argument that his shackles deprived him of a fair trial is unviable.

Seventh, Nissen claims without a sound legal or factual basis that the Court lacks personal jurisdiction. See Second MTD at 9 (citing Pennoyer v. Neff, 95 U.S. 714 (1878)). Failure to object to a district court's personal jurisdiction amounts to a waiver. See, e.g., United States v. Grote, 632 F.2d 387, 388-89 (5th Cir. 1980). Accordingly, while a defendant may object to a court's subject-matter jurisdiction at any time, see Fed. R. Crim. P. 12(b)(2), a defendant must raise personal jurisdiction before trial, United States v. Grote, 632 F.2d at 388. Further, the Court has personal jurisdiction over Nissen. "It is well settled that a district court has personal jurisdiction over any party who appears before it, regardless of how his appearance was obtained." United States v. Lussier, 929 F.2d 25, 27 (1st Cir. 1991). Forcible abduction or extradition, accordingly, does not prohibit a defendant's trial in a United States court for violation of United States criminal laws. See United States v. Alvarez-Machain, 504 U.S. 655, 670 (1992). As Nissen appeared before the Court and participated in the trial, the Court has personal jurisdiction, and Nissen's argument lacks sound legal or factual bases.

Eighth, Nissen's argument that venue is improper is similarly without sound legal and factual basis. Rule 18 of the Federal Rules of Criminal Procedure requires the United States to "prosecute an offense in a district where the offense was committed." Fed, R, Crim. P. 18. The Indictment alleges two separate § 875(c) violations, both occurring within the District of New Mexico. See Indictment at 1. Accordingly, venue is proper, and Nissen's argument lacks sound legal or factual bases.

Ninth, sufficient evidence supports Nissen's conviction. Nissen contends that "the verdict is not supported by substantial evidence," and contends that the Court erred in the MOO. Acquittal Motion at 2-3. The Court decided previously that sufficient evidence supports Nissen's convictions for violating § 875(c). See MOO, 2020 WL 108488, at *13-*16. The Court accordingly understands Nissen's argument to be for reconsideration of the MOO. "Motions to reconsider are proper in criminal cases even though the Federal Rules of Criminal Procedure do not specifically provide for them." United States v. Christy, 739 F.3d 534, 539 (10th Cir. 2014). The Tenth Circuit has held that criminal motions to reconsider are proper, because a "district court should have the opportunity to correct alleged errors in its dispositions." United States v. Christy, 739 F.3d at 539. A district court may grant a motion to reconsider "when the court has misapprehended the facts, a party's position, or the law." United States v. Christy, 739 F.3d at 539 (citing Servants of Paraclete v. Does, 204 F.3d 1005, 1012 (10th Cir. 2000)). Specific grounds for reconsideration include: "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice." Servants of Paraclete v. Does, 204 F.3d at 1012. Motions to reconsider "should not be used to revisit issues already addressed or advance arguments that could have been raised earlier." United States v. Christy, 739 F.3d at 539.

Nissen does not identify any intervening change in controlling law or new evidence. Nissen asserts that the Court erred in the MOO and at trial, see, e.g., Acquittal Motion at 2-3, but does not elaborate how, beyond the arguments that the Court has already dispatched. Nissen's assertion that the Court erred, without more, is not enough to prompt reconsideration, and Nissen seeks merely to revisit issues that he already raised and that the Court already decided. See

Acquittal Motion at 2-3.  Accordingly, Nissen's argument that the Court erred in the MOO is meritless insofar as Nissen does not elaborate any alleged error.

The Court has difficulty grasping Nissen's remaining arguments.  Nissen mentions maritime and admiralty law in several instances.  See, e.g., Second MTD at 17-18 ("Maritime law is that which the Congress has enacted or the federal courts, sitting in admiralty or in the exercise of their maritime jurisdiction, have declared would apply.").  The Court suspects that Nissen's citation to admiralty law, as well as his references to personal jurisdiction and the Eleventh Amendment, stem from his belief that he is a sovereign unto himself.  See Second MTD at 11 (asserting that Nissen is a "non citizen national sovereign of a free and independent state").  The Court has discussed previously the so-called sovereign citizen movement:

> According to the Southern Poverty Law Center, at least some tax protestors' convictions flow from the belief that the United States is governed by a secret judicial regime bent on enslaving American citizens, and that judges are all in on it:
>
> > At some point in history . . . the American government set up by the founding fathers -- with a legal system the sovereigns refer to as "common law" -- was secretly replaced by a new government system based on admiralty law, the law of the sea and international commerce.  Under common law, or so they believe, the sovereigns would be free men.  Under admiralty law, they are slaves, and secret government forces have a vested interest in keeping them that way.  Some sovereigns believe this perfidious change occurred during the Civil War, while others blame the events of 1933 when the U.S. abandoned the gold standard.  Either way, they stake their lives and livelihoods on the idea that judges around the country know all about this hidden government takeover but are denying the sovereigns' motions and filings out of treasonous loyalty to hidden and malevolent government forces.

Sovereign Citizens Movement, Southern Poverty Law Center, https://www.splcenter.org/fighting-hate/extremist-files/ideology/sovereign-citizens-movement (last visited April 26, 2018).  The Court has previously considered tax protestor arguments resulting from other eccentric premises:

> [T]hese individuals believe that the United States owns corporate-shell facsimiles of them, over which the individuals retain some control -- enough to draw expenses from the shell. The Southern Poverty Law Center describes a "philosophy" very similar to the [defendants'] -- in that it puts forth many of the same strange arguments and has many of the same bizarre hallmarks -- in its page on sovereign citizens:

Since 1933, the U.S. dollar has been backed not by gold, but by the "full faith and credit" of the U.S. . . . . According to sovereign "researchers," this means that the government has pledged its citizenry as collateral, by selling their future earning capabilities to foreign investors, effectively enslaving all Americans. This sale, they claim, takes place at birth. When a baby is born in the U.S., a birth certificate is issued, and the hospital usually requires that the parents apply for a Social Security number at that time. Sovereigns say that the government then uses that birth certificate to set up a kind of corporate trust in the baby's name -- a secret Treasury account -- which it funds with an amount ranging from $600,000 to $20 million, depending on the particular variant of the sovereign belief system. By setting up this account, every newborn's rights are cleverly split between those held by the flesh-and-blood baby and the ones assigned to his or her corporate shell account.

The sovereigns believe evidence for their theory is found on the birth certificate itself. Since most certificates use all capital letters to spell out a baby's name, JOHN DOE, for example, is actually the name of the corporate shell identity, or "straw man," while John Doe is the baby's "real," flesh-and-blood name. As the child grows older, most of his legal documents will utilize capital letters, which means that his state-issued driver's license, his marriage license, his car registration, his criminal court records, his cable TV bill and correspondence from the IRS all will pertain to his corporate shell identity, not his real, sovereign identity.

The process sovereigns have devised to split the straw man from the flesh-and-blood man is called "redemption," and its purpose is two-fold. Once separated from the corporate shell, the newly freed man is now outside of the jurisdiction of all admiralty laws. More importantly, by filing a series of complex, legal-sounding documents, the sovereign can tap into that secret Treasury account for his own purposes. Over the past 30 years, hundreds of

---

> sovereigns have attempted to perfect the process by packaging and promoting different combinations of forms and paperwork.  While no one has ever succeeded, for the obvious reason that these theories are not true, sovereigns are nonetheless convinced with the religious certainty of a true cult believer that they're close.  All it will take, say the promoters of the redemption scam, is the right combination of words.

> United States v. Rivera, 2015 WL 4042197, at *20-21 [(D.N.M. June 30, 2015)(Browning, J.)](quoting Sovereign Citizens Movement, Southern Poverty Law Center, https://www.splcenter.org/fighting-hate/extremist-files/ideology/sovereign-citizens-movement (last visited April 26, 2018)).

United States v. Gutierrez, No. CR 15-3955 JB, 2018 WL 2107785, at *12 (D.N.M. May 5, 2018)(Browning, J.).
    The Southern Poverty Law Center also describes how these individuals operate in the section that it titles "tactics":

> The weapon of choice for sovereign citizens is paper.  A simple traffic violation or pet-licensing case can end up provoking dozens of court filings containing hundreds of pages of pseudo-legal nonsense.  For example, a sovereign was involved in 2010 in a protracted legal battle over having to pay a dog-licensing fee.  She filed 10 sovereign documents in court over a two-month period and then declared victory when the harried prosecutor decided to drop the case.  The battle was fought over a three-year dog license that in Pinellas County, Fla., where the sovereign lives, costs just $20.  Tax cases are even worse.  Sovereign filings in such legal battles can quickly exceed a thousand pages.  While a normal criminal case docket might have 60 or 70 entries, many involving sovereigns have as many as 1,200.  The courts are struggling to keep up, and judges, prosecutors and public defenders are being swamped.

> The size of the documents is an issue, but so is the nonsensical language the documents are written in.  They have a kind of special sovereign code language that judges, lawyers and other court staff simply can't understand (nor can most non-sovereigns).  Sovereigns believe that if they can find just the right combination of words, punctuation, paper, ink color and timing, they can have anything they want -- freedom from taxes, unlimited wealth, and life without licenses, fees or laws, are all just a few strangely worded documents away.  It's the modern-day equivalent of "abracadabra."

Sovereign Citizens Movement, Southern Poverty Law Center, https://www.splcenter.org/fighting-hate/extremist-files/ideology/sovereign-citizens-movement (last visited April 8, 2020).

This passage helps explain Nissen's slew of motions and filings. The Court has wrestled with more of these filings than is required. The Court is willing to bend the local and procedural rules -- or, more accurately, the Court is willing to excuse instances of noncompliance with the rules -- when parties -- especially pro se parties -- argue in good faith. Nissen has Court-appointed counsel, however, and has not made a clear, unequivocal, and timely decision to proceed pro se. See United States v. Mackovich, 209 F.3d 1227, 1236 (10th Cir. 2000)(citing, e.g., United States v. Floyd, 81 F.3d 1517, 1527 (10th Cir.1996); United States v. McKinley, 58 F.3d 1475, 1480 (10th Cir. 1995)). The Tenth Circuit has described the rights to counsel and of self-representation as mutually exclusive. See United States v. Mackovich, 209 F.3d at 1236 (citing United States v. Reddeck, 22 F.3d 1504, 1510 (10th Cir. 1994)). "'In ambiguous situations created by a defendant's vacillation or manipulation, we must ascribe a constitutional primacy to the right to counsel because this right serves both the individual and collective good, as opposed to only the individual interests served by protecting the right of self-representation.'" United States v. Mackovich, 209 F.3d at 1237 (quoting United States v. Frazier-El, 204 F.3d 553, 559 (4th Cir. 2000)).

The Court briefly notes that, contrary to Nissen's assertion that he is a sovereign unto himself because he has not accepted into the contract of citizenship, the Fourteenth Amendment's first clause -- the "Citizenship Clause" -- states: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1 cl. 1. The phrase "'subject to its jurisdiction'" was "intended to exclude from its operation children of ministers, consuls, and citizens or subjects of foreign states, born within the United States." United States v. Wong Kim Ark, 169 U.S. 649, 678 (1898)(quoting U.S. Const. amend. XIV). "[A] citizen for purposes of the Fourteenth Amendment's Citizenship Clause is the actual, physical person born or naturalized in the United States." Caesar Kalinowski IV, A Legal Response to the Sovereign Citizen Movement, 80 Mont. L. Rev. 153, 178 (2019)("A Legal Response")(citing Elk v. Wilkins, 112 U.S. 94, 101 (1884)("[T]he Citizenship Clause contemplates two sources of citizenship, and two sources only: birth and naturalization.")). This view is the only natural reading of the Fourteenth Amendment, because people are born or naturalized, whereas corporations or other artificial entities are formed or incorporated. See Bankers' Tr. Co. v. Texas & P. Ry. Co., 241 U.S. 295, 309-10 (1916). If citizenship were a mere contractual agreement, as sovereign citizen adherents believe, then either party to the contract -- the citizen or the United States -- could revoke it at any time. The United States is powerless to revoke native-born, Fourteenth Amendment citizenship, however; the only way citizenship ceases is for the individual to relinquish it. See Afroyim v. Rusk, 387 U.S. 253, 268 (1967). As Nissen was born in New Mexico, United States of America, in 1955, and has not relinquished his citizenship, see Response at 5, he is a citizen of the United States.

Similarly, the privileges and immunities that Nissen cites for the proposition that he has the right to travel without interference, see, e.g., Second MTD at 4-6, make sense only if they apply to human beings and not to artificial entities. The Fourteenth Amendment's Privileges and Immunities Clause guarantees the right to travel, the right to demand that the federal government protect one's life, liberty, and property "when on the high seas," the right of peaceful assembly and to petition the government for redress of grievance, "the privilege of the writ of habeas corpus," and "[t]he right to use the navigable waters of the United States." The Slaughterhouse Cases, 83 U.S. (16 Wall.) 36, 79 (1872). These privileges attach only to citizens, not to aliens or entities. See, e.g., Paul v. Virginia, 75 U.S. (8 Wall.) 168, 177-78, 182 (1869). Nor would these

**IT IS ORDERED** that: (i) the Motion for Discovery of Grand Jury Minutes, filed December 30, 2019 (Doc. 98), is denied; (ii) the Motion for Leave to Amend by Addendum, filed January 15, 2020 (Doc. 106), is denied; (iii) the Motion to Dismiss Information on Two Counts of Convictions for Lack of Jurisdiction, filed January 24, 2020 (Doc. 109), is denied; (iv) the Motion for Judgment of Acquittal After Guilty Verdict, or, In the Alternative, For a New Trial, filed January 24, 2020 (Doc. 110), is denied; (v) the Motion for Acquittal, or to Dismiss Information on Two Counts for Prosecutorial Misconduct, filed January 27, 2020 (Doc. 111), is denied; (vi) the Notice of Motion for Acquittal, Overturn Guilty Verdict, or Dismiss Information of Conviction of Counts I and II, filed February 6, 2020 (Doc. 112), is denied; and (vii) the Motion to Dismiss

---

rights make sense as applied to entities; habeas corpus, for example, literally means "thou (shalt) have the body," Johnson v. Eisentrager, 339 U.S. 763, 779 n.10 (1950)(quoting 2 The Oxford English Dictionary (1933)), and "artificial entities do not have a life to protect," A Legal Response, 80 Mont. L. Rev. at 181.

Additionally, contrary to Nissen's assertion that federal courts lack jurisdiction over him, "[e]very citizen or subject of another country, while domiciled here, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States." United States v. Wong Kim Ark, 169 U.S. at 649. This application cuts both ways. Nissen, as a citizen, is entitled to invoke constitutional protections, as he does here and as he has throughout the proceedings against him. Even were Nissen not a citizen, Nissen would be entitled to constitutional protections by virtue of his presence in the United States. See Johnson v. Eisentrager, 339 U.S. 763, 771 (1950)("[E]xtending constitutional protections beyond the citizenry" to noncitizens present in the United States). As one present in the United States, however, Nissen is also subject to its laws, such as the law against transmitting true threats in interstate commerce. See, e.g., Johnson v. Eisentrager, 339 U.S. at 771 ("[T]he Court has been at pains to point out that it was the alien's presence within its territorial jurisdiction that gave the Judiciary power to act."); Gherebi v. Bush, 374 F.3d 727, 736 (9th Cir. 2004)

Nissen may sincerely believe that he is a sovereign unto himself, entitled to immunity, and that his prosecution and conviction lack validity and violate nearly every constitutional right. He may accordingly see himself as victim of a Kafkaesque parade of horribles, a series of compounding wrongs. The Court has done what it can to demonstrate Nissen's error in adhering to those beliefs and that, in the United States, no man is a law unto himself. Although the Court need not have done so, the Court is content that it has addressed all of Nissen's arguments and, accordingly, has gone as far as it can.

Information of Illegal Convictions on Counts I and II for Federal Abuse of Arbitrary Power and

Judicial Misconduct, filed February 19, 2020 (Doc. 113), is denied.


_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

John C. Anderson
   United States Attorney
Jack Burkhead
Paul Mysliwiec
Alexander Mamoru Max Uballez
   Assistant United States Attorneys
Albuquerque, New Mexico

        *Attorneys for the Plaintiff*

Joe M. Romero, Jr.
Romero & Winder, PC
Albuquerque, New Mexico

        *Attorneys for the Defendant*