IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                                          No. CR 19-0077 JB

MICHAEL JAMES NISSEN,

       Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on the United States' PSR Objections, filed November 21, 2019 (Doc. 90)("Objections").  The primary issues are: (i) whether the Court should amend the Revised Presentence Investigation Report, filed November 7, 2019 (Doc. 88)("Revised PSR"), to include as relevant certain conduct that, on December 11, 2018, Defendant Michael Nissen called in a bomb threat to a New Mexico State Police ("NM State Police") office; (ii) whether the Court should apply a 6-level enhancement under the United States Sentencing Guidelines Manual ("U.S.S.G" or "Guidelines") § 2A6.1(b)(1), because Nissen's conduct evidenced his intent to carry out his threats against the NM State Police; and (iii) whether the Court should apply a 4-level enhancement under U.S.S.G. § 2A6.1(b)(4), because Nissen's offenses substantially disrupted public services or resulted in a substantial expenditure of funds to respond to his offenses.  The Court concludes that: (i) the Court will amend the PSR, because the conduct that the United States cites is relevant to the charged conduct; (ii) the 6-level enhancement under U.S.S.G. § 2A6.1(b)(1) does not apply, because Nissen did not demonstrate an intent to carry out his threats against NM State Police employees; and (iii) the 4-level enhancement under U.S.S.G.

2A6.1(b)(4) does not apply, because Nissen's offenses did not substantially disrupt public functions or services or result in substantial expenditure of funds. Accordingly, the Court sustains in part and overrules in part the Objections.

## FACTUAL BACKGROUND

The Court takes its facts from the Revised PSR, disclosed October 4, 2019, and revised December 3, 2019,[1] and the evidence introduced at the jury trial. This case deals with threats that Nissen communicated to NM State Police officers and dispatch employees on November 2 and 26, 2018. See Revised PSR ¶ 1, at 4. On the evening of November 2, 2018, NM State Police officer

---

[1]The USPO disclosed the initial PSR on October 4, 2019. See Presentence Investigation Report, disclosed October 4, 2019 (Doc. 83). The USPO disclosed a revised PSR on December 3, 2019. See Revised PSR at 1. In a memorandum attached to the Revised PSR, Shaun Ward, United States Probation Officer, notes that the USPO made the following changes in the Revised PSR:

   Release Status: This section was updated to reflect the current time in custody.

   Offense Conduct: This section was revised and is the version provided by the government as this was a jury trial case. Several paragraphs in this section were moved to the "Offense Behavior Not Part of Relevant Conduct" section.

   Victim Impact: Paragraph 16 now includes information about a victim impact statement that was received.

   Offense Level Computation: The paragraphs in this section has been revised to include a specific offense characteristic and victim related adjustments. The resulting total offense level is now 22.

   Custody: Paragraph 65 has been revised with the corrected offense level.

   Fines: Paragraph 76 has been revised with the new fine range.

Memorandum from Shaun Ward, United States Probation Officer, to the Court at 1 (Dated Dec. 3, 2019), filed December 3, 2019 (Doc. 92).

Jordan Burd stopped Nissen on Interstate 40 in Torrance County, New Mexico, near mile marker 194 and issued several traffic citations.  See Revised PSR ¶ 6, at 4.  About a half-hour later, Nissen called NM State Police dispatch six times and threatened to kill Officer Burd.  See Revised PSR at ¶ 8, at 4.  In the calls, Nissen said that an NM State Police officer had just given him several citations.  See Revised PSR ¶ 8, at 4-5.  Nissen then said:

> You guys got some of the stupidest fucking pigs on the road.  The next time someone violates me like that on the road, I'm gonna put a bullet in that fucking pig's head . . . .  He violated my Fourth Amendment constitution, he violated my Second and my First Amendment and the next time he does it I'm gonna plea the Fifth, but next time I'm gonna take my revolver out and put that motherfucker drop dead.

Revised PSR ¶ 8, at 5.  After fielding these calls, NM State Police "sent a warning out to all patrol officers that Nissen threatened police and should be considered armed and dangerous."  Revised PSR ¶ 9, at 5.  On November 26, 2018, Nissen against called NM State Police, this time calling the administrative line rather than dispatch.  See Revised PSR ¶ 10, at 5.  When Nissen thought that the NM State Police employee was not assisting him quickly enough, Nissen became verbally combative and threatened to shoot the NM State Police employee in the head.  See Revised PSR ¶ 10, at 5.  This is the conduct for which Nissen was indicted, see Indictment at 1, filed January 10, 2019 (Doc. 12), and convicted on two counts of transmitting threats in interstate commerce, in violation of 18 U.S.C. § 875(c), see Jury Verdict at 1, filed August 7, 2019 (Doc. 73).

On November 27, 2018, law enforcement officers were working on an assignment that, coincidentally, was very near to Nissen's home in Albuquerque, New Mexico.  See Revised PSR ¶ 11, at 5.  Due to law enforcement's prior interactions with Nissen, an NM State Police crisis intervention officer was sent to Nissen's home to verify whether he would be a threat to officers working near his home.  See Revised PSR ¶ 11, at 5.  The officer spoke with Nissen by telephone

- 3 -

for over an hour, during which Nissen spoke about several subjects, ranging from constitutional rights to his conspiracy theories.  <u>See</u> Revised PSR ¶ 11, at 5.  Nissen told the officer that he was "on a secret mission from the Prime Creator" and that the CIA wanted to clone him, because he is the perfect man.  Revised PSR ¶ 11, at 5.  Nissen also said that he "always carries a .357 Magnum handgun and a shotgun everywhere he goes."  Revised PSR ¶ 11, at 5.  The officer took Nissen to the University of New Mexico Hospital Psychiatric Center for mental evaluation.  <u>See</u> Revised PSR ¶ 11, at 5.

On December 11, 2018, Nissen, dressed in a hooded sweater, went to the main entrance of NM State Police's District 5 office in Albuquerque.  <u>See</u> Revised PSR ¶ 38, at 8.  Speaking into an intercom, Nissen kept his face covered, identified himself as Bob Jones, and said that he was there to deliver a gift.  <u>See</u> Revised PSR ¶ 38, at 8.  The NM State Police employee to whom Nissen spoke was the same one whom Nissen had threatened on November 26, 2018, and the employee recognized Nissen.  <u>See</u> Revised PSR ¶ 38, at 8.  Nissen began cursing and left an object directly in front of the office's door.  <u>See</u> Revised PSR ¶ 38, at 8.  Fearing that Nissen left a bomb, NM State Police evacuated the entire building and called the NM State Police's Bomb Squad.  <u>See</u> Revised PSR ¶ 38, at 8.  NM State Police later identified that object as a bleach bottle that had been painted black, with flowers and two envelopes protruding from its top.  <u>See</u> Revised PSR ¶ 38, at 8.  The envelopes contained written materials about sovereign citizens[2] and constitutional issues.  <u>See</u> Revised PSR ¶ 38, at 8.  NM State Police "spent significant resources responding to

---

[2]In a previous Memorandum Opinion and Order, the Court discussed the so-called Sovereign Citizens Movement's background and beliefs, and the Court debunked some of the Sovereign Citizens Movement's foundational legal claims.  <u>See</u> <u>United States v. Nissen</u>, 2020 WL 1929526, at *21 n.7 (D.N.M. April 21, 2020)(Browning, J.).

Nissen's behavior." Revised PSR ¶ 38, at 8. The station was "shut down for at least two hours and numerous agencies were called to assist." Revised PSR ¶ 39, at 8. When NM State Police officers located Nissen after the event, Nissen "laughed and joked about the incident." Revised PSR ¶ 39, at 8. NM State Police issued a "trespass order" and took Nissen to the University of New Mexico Hospital Mental Health Center for evaluation. Revised PSR ¶ 39, at 8. Hospital staff were unable to evaluate Nissen, who became agitated and aggressive. See Revised PSR ¶ 39, at 8. NM State Police officers released Nissen from custody the following day. See Revised PSR ¶ 39, at 8.

On December 13, 2018, Nissen visited the Bernalillo County Sheriff's Office and spoke with Sheriff's Deputies to complain about the NM State Police. See Revised PSR ¶ 40, at 8. Nissen said that an officer stopped him near mile marker 194 on I-40, and that, after the stop, he called NM State Police dispatch "just to get it done and then it got a little crazy . . . . I didn't make no threatening calls, but I kept calling them about the law." Revised PSR ¶ 40, at 8. Nissen also told Bernalillo County Sheriff's Deputies that he owned multiple firearms including rifles and a revolver that he uses to "protect himself from 'rogue cops.'" Revised PSR ¶ 40, at 8.

## PROCEDURAL HISTORY

The United States objects to the Revised PSR. See Objections at 1. Nissen has declined to respond to the Objections. See Hearing Transcript at 27:17-22 (taken May 8, 2020)(Romero, Court)("May 8 Tr.").[3] The USPO responds and disagrees with the United States' objections,

---

[3]The Court's citations to the May 8 Tr. refer to the court report's unedited draft transcript. Accordingly, line and page numbers are subject to slight change in the final version.

maintaining its position that the United States' requested enhancements are inapplicable.  See Addendum to the Presentence Report at 1-2, filed December 3, 2019 (Doc. 92)("Addendum").

### 1.    The Objections.

The United States first argues that the USPO "describes as irrelevant conduct that the Court has already ruled was relevant to the counts of convictions, and thereby makes several errors that must be corrected."  Objections at 1.  The United States notes that, before trial in this matter, it "filed notice that it intended to offer evidence of several non-charged incidents" under rule 404(b) of the Federal Rules of Evidence.  Objections at 1 (citing Motion in Limine and Notice of Intent to Introduce Evidence of Prior Bad Acts Pursuant to Federal Rule of Evidence 404(b) or as *Res Gestae* at 1, filed July 29, 2019 (Doc. 46)("MIL")).  The United States says that it sought to admit evidence of three prior incidents at trial: (i) "the December 11, 2018 bomb scare initiated by Defendant at the New Mexico State Police . . . office in Albuquerque"; (ii) Nissen's December 13, 2018, interview with Bernalillo County Sheriff's Deputies; and (iii) the State of New Mexico's recovery, during its execution of a search warrant, of Nissen's revolver, to which he referred in his interview with Bernalillo County Sheriff's Deputies.  Objections at 1-2.

The United States contends that the Court concluded, on the United States' MIL, that each of the above incidents is relevant to the Indictment's allegations.  See Objections at 2 (citing Hearing Transcript at 15:2-17 (taken August 1, 2019)(Court)("Aug. 1 Tr.").[4]  The United States acknowledges, however, that the Court excluded the bomb scare incident and Nissen's revolver as unfairly prejudicial and potentially distracting to the jury.  See Objections at 2.  The United States

_____

[4]The Court's citations to the Aug. 1 Tr. refer to the court reporter's unedited draft transcript. Accordingly, line and page numbers are subject to slight change in the final version.

argues, however, that the Court's ruling that each of the incidents are relevant to Nissen's conviction necessitates those incidents' inclusion in the PSR's relevant conduction section.  See Objections at 2.  The United States accordingly objects to the USPO's inclusion of those incidents in the PSR's irrelevant conduct section.  See Objections at 2.

The United States "incorporates by references its written argument in" its MIL.  Objections at 2.  The United States argues that, by calling in a bomb threat, Nissen intended to "scare or inconvenience" NM State Police, "the target of Defendant's wrath."  Objections at 2.  The United States also asserts that Nissen's interview with Detective Cash, in which Nissen mentioned his revolver, demonstrates Nissen's "opposition to state police such as Officer Burd."  Objections at 2.

The United States then turns to the USPO's decision not to translate these incidents into sentencing enhancements.  See Objections at 3.  The United States argues that U.S.S.G. § 2A6.1(b) applies to Nissen's sentence in two ways.  See Objections at 3.  First, the United States argues that § 2A6.1(b)(1) provides a 6-level enhancement for "'any conduct evidencing an intent to carry out such a threat[.]'"  Objections at 3 (quoting U.S.S.G. § 2A6.1(b)(1)).  The United States argues that § 2A6.1(b)(1) applies, because Nissen "was carrying around a loaded revolver, admittedly for the explicit purpose of opposing state police," which demonstrates his intent to carry out his threats against NM State Police officers.  Objections at 3.  The United States argues that Nissen's possession of a revolver "is also potentially relevant to Defendant's attempt to enter the NM [State Police] office, where he could have made good [on] his threat to shoot Barbara Beuzekom in the face as per his threat in Count 2."  Objections at 3.  The United States thus contends that Nissen's revolver, combined with his attempted entry to the NM State Police office on December 11, 2018, demonstrate his intent to carry out his threats against NM State Police employees and thus render

applicable the § 2A6.1(b)(1) enhancement.  See Objections at 3.  Second, the United States asserts that § 2A6.1(b)(4)'s 4-level enhancement for "a substantial expenditure of funds to clean up, decontaminate, or otherwise response to offense," U.S.S.G. § 2A6.1(b)(4), applies, see Objections at 3-4.  The United States argues that NM State Police expended "significant resources" in responding to Nissen's bomb threat, and that the bomb threat is "strong evidence that [Nissen] intended both to terrify and to provoke a response from the police with his antics."  Objections at 3-4.  "With those two enhancements applied," the United States argues, Nissen's "final offense level becomes 32," which results in a Guidelines range of 121-151 months.  Objections at 4.  The United States avers, however, that, because Nissen was convicted on two counts of violating § 875(c), "each of which carries a maximum of 60 months in prison," Nissen's Guidelines range is "120-120" months.  Objections at 4.

> **2.     The Addendum.**

The USPO responds to the United States' Objections, and the USPO maintains that its conclusions in the PSR are correct.  See Addendum at 1.  Responding to the United States' relevant-conduct Objection, the USPO asserts that the Indictment's two counts are "essentially standalone events, which occurred at specific times, against two specific victims."  Addendum at 1.  The USPO says that, under U.S.S.G. § 1B1.3, which defines relevant conduct, the December 11, 2019, incident is not relevant to either of the Indictment's counts.  See Addendum at 1.  The USPO instead explains that, because "the bomb scare incident occurred at a completely different time, and did not involve the same victims, and was not similar in conduct to the other incidents, it was not included as part of relevant conduct in determining guideline applications."  Addendum at 1.  The USPO notes that Nissen's "offenses of conviction are part of Part A of Chapter 2 of the

USSG," and the USPO asserts that "[a]ll Part A offenses (except 2A3.5) are excluded from being grouped together." Addendum at 1. The USPO avers that the Guidelines' exclusionary treatment of Chapter 2 offenses "further demonstrates that these offenses are treated as individual, distinct incidents, and are not lumped together with other conduct." Addendum at 1. The USPO agrees with the United States that the Court's rule 404(b) conclusion regarding the December 11, 2019, incident is itself relevant, but the USPO maintains that the incident's relevancy pertains to Nissen's eventual sentence and not to Nissen's specific offense conduct. See Addendum at 1-2. Next, the USPO asserts that Nissen did not evidence an intent to carry out his threats, and so § 2A6.1(b)(1)'s 2-level enhancement does not apply. See Addendum at 2. The USPO instead asserts that, although Nissen made statements to law enforcement about shooting police officers, Nissen "also said many strange and delusional things while talking to police" but did not make any overt acts which suggest an intent to actually shoot police officers. Addendum at 2. The USPO does not respond to the United States' argument that § 2A6.1(b)(4)(B)'s 4-level enhancement applies. See Addendum at 1-2.

## RELEVANT LAW REGARDING THE GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States of America severed the mandatory provisions from the Sentencing Reform Act, Pub. L. No. 98-473, 98 Stat. 1976, thus making Guidelines sentencing ranges effectively advisory. In excising the two sections, the Supreme Court left the remainder of the Sentencing Reform Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing. Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable." United States v. Booker, 543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)    to afford adequate deterrence to criminal conduct;
>
> (C)    to protect the public from further crimes of the defendant; and
>
> (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551. To achieve these purposes, § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the nature of the offense and of the defendant's character; (iii) the available sentences; (iv) the policy favoring uniformity in sentences for defendants who commit similar crimes; (v) the need to provide restitution to victims; and (vi) any pertinent United States Sentencing Commission policy statements in effect on the date of sentencing. See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines are no longer mandatory, both the Supreme Court and the United States Court of Appeals for the Tenth Circuit have clarified that, while the Guidelines are one of several factors which § 3553(a) enumerates, they are entitled to careful consideration. See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the

- 10 -

Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many").  They are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses." United States v. Cage, 451 F.3d at 593 (internal quotation marks omitted)(quoting United States v. Terrell, 445 F.3d 1261, 1265 (10th Cir. 2006)).  A reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a).  See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable." United States v. Terrell, 445 F.3d 1261, 1264 (10th Cir. 2006), overruled on other grounds by Rita v. United States, 551 U.S. at 349, as recognized in United States v. Zamora-Solorzano, 528 F.3d 1247, 1251 n.3 (10th Cir. 2008). This presumption, however, is an appellate presumption, and not one that the trial court can or should apply.  See Gall v. United States, 552 U.S. 38, 46-47 (2007); Kimbrough v. United States, 552 U.S. 85, 90-91 (2007); Rita v. United States, 551 U.S. at 351.  Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the advisory[5]

_____

[5]Attorneys and courts often say that the "Guidelines" are advisory, but it appears more appropriate to say that the resulting Guidelines ranges are advisory.  Gall v. United States, 552 U.S. at 46 ("As a result of our decision [in United States v. Booker], the Guidelines are now advisory . . . ."); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)(unpublished)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541

- 11 -

F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory."). The Court must consider the Guidelines, see Gall v. United States, 552 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the Guidelines range, see Gall v. United States, 552 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."). The Court is not mandated, however, to apply a sentence within the calculated Guidelines range. See United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-Booker have discretion to assign sentences outside of the Guidelines-authorized range . . . ."). Accord United States v. Chavez-Rodarte, No. CR 08-2499 JB, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

> The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole. The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).

> . . . .

> The Supreme Court held in United States v. Booker that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in Kimbrough v. United States, 552 U.S. 85 (2007), that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. at 101 (alteration in original)(internal quotation marks omitted). In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield. In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v. Booker-granted authority to post-Guidelines analysis "variances." Irizarry v. United States, 553 U.S. 708, 710-16 (2008). A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably. See Gall v. United States, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the

Guidelines sentence.  See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S.

at 46-47; Kimbrough v. United States, 552 U.S. at 90-91.

> While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-guideline sentence. Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward departures.  The sentencing court may, however, also use these same departure factors in the Booker calculus, even if the court does not grant a downward departure.

United States v. Apodaca-Leyva, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb. 13,

2008)(Browning, J.).  The Supreme Court has recognized, however, that sentencing judges are "in

a superior position to find facts and judge their import under § 3553(a) in each particular case."

Kimbrough v. United States, 552 U.S. at 89.   Applying § 3553(a)'s factors, the Court has

concluded that the case of an illegal immigrant who re-entered the United States to provide for his

two children and two siblings was not materially different from other re-entry cases, and, thus, no

variance from the Guidelines sentence was warranted.  See United States v. Almendares-Soto, No.

CR 10-1922 JB, 2010 WL 5476767, at *12 (D.N.M. Dec. 14, 2010)(Browning, J.).  On the other

hand, in United States v. Jager, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. Feb. 17,

2011)(Browning, J.), although the defendant's military service was not present to an unusual

degree and, thus, did not warrant a departure, the Court concluded that a variance was appropriate,

because the defendant's military service was "superior and uniformly outstanding," as the

---

Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence" (emphasis added)).

United States v. Nolf, 30 F. Supp. 3d 1200, 1222-24, (D.N.M. June 20, 2014)(Browning, J.)(emphasis in original).

- 13 -

defendant appeared to have been "trustworthy[] and dedicated, and he served with distinction." 2011 WL 831279, at *14.

## LAW REGARDING THE BURDEN OF PROOF REQUIRED FOR ENHANCEMENTS UNDER THE GUIDELINES

In Apprendi v. New Jersey, 530 U.S. 466 (2000)("Apprendi"), the Supreme Court reaffirmed the principle that it is permissible for sentencing judges "to exercise discretion -- taking into consideration various factors relating both to offense and offender -- in imposing judgment within the range prescribed by statute." 530 U.S. at 481. The Supreme Court cautioned, however, that the Constitution of the United States of America limits this discretion, and the Sixth Amendment to the Constitution requires that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi, 530 U.S. at 490. In Blakely v. Washington, 542 U.S. 296 (2004), the Supreme Court elaborated on its holding in Apprendi, stating that the "'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Blakely v. Washington, 542 U.S. at 303 (emphasis and citations omitted). In United States v. Booker, however, the Supreme Court held that, because the sentencing guidelines are no longer mandatory, "Apprendi does not apply to the present advisory-Guidelines regime." United States v. Ray, 704 F.3d 1307, 1314 (10th Cir. 2013). See United States v. Booker, 543 U.S. at 259 ("[W]ithout this provision [of the Guidelines statute] -- namely, the provision that makes the relevant sentencing rules mandatory and imposes binding requirements on all sentencing judges -- the statute falls outside the scope of Apprendi's requirement." (alterations and internal quotations marks omitted)). More recently, the Supreme Court held that the requirements in Apprendi apply

- 14 -

to facts that increase a defendant's mandatory minimum sentence.  See Alleyne v. United States, 570 U.S. 99, 103 (2013)("Alleyne").

In United States v. Magallanez, 408 F.3d 672 (10th Cir. 2005), the Tenth Circuit held that Blakely v. Washington and United States v. Booker did not change the district court's enhancement findings analysis.  See United States v. Magallanez, 408 F.3d at 684-85.  United States v. Magallanez involved plain-error review of a drug sentence in which a jury found the defendant guilty of conspiracy to possess with intent to distribute and of distributing methamphetamine.  See 408 F.3d at 676.  As part of its verdict, the jury, through a special interrogatory, attributed to the defendant between 50 and 500 grams of methamphetamine.  See 408 F.3d at 682.  At sentencing, however, the judge -- based on testimony of the various amounts that government witnesses indicated they had sold to the defendant -- attributed 1200 grams of methamphetamine to the defendant and used that amount to increase his sentence under the Guidelines.  See 408 F.3d at 682.  The district court's findings increased the defendant's Guidelines sentencing range from 63 to 78 months to 121 to 151 months.  See 408 F.3d at 682-83.  On appeal, the Tenth Circuit stated that, both before and after Congress' passage of the Sentencing Reform Act, "sentencing courts maintained the power to consider the broad context of a defendant's conduct, even when a court's view of the conduct conflicted with the jury's verdict." 408 F.3d at 684.  Although United States v. Booker made the Guidelines ranges "effectively advisory," the Tenth Circuit reaffirmed that "district courts are still required to consider Guideline ranges, which are determined through application of the preponderance standard, just as they were before."  United States v. Magallanez, 408 F.3d at 685 (citation omitted).

- 15 -

The Tenth Circuit, while "recognizing 'strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof,'" has "long held that sentencing facts in the 'ordinary case' need only be proven by a preponderance." United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)(quoting United States v. Washington, 11 F.3d 1510, 1516 (10th Cir. 1993)).[6]  "[T]he application of an enhancement . . . does not implicate the Supreme Court's holding in Apprendi v. New Jersey." United States v. Reyes-Vencomo, No. CR 11-2563 JB, 2012 WL 2574810, at *3 (D.N.M. June 26, 2012)(Browning, J.).  The Tenth Circuit applies Apprendi's requirement that a fact be submitted to a jury only where the fact would increase a defendant's sentence "above the statutory maximum permitted by the statute of

_____

[6]Although the Tenth Circuit stated in United States v. Washington that "the issue of a higher than a preponderance standard is foreclosed in this circuit," 11 F.3d at 1516, the Tenth Circuit has since classified its holding as leaving "open the possibility that due process may require proof by clear and convincing evidence before imposition of a sentence that increases a sentence by an 'extraordinary or dramatic' amount," United States v. Ray, 704 F.3d at 1314 (quoting United States v. Olsen, 519 F.3d at 1105). See United States v. Olsen, 519 F.3d at 1105 (affirming the use of the preponderance-of-the-evidence standard for sentencing facts that increase a sentence in the "'ordinary case'" (quoting United States v. Washington, 11 F.3d at 1516)). The Tenth Circuit has not yet found that an "extraordinary or dramatic" instance warrants a higher standard of proof for certain facts that enhance a defendant's sentence. United States v. Olsen, 519 F.3d at 1105 (explaining that it need not determine whether a higher standard of proof is required to sentence a defendant for committing perjury in relation to a grand jury investigation, because the enhancement did not require the district court to determine that the defendant committed murder, but only that he obstructed a homicide investigation). See United States v. Constantine, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)(affirming a preponderance-of-the-evidence standard for facts that enhance a defendant's offense level 4 levels); United States v. Valdez, 225 F.3d 1137, 1143 n.2 (10th Cir. 2000)(rejecting the defendant's argument that a dramatic increase in a sentence because of a sentencing judge's finding of additional amounts of methamphetamine associated with acquitted charges entitled the defendant to a clear-and-convincing evidence standard at sentencing, and noting that the Tenth Circuit "foreclosed by binding precedent" this argument); United States v. Washington, 11 F.3d at 1516 (finding that a district court need not find by any more than a preponderance of the evidence the amount of cocaine a defendant distributed, even though its findings increased the defendant's sentence from twenty years to consecutive forty-year terms).

- 16 -

conviction."  United States v. Price, 400 F.3d 844, 847 (10th Cir. 2005).  Accord United States v.

Ray, 704 F.3d at 1314.  A defendant may assert an error under Apprendi only where the fact at

issue increased his sentence beyond the statutory maximum.  See United States v. O'Flanagan,

339 F.3d 1229, 1232 (10th Cir. 2003)(holding that a defendant could not assert an error

under Apprendi, because "his sentence does not exceed the statutory maximum"); United States v.

Hendrickson, 2014 WL 6679446, at *6 (10th Cir. 2014)[7](holding that, after Alleyne, "[i]t is well-

established that sentencing factors need not be charged in an indictment and need only be proved

to the sentencing judge by a preponderance of the evidence").  The Court has noted:

> [A]lthough the decision of the Supreme Court of the United States
> in Alleyne v. United States, . . . expands the rule from Apprendi v. New Jersey
> . . . (holding that facts that increase the maximum sentence a defendant faces must
> be proven to a jury beyond a reasonable doubt), to cover facts that increase the
> mandatory minimum sentence, as well as the maximum sentence, it does not
> prohibit district judges from continuing to find advisory sentencing factors by a
> preponderance of the evidence.  See [United States v. ]Sangiovanni, 2014 WL
> 4347131, at *22-26 [(D.N.M. 2014)(Browning, J.)].

---

[7]United States v. Hendrickson is an unpublished opinion, but the Court can rely on an
unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th
Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive
value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . [a]nd we
> have generally determined that citation to unpublished opinions is not favored.
> However, if an unpublished opinion or order and judgment has persuasive value
> with respect to a material issue in a case and would assist the court in its disposition,
> we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes United States
v. Hendrickson, United States v. Schmidt, 353 F. App'x 132 (10th Cir. 2009), United States v.
Leroy, 298 F. App'x 711 (10th Cir. 2008), and United States v. Banda, 168 F. App'x 284 (10th
Cir. 2006), have persuasive value with respect to a material issue, and will assist the Court in its
disposition of this Memorandum Opinion and Order.

United States v. Cervantes-Chavez, No. CR 14-0259 JB, 2014 WL 6065657, at *14 (D.N.M. Nov.

3, 2014)(Browning, J.).

## LAW REGARDING RELEVANT CONDUCT FOR SENTENCING

In calculating an appropriate sentence, the Guidelines consider a defendant's "offense of

conviction and all relevant conduct under § 1B1.3 (Relevant Conduct) unless a different meaning

is specified or is otherwise clear from the context." U.S.S.G. § 1B1.1, n.1(H). In United States v.

Booker, the Supreme Court notes:

> Congress' basic statutory goal -- a system that diminishes sentencing disparity --
> depends for its success upon judicial efforts to determine, and to base punishment
> upon, the real conduct that underlies the crime of conviction. That determination
> is particularly important in the federal system where crimes defined as, for example,
> "obstruct[ing], delay[ing], or affect[ing] commerce or the movement of any article
> or commodity in commerce, by . . . extortion," . . . can encompass a vast range of
> very different kinds of underlying conduct.

543 U.S. at 250-51 (emphasis in original)(quoting 18 U.S.C. § 1951(a)). The Supreme Court's

reasoning in United States v. Booker suggests that the consideration of real conduct is necessary

to effectuate Congress' purpose in enacting the Guidelines.

Section 1B1.3(a) provides that the base offense level under the Guidelines "shall be

determined" based on the following:

> (1)
>
> (A)     all acts and omissions committed, aided, abetted,
> counseled, commanded, induced, procured, or willfully caused by
> the defendant; and
>
> (B)     in the case of a jointly undertaken criminal activity
> (a criminal plan, scheme, endeavor, or enterprise undertaken by the
> defendant in concert with others, whether or not charged as a
> conspiracy), all reasonably foreseeable acts and omissions of others
> in furtherance of the jointly undertaken criminal activity, that
> occurred during the commission of the offense of conviction, in

- 18 -

preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

(2)     solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

(3)     all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and

(4)     any other information specified in the applicable guideline.

U.S.S.G. § 1B1.3(a)(1)-(4).  The court may consider, as relevant conduct, actions that have not resulted in a conviction.  Pursuant to § 6A1.3's commentary, evidentiary standards lower than beyond a reasonable doubt are permitted to show relevant conduct.  The court may rely upon reliable hearsay, so long as the evidence meets the preponderance-of-the-evidence standard.  See United States v. Vigil, 476 F. Supp. 2d 1231, 1245 (D.N.M. 2007)(Browning, J.), aff'd, 523 F.3d 1258 (10th Cir. 2008).  Accord United States v. Schmidt, 353 F. App'x 132, 135 (10th Cir. 2009)(unpublished)("The district court's determination of 'relevant conduct' is a factual finding subject to a preponderance of the evidence standard, and clear error review.").  The evidence and information upon which the court relies, however, must have sufficient indicia of reliability.  See U.S.S.G. § 6A1.3 ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

Supreme Court precedent on relevant conduct consists primarily of two cases: Witte v. United States, 515 U.S. 389 (1995), and United States v. Watts, 519 U.S. 148 (1997).  In Witte v.

United States, the Supreme Court upheld the use of uncharged conduct at sentencing against a double-jeopardy challenge.  See 515 U.S. at 404-06.  The defendant in Witte v. United States had been involved in an unsuccessful attempt to import marijuana and cocaine into the United States in 1990, and in an attempt to import marijuana in 1991.  See 515 U.S. at 392-93.  In March, 1991, a federal grand jury indicted the defendant for attempting to possess marijuana with intent to distribute in association with the defendant's latter attempt to import narcotics.  See 515 U.S. at 392-93.  At sentencing, the district court concluded that, because the 1990 attempt was part of the continuing conspiracy, it was relevant conduct under § 1B1.3, and thus calculated the defendant's base offense level based on the aggregate amount of drugs involved in both the 1990 and 1991 episodes.  See 515 U.S. at 394.

In September, 1992, a second federal grand jury indicted the defendant for conspiring and attempting to import cocaine in association with his activities in 1990.  See 515 U.S. at 392-93.  The defendant moved to dismiss the indictment, contending that he had already been punished for the cocaine offenses, because the court had considered those offenses relevant conduct at the sentencing for the 1991 marijuana offense.  See 515 U.S. at 395.  The district court agreed and dismissed the indictment, holding that punishment for the cocaine offenses would violate the prohibition against multiple punishments in the Double Jeopardy Clause of the Fifth Amendment to the Constitution.  See 515 U.S. at 395.  The United States Court of Appeals for the Fifth Circuit reversed and held that "the use of relevant conduct to increase the punishment of a charged offense does not punish the offender for the relevant conduct."  United States v. Witte, 25 F.3d 250, 258 (5th Cir. 1994).  In reaching this holding, the Fifth Circuit acknowledged that its conclusion was contrary to other United States Courts of Appeals opinions, including a Tenth Circuit opinion, that

- 20 -

had previously considered this question.  See 25 F.3d at 255 n.19 (citing United States v. Koonce, 945 F.2d 1145 (10th Cir. 1991)).

The Supreme Court granted certiorari to resolve the conflict between the Courts of Appeals and affirmed the Fifth Circuit decision.  See Witte v. United States, 515 U.S. at 395.  In holding that a district court's consideration of the defendant's relevant conduct did not punish the defendant for that conduct, the Supreme Court concluded that "consideration of information about the defendant's character and conduct at sentencing does not result in 'punishment' for any offense other than the one of which the defendant was convicted."  515 U.S. at 401.  The Supreme Court reasoned that sentencing courts had always considered relevant conduct and "the fact that the sentencing process has become more transparent under the Guidelines . . . does not mean that the defendant is now being punished for uncharged relevant conduct as though it were a distinct criminal offense."  515 U.S. at 402.  Sentencing enhancements do not punish a defendant for uncharged offenses; rather, they reflect Congress' policy judgment "that a particular offense should receive a more serious sentence within the authorized range if it was either accompanied by or preceded by additional criminal activity."  515 U.S. at 403.

In United States v. Watts, the Supreme Court, in a per curiam opinion, relied upon Witte v. United States and upheld, against a double-jeopardy challenge, a sentencing judge's use of conduct for which the defendant had been acquitted.  See United States v. Watts, 519 U.S. at 149.  The Supreme Court noted that its conclusion was in accord with every United States Court of Appeals -- other than the Court of Appeals for the Ninth Circuit -- and that each had previously held that a sentencing court may consider conduct for which the defendant had been acquitted, if the government establishes that conduct by a preponderance of the evidence.  See 519 U.S. at 149

(citing, e.g., United States v. Coleman, 947 F.2d 1424, 1428-29 (10th Cir. 1991)).  The Supreme

Court began its analysis with 18 U.S.C. § 3661: "No limitation shall be placed on the information

concerning the background, character, and conduct of a person convicted of an offense which a

court of the United States may receive and consider for the purpose of imposing an appropriate

sentence."  United States v. Watts, 519 U.S. at 151 (quoting 18 U.S.C. § 3661).  According to the

Supreme Court, 18 U.S.C. § 3661 codifies "the longstanding principle that sentencing courts have

broad discretion to consider various kinds of information" and that "the Guidelines did not alter

this aspect of the sentencing court's discretion."  United States v. Watts, 519 U.S. at 151-52.

Tenth Circuit caselaw now adheres closely to the Supreme Court's results in Witte v.

United States and United States v. Watts.  See United States v. Andrews, 447 F.3d 806, 810 (10th

Cir. 2006)(applying Witte v. United States' holding to affirm that a career-offender enhancement

does not violate the Fifth Amendment's Double Jeopardy Clause).  In United States v. Banda, 168

F. App'x 284 (10th Cir. 2006)(unpublished), the Tenth Circuit rejected a defendant's argument

that it was "structural error" for a district court to find sentencing factors "by a preponderance of

the evidence rather than the jury applying a beyond-a-reasonable-doubt standard."  168 F. App'x

at 290. The Tenth Circuit explained that "'[i]t is now universally accepted that judge-found facts

by themselves do not violate the Sixth Amendment.  Instead, the constitutional error was the

court's reliance on judge-found facts to enhance the defendant's sentence mandatorily.'"  168 F.

App'x at 290 (quoting United States v. Lauder, 409 F.3d 1254, 1269 (10th Cir. 2005)).

In United States v. Coleman, the defendant appealed the district court's sentence

enhancement for firearms possession after he was convicted of conspiracy to possess and

possession of a controlled substance with intent to distribute but was acquitted of using or carrying

- 22 -

a firearm during and in relation to a drug trafficking crime.  See 947 F.2d at 1428.  The Tenth

Circuit acknowledged that courts had taken various positions on whether a sentence may be

enhanced for firearms possession despite a defendant's acquittal on firearms charges.  See 947

F.2d at 1428-29 (citing United States v. Duncan, 918 F.2d 647, 652 (6th Cir. 1990)("[A]n acquittal

on a firearms carrying charge leaves ample room for a district court to find by the preponderance

of the evidence that the weapon was possessed during the drug offense."); United States v.

Rodriguez, 741 F. Supp. 12, 13-14 (D.D.C. 1990)(Green, J.)(refusing to apply 2-level

enhancement for firearms possession, because "[t]o add at least 27 months to the sentence for a

charge of which the defendant was found not guilty violates the constitutional principle of due

process and the ban against double jeopardy")).

  Without discussion related to the standard of proof a sentencing court should use to make

factual findings, the Tenth Circuit held that the district court did not err in enhancing the

defendant's sentence for possession of a firearm.  See United States v. Coleman, 947 F.2d at 1429.

The Tenth Circuit based its conclusion on evidence that: (i) individuals at the arrest scene handled

the weapons at will; (ii) the weapons were handled at will by individuals who lived at the house;

and (iii) the weapons were kept for the protection of conspiracy participants and the narcotics

involved.  See 947 F.2d at 1429.  The Tenth Circuit summarized that, in reviewing relevant federal

case law, it found "persuasive the decisions that have allowed a sentencing court to consider trial

evidence that was applicable to a charge upon which the defendant was acquitted."  947 F.2d

at 1429.

  In United States v. Washington, the defendant argued that the United States needed to

prove drug quantities used as relevant conduct to establish a defendant's offense level by clear-

- 23 -

and-convincing evidence, rather than by a preponderance of the evidence.  See 11 F.3d at 1512.

The defendant objected to his sentencing, because the drug quantity that the district court

considered as relevant conduct, and which the court found by a preponderance of the evidence,

increased his Guidelines sentencing range from 210-262 months to life in prison.  See 11 F.3d

at 1515.  The defendant argued "that because the additional drug quantities effectively resulted in

a life sentence a higher standard of proof should be required."  11 F.3d at 1515.  Although the

Tenth Circuit in United States v. Washington "recognize[d] the strong arguments that relevant

conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof,"

it held that "the Due Process Clause does not require sentencing facts in the ordinary case to be

proved by more than a preponderance standard."   11 F.3d at 1516 (citing McMillan v.

Pennsylvania, 477 U.S. 79, 84 (1986)).  See United States v. Sangiovanni, 2014 WL 4347131,

at *22-26 (concluding that a sentencing court can cross reference from the Guidelines that

correspond to the defendant's crime of conviction to the Guidelines for another, more harshly

punished crime, if it can be established by a preponderance of the evidence that the defendant

committed the more serious crime); United States v. Cervantes-Chavez, 59 F. Supp. 3d 1295,

1314-15 (D.N.M. 2014)(Browning, J.)(cross-referencing from the guideline for being an illegal

alien in possession of a firearm to the drug-possession guideline after finding by a preponderance

of the evidence that the defendant committed a drug-possession crime).

The Court previously has held that it may consider a defendant's refusal to answer

questions for the PSR, while not drawing an adverse inference from the refusal.  See United States

v. Goree, No. CR 11-0285 JB, 2012 WL 592869, at *11 (D.N.M. 2012)(Browning, J.).  The Court

also has held that, although it can consider a defendant's silence about information regarding

- 24 -

herself or others engaging in criminal conduct, it will not rely on that silence to increase the defendant's sentence. See <u>United States v. Chapman</u>, No. CR 11-0904 JB, 2012 WL 2574814, at *13 n.5 (D.N.M. 2012)(Browning, J.). Finally, the Court has held that a defendant's "aggression towards other individuals, and the murder he may have attempted to orchestrate while incarcerated" is relevant information which the Court can consider in fashioning a proper sentence. <u>United States v. Romero</u>, No. CR 09-1253 JB 2012 WL 6632493, at *23 (D.N.M. Dec. 6, 2012)(Browning, J.). See <u>United States v. Tapia</u>, No. CR 12-3012 JB, 2017 WL 6417610, at *10-15 (D.N.M. Dec. 14, 2017)(Browning, J.).

## <u>ANALYSIS</u>

The Court concludes that the December 11, 2018, incident and Nissen's December 13, 2018, interview with Cash are relevant conduct under U.S.S.G. § 1B1.3. The Court further concludes that the United States has not demonstrated by a preponderance of the evidence that Nissen intended to carry out his threats against NM State Police officers and employees. Accordingly, the Court does not apply the 6-level enhancement under U.S.S.G. § 2A6.1(b)(1). Last, the Court will not apply the 4-level enhancement under U.S.S.G. § 2A6.1(b)(4), because the United States has not proven by a preponderance of the evidence that Nissen's offense did not substantially disrupt public functions or cause the NM State Police to expend substantial resources. Accordingly, the Court sustains in part and overrules in part the United States' Objections.

**I.  THE COURT WILL NOT AMEND THE PSR'S RELEVANT CONDUCT <u>SECTION.</u>**

The United States asserts that the USPO errs in omitting three incidents from the PSR's relevant conduct section. See Objections at 2. First, the United States contends that the PSR should include as relevant that, on December 11, 2018, Nissen, dressed in a disguise, visited an

- 25 -

NM State Police and left a suspicious object.  See Objections at 2.  Second, The United States says that the PSR should include as relevant conduct Nissen's December 13, 2018, interview with Cash, in which Nissen discussed the threats he made to NM State Police employees and mentioned that he owns a revolver that he carries for protection against police.  See Objections at 2-3.  Last, the United States asserts that the PSR should include as relevant conduct "the service of the state search warrant, recovering the revolver referenced in the December 13 interview with Detective Cash."  Objections at 2-3.  To support this Objection, the United States points to the Court's August 1, 2019, oral ruling, responding to the United States' motion to admit each of these acts as rule 404(b) evidence, in which the Court held that these acts are relevant to the charged conduct, but inadmissible as unfairly prejudicial under rule 403.  See Objections at 2 (citing Aug. 1 Tr. at 15:12-17 (Court)).  The United States further asserts that, in the December 11, 2018, incident, Nissen intended to scare NM State Police employees, whom he was convicted of threatening.  See Objections at 3.

That a defendant's conduct is relevant to the charged offense under rule 401, however, does not render that conduct relevant for § 1B1.1's purposes.  An "offense," as the Guidelines defines, includes the "offense of conviction and all relevant conduct under § 1B1.3"  United States v. Tagore, 158 F.3d 1124, 1128 (10th Cir. 1998).  Section 1B1.1 of the Guidelines provides that sentencing courts shall calculate a defendant's Guidelines sentence "on the basis of" "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant."  U.S.S.G. § 1B1.3(a) and (a)(1)(A).  Section 1B1.3 embodies the principle that the sentence should reflect the offense's seriousness, and so courts should consider all conduct relevant to determining that seriousness.  See United States v. Allen, 488 F.3d 1244,

1255 (10th Cir. 2007). The Guidelines thus "allow courts to consider conduct which is not formally charged or is not an element of the offense of conviction." United States v. Tagore, 158 F.3d at 1128. The conduct that a sentencing court may consider, therefore, "comprises more, often much more, than the offense of conviction itself, and may include uncharged and even acquitted conduct." United States v. Allen, 488 F.3d at 1254-55. The Court may consider only relevant conduct, however, and this "relatedness principle is fundamental because of our commitment to sentencing based on the seriousness of the actual offense proven or admitted." United States v. Allen, 488 F.3d at 1255. This limiting principle is based in the Sixth Amendment: "If the considered conduct has nothing to do with the offense of conviction, the court is effectively sentencing a defendant for a crime that was never proved to the jury . . . ." United States v. Allen, 488 F.3d at 1255.

Conduct will be relevant when it is "the same type of conduct" or part of "the same scheme or plan" as the conviction offenses. United States v. Custodio, 39 F.3d 1121, 1126 (10th Cir. 1994). In this way, the test for relevant conduct under §1B1.3 is not synonymous with the test for relevancy under rules 401, 403, and 404(b). The standard for relevance under rule 401 is very liberal. See United States v. Leonard, 439 F.3d 648, 651 (10th Cir. 2006)("Rule 401 is a liberal standard.")(citing United States v. McVeigh, 153 F.3d 1166, 1190 (10th Cir. 1998)). Under rule 401, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. See United States v. Leonard, 439 F.3d at 651. Under rule 404(b), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the

- 27 -

character." Fed. R. Evid. 404(b)(1).  The reason for this rule is not that evidence of other crimes is not relevant or probative, but that it is too probative; it violates the Anglo-American principle that a defendant should be tried only for the crime with which he is charged.  See, e.g., People v. Zackowitz, 172 N.E. 466, 468 (N.Y. 1930)(Cardozo, J.).  The Court can admit that sort of evidence, however, "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).  "In other words, one cannot present evidence the relevance of which is based on the forbidden inference: the person did X in the past, therefore he probably has a propensity for doing X, and therefore he probably did X this time, too."  Wilson v. Jara, No. CIV 10-0797, 2011 WL 6739166, at *5 (D.N.M. Nov. 1, 2011)(Browning, J.).

Rule 404's distinction between propensity and "another purpose," Fed. R. Evid. 404(b)(2), is thus analogous the Guidelines' distinction between an offense's characteristics and an offender's characteristics.  See United States v. Allen, 488 F.3d at 1254; Douglas A. Berman, Conceptualizing Blakely, 17 Fed. Sent'g Rep. 89, 89-90 (2004)(distinguishing between offense characteristics and offender characteristics).  Relevant conduct determines the overall offense level, while the defendant's characteristics relating to the risk of recidivism -- typically past criminal conduct -- relate to the defendant's criminal history category.  See U.S.S.G. §§ 1B1.3 (relevant conduct), 4A1.1, 4A.3.(a)(2)(E) (criminal history).

> Conduct related to the offense of conviction is treated as an offense characteristic, whereas past criminal convictions are generally treated as an offender characteristic, and taken into account by assigning a criminal history score. . . . Future dangerousness also is an offender characteristic.  Because evaluation of future dangerousness could otherwise veer into speculation, it generally is evaluated on the basis of the defendant's recidivism, which takes into account prior convictions and prior similar adult misconduct.  United States Sentencing Guidelines Manual §§ 4A1.1, 4A.3.(a)(2)(E).

United States v. Allen, 488 F.3d at 1254.  Accordingly, that the December 11, 2018, incident and Nissen's interview with Bernalillo County Sheriff's deputies are relevant under rule 401 does not automatically render those acts relevant for § 1B1.3's purposes.  Those acts are relevant for sentencing purposes if they are part of the same course of conduct as the offenses of which Nissen was convicted, and if they reflect those offenses' seriousness.

Here, the December 11, 2018, incident is relevant conduct.  Nissen, apparently still upset at the NM State Police, went to the NM State Police office in Albuquerque, New Mexico -- the same office at which he had directed his threats less than a month earlier -- and, dressed in a disguise, told NM State Police staff through an intercom that he was "there to deliver a present." Revised PSR ¶ 38, at 10.  Coincidentally, the NM State Police employee with whom Nissen spoke over the intercom was the same employee that Nissen threatened by telephone on November 26, 2018.  See Revised PSR ¶ 38, at 10.  When the employee identified Nissen, he "began cursing and left and object directly in front of the door" before leaving.  Revised PSR ¶ 38, at 10.  The object was a black, spray-painted bleach bottle with flowers, as well as two letters "concerning sovereign citizens and constitutional issues."  Revised PSR ¶ 38, at 10.  Nissen's actions on December 11, 2019, are part of the "same scheme or plan" as his convicted conduct -- threatening and antagonizing NM State Police employees against whom Nissen felt aggrieved.  United States v. Custodio, 39 F.3d at 1126.  Similarly, the December 11, 2018, incident occurred "during the same time frame" as the November, 2018, threats for which Nissen was convicted.  United States v. Allen, 488 F.3d at 1256.  There is thus a "strong relationship between the uncharged conduct and the convicted offense," because the United States "has demonstrated a significant similarly, regularity, and temporal proximity" between the "uncharged conduct and the convicted

- 29 -

offense[s]."  <u>United States v. Ortiz</u>, 431 F.3d at 1040.  Nissen's convicted offenses and his

December 11, 2018, actions share "common victims, . . . common purpose[, and] similar modus

operandi."  U.S.S.G. § 1B1.3, comment.  The convicted offenses and the December 11, 2018,

incident all involved threats or threatening conduct directed at NM State Police employees, the

objects of Nissen's ire.  Accordingly, the December 11, 2018, incident is relevant conduct, and the

PSR should be amended to reflect its relevancy.

       The December 13, 2018, interview with Bernalillo County Sheriff's deputies is relevant

conduct, but NM State Police's recovery of Nissen's handgun is not relevant conduct for § 1B1.3's

purposes.  As for the interview, Nissen contacted the Bernalillo County Sheriff's Office to

complaint about the NM State Police.  <u>See</u> RevisedPSR ¶ 40, at 10.  Bernalillo County Sheriff's

deputies agreed to meet with Nissen, and Nissen mentioned that he owns firearms, including a rifle

and a revolver.  <u>See</u> Revised PSR ¶ 40, at 10.  Nissen told the Bernalillo County Sheriff's deputies

that he carries the revolver to protect himself from "'rogue cops,'" and the sheriff's deputies

understood Nissen to be referring to NM State Police officers.  Revised PSR ¶ 40, at 10.  Nissen

also discussed the threats which he made against NM State Police employees, saying that he called

to explain his legal rights, but that, in doing so, he got carried away.  <u>See</u> Revised PSR ¶ 40, at 10.

The United States also asserts as relevant conduct that, on December 19, 2018, NM State Police

officers executed a search warrant on Nissen's home and they recovered the handgun that Nissen

mentioned in his interview with Bernalillo County Sheriff's deputies.  <u>See</u> Objections at 2-3.  The

Revised PSR discusses this search warrant and Nissen's arrest in the context of Nissen's criminal

history, because the search also revealed twenty pounds of processed marijuana and thirty-two

marijuana plans.  <u>See</u> Revised PSR ¶ 46, at 11. Nissen now has marijuana-distribution charges

pending in Bernalillo County Metropolitan Court.  See Revised PSR ¶ 46, at 11.  These charges do not factor into Nissen's criminal history category, which is zero, because the charges remain pending.  See Revised PSR ¶ 40, at 11; id. ¶ 46, at 11; United States v. Allen, 488 F.3d at 1256 ("[C]riminal history points are assigned only on the basis of prior convictions by a jury or pleas of guilty or nolo contendere.").

Nissen's December 13, 2018, interview with Bernalillo County Sheriff's deputies is relevant conduct, but NM State Police's recovery of the handgun that Nissen referenced in the December 13, 2018, interview is not relevant.  The United States argues that these incidents are relevant conduct, primarily because Nissen's handgun, along with his statements to Bernalillo County Sheriff's deputies that he protects himself against corrupt police offers, demonstrates his "oppositional interest in state police officers[.]"  Objections at 2.  See MIL at 4.  There is a strong relationship between Nissen's statements and his convicted offense.  Nissen, still fixated on NM State Police, contacted the Bernalillo County Sheriff's Office to complain about NM State Police. See Revised PSR ¶ 40, at 10.  Nissen told the sheriff's deputies that he carries a concealed handgun to protect himself from police officers that he deems corrupt.  See Revised PSR ¶ 40, at 10.  There is no evidence that Nissen purchased the handgun in connection with his threats against NM State Police employees, and so his mere possession of a handgun is not part of Nissen's plan or scheme to threaten NM State Police employees.  See U.S.S.G. § 1B1.3.  Nissen's statement, however, that he keeps the handgun to use against law enforcement is of "the same type of conduct" and "the same scheme or plan" as the charged conduct.  United States v. Custodio, 39 F.3d at 1126.

NM State Police's recovery of the handgun is not relevant conduct.  The United States does not provide any information about what NM State Police sought in executing the search

warrant on December 18, 2018.  See generally Objections; MIL.  The Court thus hesitates to consider as relevant conduct NM State Police's recovery of the handgun, because NM State Police may have sought the warrant to search for marijuana plants -- Nissen's possession of which is unrelated to his threats against NM State Police.  See U.S.S.G. § 6A1.3 ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").  Further, the recovery itself is not Nissen's conduct, but rather NM State Police's conduct, and Nissen's possession of the handgun is relevant primarily because of Nissen's statements that he keeps it to protect against "rogue cops."  PSR ¶ 39, at 10.  The recovery thus is not necessarily indicative of the offense's seriousness or of Nissen's plan or scheme regarding his threats against NM State Police employees.  Accordingly, NM State Police's recovery of Nissen's handgun is not relevant conduct for § 1B1.3's purposes.

## II.  THE COURT DOES NOT APPLY THE 6-LEVEL ENHANCEMENT UNDER U.S.S.G. § 2A6.1(b)(1), BECAUSE NISSEN DID NOT ENGAGE IN ANY CONDUCT EVIDENCING AN INTENT TO CARRY OUT HIS THREATS AGAINST NM STATE POLICE EMPLOYEES.

The United States argues that a 6-level enhancement under § 2A6.1(b)(1) applies, because "carrying around a loaded revolver, admittedly for the explicit purpose of opposing state police, is direct evidence of intent to carry out threats to 'put a bullet in that *** pig's head'" and "take my revolver out and [] put that *** drop dead.'"  Objections at 3 (quoting Revised PSR ¶ 8, at 5)(alterations in Objections).  The USPO maintains that this enhancement does not apply, because Nissen did not make any "overt acts to suggest he was planning to carry out his threats to shoot any of the victims."  Addendum at 2.  The 6-level enhancement does not apply, because the United

States has not proven by a preponderance that Nissen's offense demonstrates an intent to carry out his threats against NM State Police officers and employees.

Section 2A6.1(b)(1) provides for a 6-level enhancement if "the offense involved any conduct evidencing an intent to carry out such threat." U.S.S.G. § 2A6.1(b)(1).[8] The enhancement's applicability "does not depend on the defendant's actual intent, which could exist regardless siwhether any actions were taken toward carrying it out; rather it depends on whether or not the defendant engaged in conduct from which the court permissibly infers such an intent." United States v. Berndt, 127 F.3d 251, 259 (2d Cir. 1997). To be probative, the conduct typically must have occurred either contemporaneously with or before the threat. See U.S.S.G. § 2A6.1 cmt. 1 ("In determining whether subsections (b)(1), (b)(2), and (b)(3) apply, the court shall consider both conduct that occurred prior to the offense and conduct that occurred during the offense; however, conduct that occurred prior to the offense must be substantially and directly connected to the offense, under the facts of the case taken as a whole."). Courts examine "the proximity in time between the threat and the prior conduct[, . . .] the seriousness of the defendant's prior conduct[, and] the extent to which the pre-threat conduct has progressed towards carrying out the threat." United States v. Barbour, 70 F.3d 580, 587 (11th Cir. 1995).

---

[8]Tenth Circuit caselaw interpreting § 2A6.1(b)(1) is sparse, as the Tenth Circuit has addressed the enhancement in only three cases. See United States v. Scott, 42 F. App'x 264, 265 (10th Cir. 2002)(holding that the fact that the defendant possessed weapons that he referenced in a threat well before making the threat does not render the enhancement inapplicable); United States v. Martin, 163 F.3d 1212, 1217 (10th Cir. 1998)(finding not clearly erroneous the district court's credibility determination at sentencing in concluding that § 2A6.1(b)(1) applied, where the district court relied on testimony that the defendant purchased a firearm around the time he made the threats); United States v. Lara-Acuna, 21 F.3d 1122 (10th Cir. 1994)(holding that §2A6.1(b)(1) applies to conveying maliciously false information in the form of a bomb threat in violation of 18 U.S.C. § 844).

To be probative, the conduct should be directed at the threats' recipient, and must occur contemporaneously with or just before the threat.  In United States v. Scott, the United States Court of Appeals for the Eleventh Circuit concluded that § 2A6.1(b)(1) did not apply to a defendant who, while awaiting sentencing, sent a series of letters to the sentencing judge threatening to blow up the "fed building" and kill all "feds, judges."  United States v. Scott, 441 F.3d at 1324.  The defendant told federal law enforcement agents that he was upset at the judge for "lying" to him about his sentence, but, when asked whether he intended to carry out the threats, stated: "There are a lot of people that I want to do something to, but I have not made up my mind when or where I will do it."  United States v. Scott, 441 F.3d at 1324.  The defendant argued that § 2A6.1(b)(1) did not apply, because "there was no evidence of any preparation to carry out the threats, only evidence of the threats themselves," but the district court overruled the defendant's objections, concluding that the defendant's statements to federal agents were "hard to ignore."  United States v. Scott, 441 F.3d at 1325.  The Eleventh Circuit reversed.  See 441 F.3d at 1328.  The Eleventh Circuit concluded that the district court erred in relying on the defendant's post-offense statements to law enforcement, because the defendant did not make the statement's contemporaneously with or before the offense, as the commentary to § 2A6.1(b)(1) requires, and because the statement was "simply an answer (and a somewhat ambiguous one at that) given by Scott while in custody and in response to an investigator's question[.]"  See 441 F.3d at 1329.

Alternatively, § 2A6.1(b)(1) is likely satisfied where the defendant has a pattern of targeting or seeking out his victims.  For example, where a defendant had recently shot at his or her victim, such conduct will strongly evidence intent to carry out subsequent threats against that same victim.  See United States v. Sullivan, 75 F.3d 297, 302 (7th Cir. 1996).  Similarly, repeated

- 34 -

threats against the same victim over a long period of time suggest the defendant's intent to carry out the threats.   See, e.g., United States v. Harris, 763 F. Supp. 546, 549 (M.D. Ala. 1991)(Thompson, C.J.)("A brief examination of these letters reveals that Harris's death threats were pointed and unambiguous, and, indeed, grew more heated and enraged with the passage of time.").   Surveilling or seeking out one's victims is also strong evidence of intent to carry out the threats.   See United States v. Taylor, 88 F.3d 938, 943 (11th Cir. 1996)(holding that six-level enhancement applicable where the victim "had observed [the defendant] conducting surveillance of his home, and many of [the defendant's] letters described the [victims'] activities in a detail that seemed to indicate first-hand observation"); United States v. Green, 25 F.3d 206, 211 (3d Cir. 1994)(holding that evidence that the defendant asked local law enforcement to provide the victim's license plate number and address "certainly constitutes conduct evidencing an intent to carry out the . . . threats").   Finally, Courts uniformly rely on the defendant's possession of weapons that enable him or her to carry out the threat.   See, e.g., United States v. Carter, 111 F.3d 509, 514 (7th Cir. 1997); United States v. Kirsh, 54 F.3d 1062, 1073 (2d Cir. 1995); United States v. Hines, 26 F.3d 1469, 1474 (9th Cir. 1994).   Although buying weapons around the time the defendant makes a threat is strong evidence of intent, see United States v. Kirsh, 54 F.3d at 1073, that a defendant did not acquire new weapons around the time he or she made threats does not render § 2A6.1(b)(1) inapplicable, especially where the defendant already owned weapons and engaged in some additional overt act, see United States v. Scott, 42 F. App'x at 265.   Accordingly, there must be some overt act, beyond the threats themselves and occurring before or during the threat that fairly demonstrates the defendant's intent to carry out the threats.   See United States v. Barbour, 70 F.3d at 586.

That Nissen intended to carry out his threats is not an element of § 875(c).  See MOO, 2020 WL 108488, at *15.  The Court therefore expressly instructed the jury that, to find Nissen guilty, it need not conclude that Nissen intended to shoot the NM State Police officer and employee against whom he made his threats:

> A "threat" is a serious statement expressing intent to instill fear, which, under the circumstances, would cause apprehension in a reasonable person, as distinguished from mere political argument, idle talk, exaggeration, or something said in a joking manner.  It is not necessary that Mr. Nissen intended to or had the ability to carry out the threat.

Jury Instruction No. 9, at 11, filed August 7, 2019 (Doc. 69)("Jury Instructions").  Accord Criminal Pattern Jury Instruction Committee of the United States Court of Appeals for the Tenth Circuit, **CRIMINAL PATTERN JURY INSTRUCTIONS (CRIMINAL)** 2.37.1, at 131 (**2011 Edition Updated February 2018)(INTERSTATE TRANSMISSION OF THREATENING COMMUNICATION).  The issue is thus whether the United States has proven by a preponderance that Nissen engaged in conduct that evidenced his intent to carry out his threats against Burd and Beuzekom, whom Nissen was convicted of threatening, or against other NM State Police officers and employees.  See United States v. Ortiz, No. CR 19-2853 JB, 2020 WL 1984183, at *4 (D.N.M. April 27, 2020)(Browning, J.)(noting Tenth Circuit caselaw that "facts relevant to sentencing still need be proved only by a preponderance of the evidence" (citing United States v. Magallanez, 408 F.3d 672, 684-85 (10th Cir. 2005))).

As discussed above, there is no evidence that Nissen purchased his firearms in connection with his threats against NM State Police employees.  Although this fact does not necessarily render § 2A6.1(b)(1) inapplicable, there is no evidence that, leading up to Nissen's threatening calls to NM State Police, Nissen engaged in any overt acts suggesting he intended to shoot NM State

Police employees.  See United States v. Scott, 42 F. App'x at 265 (holding that the defendant's pre-possessing firearms did not render § 2A6.1(b) inapplicable, because other overt acts suggested the defendant's intent to carry out his threats).  Although the Court concluded above that Nissen's December conduct is relevant for § 1B1.3's purposes, § 2A6.1(b)(1) directs the Court to consider Nissen's conduct leading up to and including the threats.  See U.S.S.G. § 2A6.1(b)(1) cmt. 1  The United States has not introduced evidence of any of Nissen's acts leading up to and including the threats that indicates he intended to carry them out.  Instead, the United States proved that, thirty minutes after Burd stopped Nissen on I-40 and briefly seized Nissen's rifle, Nissen called NM State Police to complain about what he believed was a constitutional violation.  See Revised PSR ¶ 8, at 4.  Nissen called several times that day to further complain.  See Revised PSR ¶ 8, at 5. Nissen issued his next threat over three weeks later, on November 26, 2018, when he again called NM State Police to further complain and, in doing so, became increasingly agitated and threatened to shoot Beuzekom, the NM State Police dispatch operator, in the head.  See Revised PSR ¶ 10, at 5.  The United States introduced no evidence that Nissen's fixation on NM State Police preceded Burd's stop.  The United States introduced no evidence about what Nissen did between Burd's stop and his November 2, 2018, threat or about what Nissen did in the three-week interim between the two threats.  Accordingly, there is no evidence that Nissen made any overt acts leading up to or during his threats that suggests his intent to act on those threats.

Further, even if the Court were to rely on Nissen's December, 2018, actions, § 2A6.1(b)(1) would remain inapplicable.  Although Nissen visited the NM State Police office in Albuquerque on December 11, 2018, he was not armed.  See Revised PSR ¶ 38, at 10.  Instead, Nissen carried a black spray-painted bleach bottle containing flowers and two letters detailing what

he believes are his constitutional rights.  See Revised PSR ¶ 38, at 10.  That Nissen's visit alarmed NM State Police employees, see Revised PSR ¶ 38, at 10, is evidence that NM State Police employees took Nissen's initial threats seriously, as § 875(c) requires, see United States v. Nissen, 2020 WL 108488, at *11 (noting that the First Amendment to the Constitution of the United States of America requires that reasonable observers would understand the communication be a genuine threat (citing United States v. Stevens, 881 F.3d 1249, 1253 (10th Cir. 2018))).  The incident does not, however, indicate that Nissen intended to shoot NM State Police employees in the head, as he had threatened to do in November, 2018, see Revised PSR ¶¶ 8-11, at 6-7, because Nissen was unarmed and carried only flowers, letters, and a spray-painted bleach bottle, see Revised PSR ¶ 38, at 10.

Nissen's December 13, 2018, interview with Bernalillo County Sheriff's deputies similarly suggests no intent.  To the contrary, Nissen explained that he called NM State Police each time to explain his rights but that he got carried away and threatened NM State Police officers and employees.  See Revised PSR ¶ 40, at 8 (quoting Nissen as saying that he "just [called to] get it done and then it got a little crazy" and "I didn't make no threatening calls, but I kept calling them about the law").  Nissen's statement is not "serious conduct [that] indicates an intent to carry out the threat," but rather "simply an answer (and a somewhat ambiguous one at that) given by [Nissen] . . . in response to an investigator's question, and it occurred after the crime had been completed."  United States v. Scott, 441 F.3d at 1329.  Because the United States has not proven by a preponderance that Nissen engaged in conduct that suggests he intended to carry out his threat, the Court overrules the United States Objection and declines to apply the 6-level enhancement under § 2A6.1(b)(1).

- 38 -

III.    **NISSEN DID NOT SUBSTANTIALLY DISRUPT NM STATE POLICE OPERATIONS OR CAUSE A SUBSTANTIAL EXPENDITURE OF FUNDS, SO <u>THE COURT WILL NOT APPLY § 2A6.1(b)(4)'s 4-LEVEL ENHANCEMENT</u>.**

The United States also asserts that the Court should apply a 4-level enhancement under § 2A6.1(b)(4)(B), which applies if the offense resulted in "a substantial expenditure of funds to clean up, decontaminate, or otherwise respond to the offense."[9]  U.S.S.G. § 2A6.1(b)(4)(B).  <u>See</u> Objections at 3-4.  The United States asserts that NM State Police expended significant resources responding to Nissen's December 11, 2018, visit to NM State Police's Albuquerque office.  <u>See</u> Objections at 3-4.  The United States further asserts that the 4-level enhancement applies, because Nissen's "amusement at the response to his bomb scare is strong evidence that he intended both to terrify and to provoke a response from the police with his antics."  Objections at 3-4.  Finally, the United States also points to NM State Police's "all-patrol-officer messages sent out to warn about the lethal danger Defendant represented, and . . . the warnings put up to alert even administrative employees to the dangers Defendant presented."  Objections at 4.

The Court declines to apply the 4-level enhancement.  First, § 2A6.1(b)(4) requires that the "offense" resulted in substantial expenditure of funds.  <u>See</u> U.S.S.G. § 2A6.1(b)(4).  The Guidelines provide that the Court may consider other acts as part of the "course of conduct or common scheme or plan" related to a conviction offense "only if those other acts must be grouped with the conviction offense under U.S.S.G. § 3D1.2(d)."  <u>United States v. Keyser</u>, 704 F.3d 631, 644 (9th Cir. 2012)(citing U.S.S.G. § 1B1.3(a)(2)).  Section 3D1.2(d) specifically excludes threatening communications, however, because § 2A6.1 describes such offenses.  <u>See</u> <u>United</u>

---

[9]The United States does not ask that the Court apply § 2A6.1(b)(4)(A), which provides a 4-level enhancement if the offense resulted in "substantial disruption of public, governmental, or business functions or services."  U.S.S.G. § 2A6.1(b)(4)(A).  <u>See</u> Objections at 3-4.

- 39 -

States v. Keyser, 704 F.3d at 644; U.S.S.G. § 3D1.2(d).  The Court thus may not consider the

December 11, 2018, incident, because that incident, had it resulted in a conviction, "would not be

grouped with" Nissen's November, 2018, threats.  United States v. Keyser, 704 F.3d at 644.

      Accordingly, the Court must determine whether NM State Police substantially expended

funds or resources in responding to Nissen's November, 2018, threats, for which he was convicted.

There is little caselaw specifically addressing § 2A6.1(b)(4)(B).  See United States v. Dudley, 463

F.3d 1221, 1226 (11th Cir. 2006)("No other circuit has addressed this specific guideline

enhancement in a published opinion").  Courts have, however, interpreted the term "substantial"

in other sentencing contexts, such as § 2J1.2(b)(2), which addressed "substantial" interference with

the administration of justice.  U.S.S.G. § 2J1.2(b)(2).  See, e.g., United States v. Leung, 360 F.3d

62, 67-68 (2d Cir. 2004)(concluding that the cost of interviewing several witnesses after the

defendant faked his death to avoid prosecution was substantial); United States v. Sinclair, 109 F.3d

1527, 1540 (10th Cir. 1997)(concluding that the United States expanded substantial resources in

recalling and reinterviewing two witnesses).  In United States v. Dudley, the Eleventh Circuit

began its analysis of § 2A6.1(b)(4)(A) by noting that "substantial" is defined as "'of ample or

considerable amount, quantity, size, etc,'" and disruption "cross-references to 'disrupt,' which

means "to cause disorder or turmoil in.'"  463 F.3d at 1226 (quoting Random House Unabridged

Dictionary at 569, 1897 (2d ed.1993)).  The Eleventh Circuit concluded that the defendant

substantially disrupted public services when he mailed packages containing what the defendant

claimed was anthrax to a state courthouse, resulting in

> closing half a floor of the state courthouse for two hours and the suspension of
> judicial business involving Judge Abbot for longer than that.  The letter also
> resulted in an interruption of judicial business involving Judge Penny Freesemann,
> whose chambers were located in the same building.  During that time, the hazardous

- 40 -

materials unit responded to the emergency and an officer and Judge Abbot's secretary were placed under quarantine while the FBI determined whether the white powder from the envelope contained anthrax.  In addition, the sheriff's department had to place an officer on a 24-hour security detail to protect Judge Abbot.  Afterwards, she had to spend many hours speaking with the F.B.I. and U.S. Attorney's office about the case.

United States v. Dudley, 463 F.3d at 1226.  Similarly, in United States v. Anwar, 741 F.3d 1134 (10th Cir. 2013), the Tenth Circuit concluded that § 2A6.1(b)(4)(A) applied where the defendant mailed several bomb threats to New Mexico State University, causing law enforcement to "shut down an entire building, causing the evacuation of 240 people and the interruption of 14 classes" and diverting "various . . . employees and police officers from their regular duties."  741 F.3d at 1040.

Nissen's threats against NM State Police officers and employees did not "result[] in . . . a substantial expenditure of funds to clean up, decontaminate, or otherwise respond to the offense."  U.S.S.G. § 2A6.1(b)(4)(B).  The United States has introduced no evidence of any expenditures that NM State Police or any other law enforcement agency expended responding to Nissen's threats.  Further, the PSR provides no such evidence or information from which the Court can conclude, by a preponderance of the evidence, that § 2A6.1(b)(4)(B) applies.

Moreover, although the United States does not seek a 4-level enhancement under § 2A6.1(b)(4)(A) for substantial disruption of public functions or services, see Objections at 3-4, Nissen's threats did not substantially disrupt public functions or services.  Victoria Gurule, NM State Police dispatch operator, testified that, in her "experience and . . . training, it doesn't hurt to notify the on-duty sergeant just to be aware of the situation."  Transcript of Jury Trial Volume 1 at 81:5-9 (taken August 6, 2018)(Gurule), filed December 5, 2019 (Doc. 94)("Aug. 6 Tr.").  Gurule also told Burd of the threats, because immediate backup is typically not available in Burd's patrol

- 41 -

area, and Gurule wanted to caution Burd to take care if he were to come across Nissen again.  See

Aug. 6 Tr. at 81:10-19 (Mysliwiec, Gurule)("It's better to be safe than sorry").  Steven Carroll, the

NM State Police sergeant who was on duty on November 2, 2018, when Nissen made his first

threatening telephone calls, testified that he did not initiate a formal investigation following

Nissen's November 2, 2018 telephone calls.   See Aug. 6 Tr. at 127:7-17 (Carroll, Uballez).

Beuzekom, NM State Police district administrator, testified that, when Nissen told her over the

telephone on November 26, 2018, that he would shoot in her in the face, she had an officer who

was near her speak with Nissen.  See Aug. 6 Tr. at 140:7-8 (Beuzekom); id. at 145:22-25 (Gleria,

Beuzekom)(stating that she found the nearest officer and asked him to speak with Nissen).

Beuzekom testified that she typically does not forward telephone calls to her supervisors.  See

Aug. 6 Tr. at 140:10-12 (Beuzekom).  After the telephone call, Beuzekom placed a photograph of

Nissen at the NM State Police workers' station to warn other employees and officers of Nissen.

See Aug. 6 Tr. at 142:10-20 (Beuzekom, Mysliwiec).   Burd confirmed that, sometime after he

stopped Nissen, "there was a photo of [Nissen] placed in" the NM State Police's Albuquerque

office.  Aug. 6 Tr. at 59:5-7 (Burd).   Burd also stated:

> I believe also for our administrative staff who worked during the day shift and let
> people in and out of the building, I believe they were -- I believe our administrative
> staff was told to avoid the individual and let law enforcement deal with him based
> off of threats, prior threats that had been made.

Aug. 6 Tr. at 59:7-11 (Burd).

This is not the degree of disruption that § 2A6.1(b)(4) contemplates.   "The phrase

'substantial disruption of . . . functions or services' . . . suggests a significant interruption of normal

activities when measured by scope and time."  United States v. Anwar, 741 F.3d at 1137 (quoting

U.S.S.G. § 2A6.1(b)(4)).   There is no evidence that Nissen's threats altered NM State Police's

normal operations beyond requiring it to caution its officers and employees to take caution should they encounter Nissen.

The United States asserts that Nissen's amusement after the December 11, 2018, incident demonstrates Nissen's intent "both to terrify and to provoke a response from the police with his antics." Objections at 4. Section 2A6.1(b)(4), however, "focuses on the outcome of the threat, not the defendant's intent." United States v. Anwar, 741 F.3d at 1137. Although Nissen may have intended to provoke a response from NM State Police, the response did not amount to a substantial disruption of NM State Police's normal business or functioning. Further, to the extent that Nissen instilled fear in Gurule and Beuzekom, § 2A6.1(b)(4)'s "plain language . . . makes the emotional or psychological impact of a threat relevant only to the extent it affects the substantiality of the disruption to functions or services." United States v. Anwar, 741 F.3d at 1140. Gurule's caution to Burd, and Beuzekom's placement of a photograph of Nissen in an NM State Police workstation do not reflect substantial disruption of NM State Police's functions or services. Accordingly, the Court overrules the Objection and declines to apply § 2A6.1(b)(4)'s 4-level enhancement.

**IT IS ORDERED** that: (i) the United States' PSR Objections, filed November 21, 2019 (Doc. 90), are sustained in part and overruled in part; and (ii) the Court directs that the Revised PSR be amended to reflect Nissen's relevant conduct.

_____
UNITED STATES DISTRICT JUDGE

- 43 -

*Counsel:*

John C. Anderson
  United States Attorney
Paul Mysliwiec
Jack Burkhead
Alexander Mamoru Max Uballez
  Assistant United States Attorneys
Albuquerque, New Mexico

       *Attorneys for the Plaintiff*

Joe M. Romero, Jr.
Romero & Winder, PC
Albuquerque, New Mexico

       *Attorneys for the Defendant*