**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                         No. CR 19-0077 JB

MICHAEL NISSEN,

        Defendant.

**<u>MEMORANDUM OPINION AND ORDER</u>**

**THIS MATTER** comes before the Court on: (i) the Defendant's Motion to Determine Counsel, filed April 20, 2021 (Doc. 170)("Motion"); and (ii) Defendant Michael Nissen's oral motion to represent himself, <u>see</u> Draft Transcript of Hearing at 24:21-25:3 (taken May 7, 2021)(Court, Nissen)("Tr.").[1]  The Court held a hearing on May 7, 2021.  <u>See</u> Clerk's Minutes at 1, filed May 28, 2021 (Doc. 184).   The primary issue is whether Nissen can represent himself or whether he should continue with Mr. Joe Romero as his counsel, where Nissen wants to represent himself to advance legal arguments based on the applicability of the Cestui Que Vie Act of 1666, arguments which Mr. Romero avers he "cannot ethically advocate . . . before the Court."  Motion at 2.  Even though Nissen invokes properly the right to represent himself, the Court concludes that Nissen cannot represent himself, because Nissen refuses to respond to the Court's efforts to conduct the standard colloquy that a court must conduct to determine whether a defendant has knowingly and intelligently waived his right to counsel and proceed to represent himself pro se. <u>See</u> Tr. at 24:21-26:6 (Court, Nissen).  <u>See also</u> Fed. Judicial Ctr., <u>Benchbook for U.S. District</u>

---

[1]The Court's citation refers to the unedited draft transcript.  Accordingly, page and line numbers are subject to slight change in the final edited version.

Court Judges at 6-7 (6th ed. 2013)(listing questions for a district judge to ask a defendant if the defendant does not want counsel).  Nissen met the Court's colloquy questions only with contentions that he is not Nissen, that Nissen is dead, that the person in the courtroom is an entity, that the Court should call him "Freedom Rings," and that he does not "know what Mr. Nissen is. I can't speak for somebody I'm not.  . . .  I can't speak for a dead man.  . . .  I'm not Mr. Nissen. . . .  I'm the private living man flesh and blood, which is in the Cestui Que Vie Act."  Tr. at 24:21-26:6 (Court, Nissen).  The Court concludes, therefore, that, despite the Court's efforts to conduct the standard colloquy, Nissen has not knowingly and intelligently waived his right to counsel. Accordingly, Mr. Romero will continue to represent Nissen and the Court will deny both the Motion and Nissen's oral motion.

**FACTUAL BACKGROUND**

The Court has summarized the factual background in a prior Memorandum Opinion and Order, see United States v. Nissen, No. CR 19-0077 JB, 2020 WL 1929526, at *1 (D.N.M. April 21, 2020), filed April 21, 2020 (Doc. 135)("April 21 MOO"), and provides that factual background here:

> The Court takes its background facts from the Criminal Complaint, filed December 19, 2018 (Doc. 1);[2] from the Affidavit of Peter John Nystrom Ubbelohde (executed December 19, 2018), filed December 19, 2018 (Doc. 1-1)("Ubbelohde Aff."); Nissen's [Motion to Dismiss Information on Two Counts of Convictions for Lack of Jurisdiction, filed January 24, 2020 (Doc. 109)("MTD")], and the evidence introduced at trial.  The Court must, in deciding most of Nissen's post-trial motions, construe the trial evidence in the light most favorable to the United States.  The Court therefore will be stating largely the United States' version of events, as supported by the trial evidence.
>
> This case deals with alleged threats Nissen communicated to New Mexico State Police ("NM State Police") officers and dispatch employees on November 2 and 26, 2018.  See Ubbelohde Aff. ¶¶ 6, 8, at 2-3; MTD at 1.  On the evening of

---

[2]"The United States filed a Complaint on December 19, 2018, and a two-count Indictment on January 10, 2019." April 21 MOO, 2020 WL 1929526, at *1.

November 2, 2018, an NM State Police officer stopped Nissen on Interstate 40 in Torrance County, New Mexico, near mile marker 194 and issued several traffic citations. <u>See</u> MTD at 1. About a half-hour later, NM State Police dispatch received "multiple phone calls from telephone number (505) 819-1806 and caller ID listing Michael Nissen." Ubbelohde Aff. ¶ 6, at 3. In the calls, a male caller said that an NM State Police officer had just given him several citations. <u>See</u> Ubbelohde Aff. ¶ 6, at 3. The caller then said:

> You guys got some of the stupidest fucking pigs on the road. The next time someone violates me like that on the road, I'm gonna put a bullet in that fucking pig's head . . . . He violated my Fourth Amendment constitution, he violated my Second and my First Amendment and the next time he does it I'm gonna plea the Fifth, but next time I'm gonna take my revolver out and put that motherfucker drop dead.

MTD at 1. Later that month, NM State Police Internal Affairs personnel received an email from johnny2bravo1@gmail.com further complaining about the November 2, 2018, encounter on Interstate 40. <u>See</u> Ubbelohde Aff. ¶ 7, at 3; MTD at 2. On November 26, 2018, a NM State Police "District 5 administrative assistant received a call from phone number (505) 819-1806. During the call, the male caller became verbally combative and threatened to shoot the [NM State Police] employee in the head." Ubbelohde Aff. ¶ 8, at 3.

On December 13, 2018, Nissen visited the Bernalillo County Sheriff's Office and spoke with Sheriff's Deputies to complain about the NM State Police. <u>See</u> MTD at 2. Nissen said that he was stopped near mile marker 194 on Interstate 40, and that, after the stop, he called NM State Police dispatch "just to get it done and then it got a little crazy . . . . I didn't make no threatening calls, but I kept calling them about the law." MTD at 2. Nissen also told Bernalillo County Sheriff's Deputies that he "owned multiple firearms including rifles and a revolver." Ubbelohde Aff. ¶ 9, at 3. The Ubbelohde Aff. states that Nissen told the Bernalillo County Sheriff's Deputies that he "carries his revolver on the streets and carrying his gun concealed is to protect himself from rouge [sic] cops." Ubbelohde Aff. ¶ 9, at 3-4.

April 21 MOO, 2020 WL 1929526, at *1.

## <u>PROCEDURAL BACKGROUND</u>

A federal grand jury indicted Nissen in January, 2019. <u>See</u> Indictment at 1, filed January 10, 2019 (Doc. 11). In the Indictment, the federal grand jury charges Nissen with two violations of 18 U.S.C. § 875(c). <u>See</u> Indictment at 1. Count 1 asserts that, "[o]n about November 2,

2018, in Torrance County, in the District of New Mexico, the defendant, **MICHAEL JAMES NISSEN**, transmitted in interstate and foreign commerce communications containing a threat to injure the person of another [i]n violation of 18 U.S.C. § 875(c)." Indictment at 1 (bold in original). Count 2 asserts that, "[o]n or about November 26, 2018, in Bernalillo County, in the District of New Mexico, the defendant, **MICHAEL JAMES NISSEN**, transmitted in interstate and foreign commerce communications containing a threat to injure the person of another [i]n violation of 18 U.S.C. § 875(c)." Indictment at 1 (bold in original).  The Court held a jury trial on August 6 and 7, 2019.  See Clerk's Minutes at 1, filed August 6, 2019 (Doc. 70).  The jury found Nissen guilty on both counts.  See Verdict, filed August 7, 2019 (Doc. 73).

      1.     **Nissen's Pro Se Motions**.

      Beginning on December 30, 2019, and continuing up to the present date, Nissen has filed a series of motions raising a wide range of issues.  See generally Criminal Docket No. CR 19-0077.  As far as the Court can tell, Nissen filed each of the motions at issue without counsel's assistance; Mr. Romero did not sign any of Nissen's handwritten motions.  In its April 21 MOO, the Court summarized and denied Nissen's pro se motions from December 30, 2019, through February, 2020.  See April 21 MOO, 2020 WL 1929526, at *4.  Nissen's handwritten pro se arguments are grounded generally in his belief that the Court does not have jurisdiction over him,

because Nissen is a sovereign citizen[3] or a "living man" under the Cestui Que Vie Act of 1666.[4]

---

[3]The Southern Poverty Law Center reports:

Sovereign citizens believe that they -- not judges, juries, law enforcement or elected officials -- get to decide which laws to obey and which to ignore, and they don't think they should have to pay taxes. Sovereigns are clogging up the courts with indecipherable filings and when cornered, many of them lash out in rage, frustration and, in the most extreme cases, acts of deadly violence, usually directed against government officials.

Sovereign Citizens Movement, Southern Poverty law center, https://www.splcenter.org/fighting-hate/extremist-files/ideology/sovereign-citizens-movement (last visited June 17, 2021). Sovereign citizen arguments sometimes crop up in tax protestor cases, with which the Court has previously dealt.  See, e.g., United States v. Gutierrez, No. CR 15-3955 JB, 2018 WL 2107785, at *7 (D.N.M. May 5, 2018)(Browning, J.).  See also United States v. Palmer, 699 F. App'x 836, 838 (10th Cir. 2017)("As for [the defendant's] sovereign state citizen argument, reasonable jurists could also not disagree that the claim is plainly frivolous.").

[4]In the Seventeen Century, the English Parliament enacted the Cestui Que Vie Act of 1666 ("Act"), and the Act presumes that a person is dead if there is no "sufficient and evident proofe" that the person is still alive, for instance if a person is lost at sea.  Cestui Que Vie Act, 1666, 18 & 19 Car. 2, c.11 (text available at https://www.legislation.gov.uk/aep/Cha2/18-19/11).  The Act permits, therefore, the remainderman of a life estate to terminate a tenant's life estate after the tenant has "gone beyond the Sea" for seven years:

**Recital that Cestui que vies have gone beyond Sea, and that Reversioners cannot find out whether they are alive or dead.**

Whereas diverse Lords of Mannours and others have granted Estates by Lease for one or more life or lives, or else for yeares determinable upon one or more life or lives And it hath often happened that such person or persons for whose life or lives such Estates have beene granted have gone beyond the Seas or soe absented themselves for many yeares that the Lessors and Reversioners cannot finde out whether such person or persons be alive or dead by reason whereof such Lessors and Reversioners have beene held out of possession of their Tenements for many yeares after all the lives upon which such Estates depend are dead in regard that the Lessors and Reversioners when they have brought Actions for the recovery of their Tenements have beene putt upon it to prove the death of their Tennants when it is almost impossible for them to discover the same, For remedy of which mischeife soe frequently happening to such Lessors or Reversioners.

**Cestui que vie remaining beyond Sea for Seven Years together and no Proof of their Lives, Judge in Action to direct a Verdict as though Cestui que vie were dead.**

E.g., Affidavit of Statis by Michael Nissen (taken December 30, 2020), filed January 29, 2021 (Doc. 159)("[I]'m a private non-citizen national civilian, I'm the living man residing on the land . . . ."); Defendant's Affidavit of Formal Objections to Second Addendum to the Presentence Report at 1, filed June 4, 2021 (Doc. 194)(arguing that neither the Court nor the United States Probation Office "has subject matter jurisdiction whatsoever . . . .  I that private living man am subject to the code(s), therefore, I abate this presentence for I am being denied due process of law of which this court lacks subject matter jurisdiction . . .").

## 2.    **The Competency Evaluation**.

On May 3, 2020, Nissen, through Mr. Romero, requested that the Court transfer him to a Federal Medical Center ("FMC") for extended evaluation to determine whether Nissen is mentally competent to proceed.   Motion for Temporary Transfer of Defendant to FMC -- Butner to Determine Competency, filed May 3, 2020 (Doc. 137)("Competency Motion").  On June 12, 2020, the Court granted the Competency Motion and ordered Nissen committed to the custody of the Attorney General for a pre-sentencing competency evaluation pursuant to 18 U.S.C. § 4241(d).

---

If such person or persons for whose life or lives such Estates have beene or shall be granted as aforesaid shall remaine beyond the Seas or elsewhere absent themselves in this Realme by the space of seaven yeares together and noe sufficient and evident proofe be made of the lives of such person or persons respectively in any Action commenced for recovery of such Tenements by the Lessors or Reversioners in every such case the person or persons upon whose life or lives such Estate depended shall be accounted as naturally dead, And in every Action brought for the recovery of the said Tenements by the Lessors or Reversioners their Heires or Assignes, the Judges before whom such Action shall be brought shall direct the Jury to give their Verdict as if the person soe remaining beyond the Seas or otherwise absenting himselfe were dead.

Cestui Que Vie Act, 1666, 18 & 19 Car. 2, c.11 (bold in the original)(text available at https://www.legislation.gov.uk/aep/Cha2/18-19/11).

See Sealed Memorandum Opinion and Order at 1, filed June 12, 2020 (Doc. 148). See also Unsealed Memorandum Opinion and Order at 1, filed June 12, 2020 (Doc. 148)("Unsealed Competency MOO")(unsealing the Competency MOO after directing the parties to submit redactions and not receiving any redactions). In the Unsealed Competency MOO, the Court explains:

> The Court predicts, based on its experience, that the BOP will find Nissen competent. On the record, however, all the Court has is Dr. Marshall's report, which says that Nissen is competent only if he trusts his attorney. Nissen does not trust Mr. Romero and has not trusted his previous three attorneys for reasons that indicate mental incompetency. On the present record, the Court finds, based on Dr. Marshall's report, that Nissen is not presently competent to proceed with sentencing.

Unsealed Competency MOO at 30. In a subsequent report, the BOP found Nissen competent to stand trial. See Forensic Evaluation, filed March 17, 2021 (Doc. 169)("Competency Report").

### 3.    **The Motion.**

In the Motion, Mr. Romero asks "the Court, pursuant to Faretta v. California, 422 U.S. 806 (1975), to hold a hearing to determine his continued status as Mr. Nissen's counsel." Motion at 1. In the Motion, Mr. Romero states that he "did not represent Mr. Nissen at trial" and that he "is the fifth attorney that has represented Mr. Nissen in this case." Motion ¶ 2, at 1. Mr. Romero next explains that during a telephone conversation with Nissen, after Mr. Romero explained that Nissen had upcoming hearings on his competency and sentencing,

> Mr. Nissen contends that undersigned counsel has been and/or is ineffective, in pertinent part, due to undersigned counsel's refusal to advocate in support of Mr. Nissen's *pro se* legal arguments, in particular the applicability of the Cestui Que Vie Act of 1666. During their telephone conference, Mr. Nissen discussed his position regarding the Cestui Que Vie Act of 1666, which position is consistent with multiple pro se pleadings filed by Mr. Nissen (see, i.e., Doc. 165). Undersigned counsel respectfully disagrees with Mr. Nissen's position that his *pro se* legal arguments constitutes pertinent, much less binding, legal authority in his case. As such, undersigned counsel cannot ethically advocate such positions before the Court. Undersigned counsel is addressing this issue, in as limited fashion as possible, solely for the purpose of explaining the source of the current conflict

between undersigned counsel and Mr. Nissen.

Motion ¶ 5, at 2 (italics in the original).  Mr. Romero states that Nissen wants to represent himself

and that the disagreement between Mr. Romero and Nissen "is likely to continue between Mr.

Nissen and any future appointed replacement counsel."  Motion ¶¶ 6-7, at 2.

### 4.   **The Hearing.**

The Court held a hearing on the Motion on May 7, 2021.  See Tr. at 1:23-2:3 (Court).  The

Court began by greeting all the parties, and when the Court stated: "Mr. Nissen, good afternoon to

you," Nissen responded: "First of all, I'm not Mr. Nissen.  I'm the private counsel for Mr. Nissen,

the principal name."  Tr. at 2:10-14 (Court, Nissen).  Mr. Romero stated that his Motion is "pretty

much self-explanatory," and that he was trying to refer to Nissen as "my appointed client . . .

because he does not want to be referred to as Mr. Nissen."  Tr. at 2:20-3:5 (Romero).  Mr. Romero

stated that during a conversation with Nissen, Nissen "made clear to me that he objected to this

entire process, believes it is completely without legal foundation, and requested that I recuse

myself as his counsel because I was essentially, according to him, part of the federal corporation

that is persecute[ing] . . . him."  Tr. at 3:12-18 (Romero).  Mr. Romero explained: "[T]he bottom

line being as indicated in the motion is that he does not want me as his counsel.  I don't think he

wants anyone as his counsel unless they're going to collaborate with him on the filing of the motion

and the pleadings that he has a heartfelt belief in, rooted in his belief system."  Tr. at 4:10-16

(Romero).

The Court asked Mr. Romero:

You've also indicated he may not really want any attorney.  And you know I have
a high regard for you, and I think that he's just not going to get a better attorney,
ever, than he's got right this minute.  If I decide that that's what's in his best
interests for you to continue to represent him, are you willing to do that?

Tr. at 5:16-22 (Court).  Mr. Romero stated that he would be reluctant to continue as Nissen's

counsel, but would stay on if the Court ordered it, and noted "that he's made it very clear he wishes to represent himself, and to the extent that the Court finds that he's able and competent to represent himself, I want to strenuously indicate that that is his preference and he strongly believes that is his right."  Tr. at 6:1-7 (Romero).

The Court then stated that Nissen's desire to represent himself was not straightforward, because Nissen was denying that he is Nissen:

> People in the United States get to represent themselves, but it doesn't sound like he's really representing himself.  . . .
>
> [H]e's denying that he is a person and he wants to represent another person. So that is not a clean sort of "I want to the represent myself," because he's denying that he's Mr. Nissen, the person that is about to be sentenced . . . .  [A]nd he's denying that person exists.  So it's not a clean sort of "Hey I'm Mr. Nissen I want to represent myself."
>
> . . . .
>
> I think we're all very reluctant for a defendant to represent themselves period, and to say somebody is invoking their right to represent themselves when they're really not representing themselves, they're going to represent somebody else, which they can't do . . . . I mean he's not an attorney so he can't represent somebody else.

Tr. at 6:10-7:9 (Court).  Mr. Romero stated that Nissen's invocation of his desire to represent himself was "a novel one for me."  Tr. at 6:25-7:1 (Romero).

The Court then asked Nissen to speak and asked if Nissen would like to speak without the United States present.  See Tr. at 7:16-23 (Court).  Nissen stated that he would permit the United States to read to the transcripts of the hearing, so the Court stated that if Nissen did not want to keep the information confidential, it would allow the United States to be present in the courtroom. See Tr. at 8:1-22 (Nissen, Court).  Nissen then stated:

> I'm not allowed to discuss my private matters in a public courtroom anyways, especially in a war powers courtroom.
>
> So anyways, whatever you want to do.  But I want to reiterate I'm not Mr.

Nissen, by the way of the Cestui Que Vie Act of 1666. That's a deceased artificial entity. That's a trust name. I'm the sole heir, sole beneficiary with all the paperwork I forwarded to the Court in the past six months explaining this in detail. I have a right to be the executive legislative judicial branch of the trust. And I do have a right to speak on behalf of Mr. Nissen, whoever that individual is. That's not me. And I claim that from day one. I'm the living man of the flesh and blood. I'm the private agent, lawful sole heir. That's my right. I'm the agent. I can run the office as I see necessary. And Mr. Romero appointed as the assistance of counsel and defense of Mr. Nissen, whoever that is, didn't do as I was asking, as we were working as counsel, as he says and pointed out that I was pro se, and have been all along. I've never relinquished that right. And that was put on the jury transcripts, jury trial transcripts, too, as well by the Government who made it very clear that when I was in the hands of law enforcement, I never did claim fame to the strawman name. That's set the Cestui Que Vie Act of 1666, which is in his motion to determine counsel.

. . . .

I pretty much said I've been representing myself counsel all along there has a problem with it. And when I filed an affidavit over a year ago and he went against my wishes, that's ineffective assistance of counsel. And he took the responsibility of professional malconduct.

Now, on top of that, I have something else I'd like to say. I, Freedom Rings private attorney general, did not request your withdrawal, sir. You filed your ex parte motion to determine counsel for what you, sir, call a conflict per our confidential counsel-to-counsel call while Freedom Rings. You illegally detained attorney general, private counsel of the deceased defendant Michael James Nissen, [who] was in Otero County Prison Facility.

So upon discovery of your ex parte motion, Joe Romero, I, Freedom Rings, private attorney general, counsel for the deceased Michael Nissen, counted your motion with paperwork concerning your incompetent short term memory, bordering insanity, with the clerk of this Court, which is recorded and documented on the behalf of the deceased, Mr. Nissen.

In addition, how can a deceased entity request your withdrawal from this case?

Tr. at 9:2-11:2 (Nissen). The Court then asked: "Anything else, Mr. Nissen?" Tr. at 11:2-3 (Court). Nissen reiterated multiple times that "I, Freedom Rings, private counsel for the deceased Michael James Nissen, has never claimed to be the deceased Michael James Nissen of 56 years now"; "I am the living of the flesh and blood, the occupant of the office of the Cestui Que trust

estate of Michael James Nissen"; "I am not Michael James Nissen, nor have I ever been this

deceased incorporated entity, et al., at any time point in time, past, present, and future"; and

explained:

> In addition, Michael James Nissen passed away on March 8, 1965, right
> shortly after birth, a living man of the flesh and blood footprint was used to identify
> the living man of the flesh and blood as the sole heir, sole beneficiary, as the
> occupant of the office of the Cestui Que trust estate for Michael James Nissen. I,
> private agent, living man of the flesh and blood, have not waived any trust rights
> and reserve all legal recourse of enforcement, exclusive equitable rights, including
> using the copyrighted trust signature for all Cestui trust rights, both public and
> private for the benefit of the living man of the flesh and blood with a footprint of
> the private agent occupant in the office of the Cestui Que trust estate for Michael
> James Nissen, whoever that deceased incorporated artificial entity, et al is. That
> isn't me. I'm freedom rings, a living man of the flesh and blood with a footprint of
> my identity on a probated birth certificate proven without a doubt that I am simply
> the private agent, living man of flesh and blood, sole heir, sole beneficiary,
> occupant in the office of the Cestui Que trust estate of Michael James Nissen to
> operate the affairs of the deceased incorporated artificial entity, et al., which include
> the legislative, executive, judicial branches of the trust estate. The private agent
> living man in his judicial persona as attorney general, as this federal United States
> corporational court, how can they indict a convicted deceased entity that doesn't
> exist?
>
> . . . .

Tr. at 13:16-14:20 (Nissen). After Nissen continued in the same vein of reasoning, the Court asked

how much longer Nissen planned to go on, because the Court had read Nissen's filings. See Tr.

at 16:19-20 (Court). Nissen stated that he was almost done and only needed a few more minutes.

See Tr. at 17:5-6 (Nissen). Nissen continued for several minutes and concluded:

> This Court has no choice but to release Joe Romero, Esq. as the private
> agent is also the CEO that can release, discharge any trustees at any time that they
> fail to carry out their judiciary responsibilities in good faith and merit for the Cestui
> Que trust estate.
>
> In conclusion, Joe Romero, Esq, you're fired for professional malconduct.

Tr. at 21:13-20 (Nissen).

The Court stated that it was inclined to let Mr. Romero "hang on," because "[i]t doesn't

seem to me that Mr. Nissen is properly invoking the right to defend himself.  I don't know what he's really wanting to do, because he's denying that Nissen exists."  Tr. at 22:3-6 (Court).  The United States then stated that it agreed with the Court that without "someone who agrees that they are Mr. Nissen . . . you don't have a record asking for pro se representation."  Tr. at 23:3-14 (Uballez).  Mr. Romero stated: "I think, as a matter of law, the Court can also find that this person is in fact the Defendant which is not something he agrees with and therefore if you find that he is in fact the Defendant, regardless of what he calls it, he can then represent himself."  Tr. at 24:14-20 (Romero).   The Court stated that it would try "see if [he] can waive [his] right to counsel and have him represent himself.  I'm not as optimistic we're going to get a clean record here, but we'll give it a try," and then asked Nissen whether "[y]ou really want me to fire Mr. Romero and let you represent yourself?"  Tr. at 24:22-1 (Court).  Nissen stated he did want to represent himself, and the Court attempted a colloquy:

| | |
|---|---|
| The Court: | All right, I'm going to call you Mr. Nissen.  And Mr. Nissen -- |
| Mr. Nissen: | I'm not Mr. Nissen.  You can call me Freedom Rings. |
| The Court: | No, I'm going to call you -- |
| Mr. Nissen: | Or Freedom for short.  But I can bring the evidence to the table in your own written law of the Cestui Que Vie Act, which clearly explains it. |
| The Court: | Mr. Romero -- |
| Mr. Nissen: | But I don't think I need to do that.  You are a professional.  You've been at it far longer than I have. |
| The Court: | Mr. Nissen, shut up. |
| Mr. Nissen: | I will. |
| The Court: | Shut up right now.  Don't say a word.  Listen to me.  I'm going to call you Mr. Nissen.  And if you cannot the answer these questions, Mr. Romero is going to continue to be your counsel, okay.  So let |

| | |
|---|---|
| | me tell you a few things about your constitutional right to be represented by an attorney at every stage of proceedings.  Do you understand, Mr. Nissen, that have that right? |
| Mr. Nissen: | Mr. Nissen, is not here to answer that question. |
| The Court: | So Mr. Romero, I hate to do that to you, but we're just going to leave you in place.  I can't even get a clean colloquy with him to represent himself. |
| Mr. Nissen: | I can't represent something I'm not. |
| The Court: | Well, you're not an attorney. |
| Mr. Nissen: | I'm not going to volunteer for somebody I'm not. |
| The Court: | You're not on an attorney.   You can't represent anybody but yourself. |
| Mr. Nissen: | I'm capable of doing this. That's in the Cestui Que Act.   I'm competent, as I've been found for the fifteenth time. |
| The Court: | All right.  Motion to relieve Mr. Romero as counsel is denied.  You will continue to have Mr. Romero as your counsel.  You either cooperate with him -- |
| Mr. Nissen: | I'm not going to cooperate. |

Tr. at 25:2-26:21 (Court, Nissen).

Next, the Court asked if they needed to have a competency hearing, and Mr. Romero stated that "based on the findings in that report if he stipulates that he's competent and you accept that stipulation, then we can proceed to sentencing."  Tr. at 28:5-7 (Romero).  Nissen stated that "I must be competent," and after the Court asked if he would "stipulate that you're competent," Nissen replied: "I'm the living man. I don't know what Mr. Nissen is. I can't speak for somebody I'm not." Tr. at 28:16-22 (Court, Nissen).  Mr. Romero stated that he has no objection to the Court finding Mr. Nissen competent, and then both the United States and Mr. Romero stipulated that Nissen is competent.  See Tr. at 29:2-14 (Romero, Court, Uballaz).  The Court then asked the

United States to prepare an order for the Court to sign, finding Nissen competent.  See Tr. at 29:15-20 (Court).

### 5.        The Competency Order.

The Court adopts the Competency Report and orders that Nissen "is presently competent to proceed in this matter."  Order Finding Defendant Competent at 1, filed June 8, 2021 (Doc. 199)("Competency Order").  The Court explains:

> [Nissen] appears to adequately understand the legal process to meet competency criteria.   [Nissen] presents with features of a personality disorder, which is categorical in nature.  Furthermore, [Nissen's] extreme overvalued beliefs relating to the sovereign citizen movement, while taking on an organizing function and occupying a central role in his life, are best understood as an extremist political philosophy and not as a psychotic belief system. [Nissen] has a factual understanding, in addition to the capacity and ability to assist his attorney, should he be willing to do so.  Finally, at a hearing held on May 7, 2021, neither party objected to the psychological report or to the Court entering an order finding the [Nissen] competent to proceed. Therefore the Court finds and concludes that [Nissen] is competent to proceed pursuant to Title 18, United States Code Section 4241.

Competency Order at 1.

### 6.        Nissen's Habeas Motion and Sentencing.

Before sentencing, on June 1, 2021, Nissen filed a motion under 28 U.S.C. § 2255 to set aside his sentence.  See Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence By a Person in Federal Custody, filed June 1, 2021 (CIV Doc. 1; CR Doc. 188)("2255 Motion").  Also before the sentencing, the Court overruled the United States' and Nissen's objections to the Second Addendum to the Presentence Report, filed May 26, 2021 (Doc. 182)("Second Add. PSR").  See Memorandum Opinion and Order, filed June 18, 2021 (Doc. 207)("Objections MOO").  The Court disagreed with Nissen's argument that it lacked subject-matter-jurisdiction over Nissen, the "living man," because "Nissen's jurisdictional argument has no sound legal basis."  Objections MOO at 1.  At the sentencing hearing on June 18, 2021, the Court then

sentenced Nissen to 41 months for Counts 1 and 2, to be run concurrently, with three years of supervised release.  See Sentencing Minute Sheet at 1, filed June 18, 2021 (Doc. 213).  After sentencing, the Court dismissed without prejudice the 2255 Motion as premature, because "Nissen's conviction is not final, judgment has not been entered, and he has not yet had an opportunity to file a direct appeal."  Memorandum Opinion and Order at 2, filed June 30, 2021 (Doc. 210).[5]

###     7.     **Nissen's Pro Se Appeal and the Tenth Circuit's Order**.

On July 6, 2021, Nissen filed a pro se appeal.  See Notice of Appeal, filed July 6, 2021 (Doc. 214)("Pro Se Appeal").  In his Pro Se Appeal, Nissen states that he is appealing the Court's "Order/Judgment" filed on June 18, 2021, which is the Court's Objections MOO.  Pro Se Appeal at 1.  On July 8, 2021, the United States Court of Appeals for the Tenth Circuit entered an Order, stating:

> On July 6, 2021, Michael Nissen filed a pro se notice of appeal following his June 18, 2021 sentencing hearing. A review of the district court docket shows that although Mr. Nissen has been sentenced, the district court has not yet entered the criminal judgment.  Therefore, the notice of appeal is premature but will ripen when the criminal judgment is entered.  See Fed. R. App. P. 4(b)(2) (filing notice of appeal before entry of judgment); United States v. Walker, 915 F.2d 1463, 1465 (10th Cir. 1990).   Accordingly, this matter is abated pending entry of a criminal judgment by the district court.  We note that the district court entered final judgment as to a premature 28 U.S.C. § 2255 motion on June 30, 2021 but has not entered the criminal judgment.
>
> . . . .
>
> Within 60 days from the date of this order, attorney Romero shall file a status report with this court regarding criminal proceedings if the district court has not yet entered the criminal judgment.

---

[5]In Nissen's corresponding civil case, CIV No. 21-0505, where Nissen filed the same Habeas motion, the Court entered the same Memorandum Opinion and Order, see Memorandum Opinion and Order, filed June 30, 2021 (CIV No. 21-0505 Doc. 8), as well as a Final Judgment, filed June 30, 2021 (CIV No. 21-0505 Doc. 9).

Order at 1-2, filed July 8, 2021 (Doc. 217)("10th Cir. Order").

### LAW REGARDING THE EFFECTIVE ASSISTANCE OF COUNSEL, SELF-REPRESENTATION AND ATTORNEY CONFLICTS OF INTEREST

The Sixth Amendment of the Constitution of the United States of America grants criminal defendants the right to the effective assistance of counsel.  See U.S. Const. amend. VI.  One aspect of the effective assistance of counsel is the absence of conflicts of interest.  The Sixth Amendment also grants defendants the right to counsel of their choice.  When the right to conflict-free counsel is in tension with the right to counsel of one's choice, a defendant may knowingly and voluntarily waive the former to vindicate the latter.  A court, however, has discretion to reject such a waiver.  Defendant may also represent themselves, if they make their waiver of their right to counsel voluntarily, knowingly, and intelligently.

1.      **The Right to Conflict-of-Interest-Free Counsel.**

The Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense."  U.S. Const. amend. VI.  Furthermore,

> [t]hat a person who happens to be a lawyer is present at trial alongside the accused, however, is not enough to satisfy the constitutional command . . . .  An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair.

Strickland v. Washington, 466 U.S. 668, 685 (1984).   "Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest." Strickland v. Washington, 466 U.S. at 688.   "In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance."  Cuyler v. Sullivan, 446 U.S. 335, 348 (1980).  A violation of applicable ethical rules, however, does not necessarily amount to an actual conflict.  See United States v. Gallegos, 39 F.3d 276, 279 (10th Cir. 1994)("[I]t is apparent also

that a violation of the rules [of professional conduct] will not in itself constitute a constitutional violation under Cuyler [v. Sullivan] and related cases.").  Instead, "'[a]n actual conflict exists when defense counsel is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client.'"  United States v. Bolivar, No. CIV 12-0128, 2012 WL 3150430, at *11 (D.N.M. July 20, 2012)(Browning, J.)(quoting Perillo v. Johnson, 205 F.3d 775, 781 (5th Cir. 2000)).  When an actual conflict of interest significantly impacts defense counsel's performance, reversal is automatic; no further showing of prejudice is required.  See Strickland v. Washington, 466 U.S. at 692.

Reversal is also automatic when a defendant objects to multiple representation -- i.e., one lawyer representing multiple defendants in a single proceeding -- and a trial judge neither acts to remove the potential conflict of interest by appointing separate counsel nor "take[s] adequate steps to ascertain whether the risk [is] too remote to warrant separate counsel."  Holloway v. Arkansas, 435 U.S. 475, 484 (1978).  See Mickens v. Taylor, 535 U.S. 162, 168 (2002)(Scalia, J.)("Holloway [v. Arkansas] thus creates an automatic reversal rule only where defense counsel is forced to represent codefendants over his timely objection, unless the trial court has determined that there is no conflict.").  See also United States v. Perez, 325 F.3d 115, 125 (2d Cir. 2003)("[A]n attorney has a potential conflict of interest if 'the interests of the defendant may place the attorney under inconsistent duties at some time in the future.'" (quoting United States v. Kliti, 156 F.3d 150, 153 n.3 (2d Cir. 1998))).

Although "a possible conflict inheres in almost every instance of multiple representation," a trial court has an "affirmative duty to inquire into the propriety of multiple representation" only when it "knows or reasonably should know that a particular conflict exists."  Cuyler v. Sullivan,

446 U.S. 335, 346-48 (1980).  See United States v. Rogers, 209 F.3d 139, 143 (2d Cir. 2000)("[A] court that learns of a possible conflict must investigate the facts and details of the attorney's interests to determine whether the attorney in fact suffers from an actual conflict, a potential conflict, or no genuine conflict at all.")(internal citations omitted).  If a trial court fails to undertake that inquiry, however, reversal is not automatic.  See Mickens v. Taylor, 535 U.S. at 173-74 ("[S]ince the trial court's failure to make the Sullivan-mandated inquiry does not reduce the petitioner's burden of proof; it was at least necessary, to void the conviction, for petitioner to establish that the conflict of interest adversely affected his counsel's performance.").  When the government is aware of a conflict of interest, it "has a duty to bring it to the court's attention and, if warranted, move for disqualification."  United States v. Migliaccio, 34 F.3d 1517, 1528 (10th Cir. 1994).  Defense counsel has a similar duty.  See Cuyler v. Sullivan, 446 U.S. at 346 ("Defense counsel have an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the course of trial.").

"These principles concerning conflicts of interest are not restricted to cases of joint representation of co-defendants at a single trial." United States v. Winkle, 722 F.2d 605, 610 (10th Cir. 1983).  "[I]n a case of joint representation of conflicting interests the evil -- it bears repeating -- is in what the advocate finds himself compelled to *refrain* from doing," Holloway v. Arkansas, 435 U.S. at 490 (emphasis in the original), and that same evil "is a potential problem in cases where a defendant's attorney previously represented a Government witness," United States v. Winkle, 722 F.2d at 610.  Accordingly, the United States Court of Appeals for the Tenth Circuit was "persuaded by the views expressed in Ross v. Heyne, 638 F.2d 979, 983 (7th Cir. 1980), that an actual conflict would arise where defense counsel is unable to cross-examine a Government witness effectively because the attorney also represented the witness." United States v. Winkle,

722 F.2d at 610.  See Ross v. Heyne, 638 F.2d 979, 983 (7th Cir. 1980)("An actual conflict would arise where defense counsel is unable to cross-examine a prosecution witness effectively because the attorney also represented the witness."); id. ("The problem that arises . . . is that the attorney may have privileged information obtained from the witness that is relevant to cross-examination, but which he refuses to use for fear of breaching his ethical obligation to maintain the confidences of his client.").  The Tenth Circuit, accordingly, concluded that it "should apply the conflicts principles from the cases of multiple representation of defendants here where the defense counsel in this criminal trial had represented the principal Government witness in litigation with a factual relationship to some issues in this criminal case," such that, "if the defendant can show that his attorney's previous representation of the witness adversely affected the adequacy of the defendant's representation, then defendant need not demonstrate prejudice to obtain relief." United States v. Winkle, 722 F.2d at 610.

There is not, however, a "per se rule prohibiting representation of the defendant by counsel who has previously represented a government witness in a related case."  United States v. Bowie, 892 F.2d 1494, 1502 (10th Cir. 1990).  Instead, a court must determine "whether an actual conflict adversely affected defense counsel's performance -- that is, a conflict existed that might have foreclosed a specific and seemingly valid or genuine strategy or tactic in the handling of th[e] witness."  United States v. Bowie, 892 F.2d at 1502.  Additionally, a court does not need to make that determination if "the *witness* waived any attorney-client privilege that might have restricted defense counsel's cross-examination," or if the "*defendant* had knowledge of his counsel's prior representation of the government witness and waived his right to counsel free of such conflicts." United States v. Bowie, 892 F.2d at 1502 (emphasis in original).  See Church v. Sullivan, 942 F.2d 1501, 1512 (10th Cir. 1991)("On remand, the district court should determine whether either of two

waivers occurred because if Green 'waive[d] his attorney-client privilege, then any potential conflict is removed[,]' and further, Church may have 'waived his right to counsel free of such conflicts.'" (alterations in original)(quoting <u>United States v. Bowie</u>, 892 F.2d at 1502)).  It is worth noting, however, that, while a defendant's waiver suffices, even without a witness' waiver, with respect to the Sixth Amendment's effective-assistance-of-counsel guarantee, a violation of professional ethical rules can still occur.  <u>See</u> <u>United States v. Gallegos</u>, 39 F.3d at 279 (considering the application of ethical rules to an ineffective-assistance-of-counsel claim and stating that "[i]t is apparent that some elements therein bear on the constitutional issue," but concluding that "it is apparent also that a violation of the rules will not in itself constitute a constitutional violation under <u>Cuyler [v. Sullivan]</u> and related cases").

The Court of Appeals of the District of Columbia explains what a trial court should do when determining whether "a potential conflict reaches the point at which disqualification is warranted" in the context of successive representation:

> [T]he trial court should "examine whether the subject matter of the first representation is substantially related to that of the second," whether "the conflict could cause the defense attorney improperly to use privileged communications in cross-examination," and whether "the conflict could deter the defense attorney from intense probing of the witness on cross-examination to protect privileged communications with the former client.

<u>Pinkney v. United States</u>, 851 A.2d at 487 (quoting <u>United States v. Ross</u>, 33 F.3d 1507, 1523 (11th Cir. 1994)).   <u>See</u> <u>United States v. Roach</u>, 912 F. Supp. 2d 1153, 1172-73 (D.N.M. 2012)(Browning, J.)(applying <u>Pinkney v. United States</u>).  "When a district court finds that counsel has a conflict of interest, real or potential, it retains substantial latitude to disqualify counsel." <u>United States v. McKeighan</u>, 685 F.3d at 968 (quoting <u>United States v. Collins</u>, 920 F.2d at 627). The Seventh Circuit has held that, before disqualifying counsel based on a potential conflict, a district court should "evaluate (1) the likelihood the conflict will actually occur; (2) the severity of

the threat to counsel's effectiveness; and (3) whether there are alternative measures available other than disqualification." United States v. Turner, 594 F.3d 946, 952 (7th Cir. 2010). A district court's ruling regarding a defendant's right to counsel is reviewed on appeal for abuse of discretion. See United States v. McKeighan, 685 F.3d at 968. See also Wheat v. United States, 486 U.S. at 164 ("The evaluation of the facts and circumstances regarding a defendant's right to counsel must be left primarily to the informed judgment of the trial court.").

The Court has previously concluded that an attorney did not have an actual or a serious potential conflict of interest in representing a husband in criminal case when the attorney had previously represented both a husband and wife in a civil case. See United States v. Roach, 912 F. Supp. 2d 1153, 1171-72 (D.N.M. 2012). Of particular importance to the Court was that the attorney representing the husband had disclosed to the wife's new attorney all information he had learned during the course of his civil representation, and both attorneys represented that they did "not see any potential conflict of interest arising down the road." United States v. Roach, 912 F. Supp. 2d at 1171. The Court has also determined that no disqualifying conflict existed where there was only a possibility that an attorney's former client would testify against her current client, and because the former representation was "unrelated to the charges in this case." United States v. Bolivar, 2012 WL 3150430, at *13 (D.N.M. July 20, 2012)(Browning, J.)("That the cases are unrelated provides a strong basis for determining that any potential conflict is not so serious as to require disqualification.').

**2.     The Right to Counsel of One's Choice.**

The "essential aim" of the Sixth Amendment "is to guarantee an effective advocate for each criminal defendant." Wheat v. United States, 486 U.S. at 159. Part of that guarantee is the defendant's right to representation by the counsel of their choice. See United States v. McKeighan,

685 F.3d 956, 966 (10th Cir. 2012)(stating that the Sixth Amendment's "guarantee includes the 'right to be represented by an otherwise qualified attorney whom the defendant can afford to hire, or who is willing to represent the defendant'")(quoting Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 624-25 (1989)).  See also United States v. Gonzalez-Lopez, 548 U.S. 140, 144 (2006)(Scalia, J.)("[A]n element of [the Sixth Amendment] right is the right of a defendant who does not require appointed counsel to choose who will represent him.").  Wrongly depriving a defendant of chosen counsel's representation, requires reversal no matter whether the error prejudiced the defendant.  See United States v. McKeighan, 685 F.3d at 966 (quoting United States v. Gonzalez-Lopez, 548 U.S. at 146-50).

The Supreme Court of the United States of America's precedent indicates that indigent defendants are unable to choose their counsel.  See Caplin & Drysdale, Chartered v. United States, 491 U.S. at 624 ("Petitioner does not, nor could it defensibly do so, assert that impecunious defendants have a Sixth Amendment right to choose their counsel.").  See also Luis v. United States, 136 S. Ct. 1083, 1089 (2016)(Breyer, J.)(plurality opinion)("[A]n indigent defendant, while entitled to adequate representation, has no right to have the Government pay for his preferred representational choice."); United States v. Gonzalez-Lopez, 547 U.S. at 144 ("We have previously held that an element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him.").  Consequently, indigent criminal defendants "have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts."  Caplin & Drysdale, Chartered v. United States, 491 U.S. at 624.  That conclusion has received significant academic criticism.  See, e.g., Janet Moore, The Antidemocratic Sixth Amendment, 91 Wash. L. Rev. 1705, 1707 (2016)("On hearing that indigent defendants have no right to choose their lawyers, the Chief Justice [John Roberts] asked, 'Why

not?'  The correct answer is that there is no good reason to discriminate against poor people in the

vindication of this fundamental constitutional right.")(quoting United States v. Gonzalez-Lopez,

Transcript of Oral Argument at 34, 548 U.S. 140 (2006)(No. 05-352)); Stephen  J.  Schulhofer &

David D. Friedman, Rethinking Indigent Defense: Promoting Effective Representation Through

Consumer Sovereignty and Freedom of Choice for All Criminal Defendants, 31 Am. Crim. L. Rev.

73, 109-10 (1993); Peter W. Tague, An Indigent's Right to the Attorney of his Choice, 27 Stan. L.

Rev. 73 (1974).

The Supreme Court has not explained why indigent defendants have no right to choose

their attorney, but it apparently stems from a concern for attorney autonomy: "[A] defendant may

not insist on representation by an attorney he cannot afford or who for other reasons declines to

represent the defendant."  Wheat v. United States, 486 U.S. at 159.  One might also worry that

allowing indigent defendants to choose their attorney would threaten the public purse by forcing

the government to pay for top tier representation, e.g., Johnnie Cochran, in every case.  See Luis

v. United States, 136 S. Ct. at 1089 ("[A]n indigent defendant, while entitled to adequate

representation, has no right to have the Government pay for his preferred representational

choice.").  When he was a judge on the United States Court of Appeals for the Seventh Circuit,

Professor Richard Posner articulated an explanation sounding in law and economics: "The services

of the criminal defense bar cannot be auctioned to the highest bidder among the indigent accused-

by definition, indigents are not bidders. But these services must be allocated somehow; indigent

defendants cannot be allowed to paralyze the system by all flocking to one lawyer."  United States

v. Ely, 719 F.2d 902, 905 (7th Cir. 1983).

Attorney autonomy, funding constraints, and resource-allocation concerns fail to explain,

however, why indigent criminal defendants should not be able to choose -- subject to the same

constraints that apply to non-indigent defendants, i.e., a trial judge's ability to "deem a chosen lawyer to be unqualified to handle the case, unavailable to proceed in a timely manner without disrupting the court's docket, or unable to cure a conflict of interest," Moore, supra 91 Wash. L. Rev. at 1710-11 -- their counsel from among those attorneys willing to take their case at the generally applicable rates for appointed counsel under the Criminal Justice Act, 18 U.S.C. § 3006A(d), or analogous state legislation.  The Court is reluctant to say that the Sixth Amendment requires the government to give indigent defendants that right, but, as a matter of public policy, such a right would not threaten attorney autonomy, because an indigent criminal defendant could select only a lawyer willing to take the case.  Nor would such a right threaten the public purse, because a defendant-chosen lawyer would be compensated at the same rate -- and with the same total-expense constraints, see 18 U.S.C. § 3006A(d)(2) -- as a government-appointed lawyer. Defense lawyers' willingness to take particular cases, or the lack thereof, and the "mundane case-management considerations" that restrict any criminal defendant's "right to be represented by counsel of choice" would address resource-allocation concerns:

> If a trial judge schedules a trial to begin on a particular date and defendant's counsel of choice is already committed for other trials until some time thereafter, the trial judge has discretion under appropriate circumstances to refuse to postpone the trial date and thereby, in effect, to force the defendant to forgo counsel of choice.

United States v. Gonzalez-Lopez, 548 U.S. at 155.

The Supreme Court has, in fact, recognized that indigent criminal defendants have a limited right to determine who represents them in narrow circumstances where such a right does not threaten the ability of lawyers to choose their clients.  An indigent criminal defendant has the right to be represented by an attorney who is willing to take the case pro bono and not by a court-appointed attorney.  See United States v. Gonzalez-Lopez, 548 U.S. at 144 ("'[T]he Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney

. . . who is willing to represent the defendant even though he is without funds.'")(quoting Caplin & Drysdale, Chartered v. United States, 491 U.S. at 624-25).

### 3.   **The Right to Self-Representation.**

Indigent defendants are entitled to refuse the assistance of appointed counsel and, instead, to represent themselves.   See Faretta v. California, 422 U.S. 806, 807 (1975)(Stewart, J.)("Faretta");  United States v. Hansen, 929 F.3d 1238, 1248-49 (10th Cir. 2019)("'[T]he Constitution does not force a lawyer upon a defendant.  He may waive his Constitutional right to assistance of counsel if he knows what he is doing and his choice is made with eyes open.'")(quoting Adams v. United States ex rel. McCann, 317 U.S. 269, 279 (1946)).  In Faretta, the Supreme Court holds that "a State may [not] constitutionally hale a person into its criminal courts and there force a lawyer upon him, even when he insists that he wants to conduct his own defense."  422 U.S. at 807.  The Supreme Court explains:

> It is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts. But where the defendant will not voluntarily accept representation by counsel, the potential advantage of a lawyer's training and experience can be realized, if at all, only imperfectly.  To force a lawyer on a defendant can only lead him to believe that the law contrives against him. Moreover, it is not inconceivable that in some rare instances, the defendant might in fact present his case more effectively by conducting his own defense.  Personal liberties are not rooted in the law of averages.  The right to defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of "that respect for the individual which is the lifeblood of the law." Illinois v. Allen, 397 U.S. 337, 350-351 (Brennan, J., concurring).

Faretta, 422 U.S. at 834.  The Supreme Court imposes some limits on a criminal defendant's right to self-representation: "When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel.  For this reason, in order to represent himself, the accused must 'knowingly and intelligently' forgo those

relinquished benefits."  Faretta, 422 U.S. at 835 (quoting Johnson v. Zerbst, 304 U.S. 458, 465 (1938), and citing Von Moltke v. Gillies, 332 U.S. 708, 723-724 (plurality opinion, Black, J.)). The Supreme Court stated that a criminal defendant therefore "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'"  Faretta, 422 U.S. at 835 (quoting Adams v. United States ex rel. McCann, 317 U.S. at 279).

"In the normal course," United States v. Vann, 776 F.3d 746, 763 (10th Cir. 2015), courts "conduct a two-part test to determine whether a defendant has effectively waived his right to counsel," United States v. Williamson, 859 F.3d 843, 862 (10th Cir. 2017). "'First, we must determine whether the defendant voluntarily waived his right to counsel.'"  United States v. Hansen, 929 F.3d 1238, 1249 (10th Cir. 2019)(quoting United States v. Williamson, 859 F.3d at 862).  "'[S]econd, we must determine whether the defendant's waiver of his right to counsel was made knowingly and intelligently.'" United States v. Hansen, 929 F.3d 1238, 1249 (10th Cir. 2019)(quoting United States v. Williamson, 859 F.3d at 862). See Faretta, 422 U.S. at 835 (stating that "the accused must 'knowingly and intelligently' forgo" those benefits traditionally "associated with the right to counsel").

The first part of the test -- voluntary waiver of a right to counsel --  "turns on whether the defendant's objections to his counsel are such that he has a right to new counsel."  United States v. Taylor, 113 F.3d at 1140 (citing United States v. Padilla, 819 F.2d 952, 955-56 (10th Cir. 1987)). For the waiver to be voluntary, a court "must be confident the defendant is not forced to make a 'choice' between incompetent counsel or appearing pro se."  United States v. Taylor, 113 F.3d at 1140 (quoting United States v. Silkwood, 893 F.2d 245, 248 (10th Cir. 1989)).  Nevertheless, "'a refusal without good cause to proceed with able appointed counsel is a 'voluntary' waiver.'"

United States v. Taylor, 113 F.3d at 1140 (quoting Maynard v. Meachum, 545 F.2d 273, 278 (1st Cir. 1976)).  "Thus, unless a defendant establishes good cause entitling him to the appointment of new counsel, the defendant's decision to waive counsel will be deemed voluntary."  United States v. Taylor, 113 F.3d at 1140.

The second part of the test -- knowing-and-intelligent waiver of the right to counsel -- "is different from making a wise decision."  United States v. Turner, 287 F.3d 980, 983, 984 (10th Cir. 2002)("A lawyer cannot be forced upon a defendant who wishes to waive his right to counsel even if self-representation would be detrimental.").  "Before a court may grant a waiver, it must ensure the defendant is 'aware of the dangers and disadvantages of self-representation.'"  United States v. Williamson, 859 F.3d at 862 (quoting Maynard v. Boone, 468 F.3d 665, 676 (10th Cir. 2006)).  See Faretta, 422 U.S. at 835.  "[K]nowing and intelligent means only that [a defendant] was reasonably informed by the court of the hazards of self-representation and had sufficient understanding of those hazards."  United States v. Turner, 287 F.3d at 984.  See Iowa v. Tovar, 541 U.S. 77, 88-89 (2004)("[B]efore a defendant may be allowed to proceed pro se, he must be warned [by the district court] specifically of the hazards ahead.").  The "tried-and-true method" is for a district court to conduct a waiver hearing -- often called a Farretta hearing -- to "ensure[] the defendant is not unwittingly or impulsively disposing of his constitutional right to counsel."  United States v. Vann, 776 F.3d at 763 (10th Cir. 2015). At such a waiver hearing, the court determines whether "the defendant is aware of the nature of the charges, the range of allowable punishments and possible defenses, and is fully informed of the risks of proceeding pro se," United States v. Williamson, 859 F.3d at 862, where the defendant "apprehend[s] ""the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other

facts essential to a broad understanding of the whole matter.'" United States v. Weninger, 624

F.2d 163, 164 (10th Cir. 1980)(quoting Von Moltke v. Gillies, 332 U.S. 708, 724 (1948)).[6]

---

[6]These factors are often called the "Von Moltke factors." United States v. Behrens, 551 F. App'x 452, 457 (10th Cir. 2014). See, e.g., United States v. McConnell, 749 F.2d 1441, 1451 n.5 (10th Cir. 1984)(noting that these topics are "taken from the Supreme Court's opinion in Von Moltke"). Further, the Tenth Circuit has explained:

> [W]e note that the Supreme Court has intimated that the Benchbook for U.S. District Court Judges provides helpful information regarding topics that are appropriate and important for trial courts to delve into when assessing the knowing and intelligent nature of a defendant's waiver of counsel. See Patterson [v. Illinois], 487 U.S. 285, 300 n.13 (1988)]. And, though neither the Court nor we purport to set out a "precise litany" of questions that are necessary, [United States v. Padilla, 819 F.2d 952, 956 (10th Cir. 1987)]; accord Tovar, 541 U.S. at 88, we would be remiss not to acknowledge, as some of our sister circuits already have, that the Benchbook provides valuable guidance of this type. See United States v. Jones, 452 F.3d 223, 229 (3d Cir. 2006)(noting that a "set" of "model questions derived from" the Benchbook "provide[s] a 'useful framework'" in deciding whether a defendant knowingly and voluntarily wishes to proceed pro se" (quoting United States v. Peppers, 302 F.3d 120, 136 (3d Cir. 2002))); see also United States v. Bankston, 820 F.3d 215, 223 (6th Cir. 2016)(describing the Benchbook as providing a "model inquiry"); United States v. Bell, 901 F.2d 574, 577 (7th Cir. 1990)(stating that "[g]uidelines for the appropriate inquiry are set forth" in the Benchbook).
>
> In particular, as relevant here, we note that the Benchbook specifically provides a line of inquiry reasonably calculated to warn a defendant regarding the obligation to abide by federal procedural and evidentiary rules. Specifically, the current edition of the Benchbook recommends that, during a Faretta hearing, district judges specifically ask: "Do you understand that the rules of evidence govern what evidence may or may not be introduced at trial, that in representing yourself, you must abide by those very technical rules, and that they will not be relaxed for your benefit?" Fed. Judicial Ctr., Benchbook for U.S. District Court Judges 6 (6th ed. 2013)[hereinafter Benchbook]. Likewise, the Benchbook recommends that district judges ask: "Do you understand that those rules [i.e., the Federal Rules of Criminal Procedure] govern the way a criminal action is tried in federal court, that you are bound by those rules, and that they will not be relaxed for your benefit?" Id. Although we reiterate that neither the Supreme Court nor our court has "prescribed any formula or script to be read to a defendant who states that he elects to proceed without counsel," Tovar, 541 U.S. at 88, 124 S.Ct. 1379, accord Padilla, 819 F.2d at 959, the Benchbook underscores -- like the controlling precedent discussed supra --the importance, in securing a knowing and intelligent waiver of the right to counsel, of a court conducting a thorough colloquy with a defendant that is

The Supreme Court has emphasized that the requisite thoroughness of the district court's inquiry into the relevant factors should be viewed through a "pragmatic" lens -- that is, the degree of thoroughness should correspond to how "substantial" and "obvious" the dangers of self-representation are at any particular stage of the criminal proceedings.

United States v. Hansen, 929 F.3d at 1250 (quoting Patterson v. Illinois, 487 U.S. 285, 298, 299-300 (1988). The Supreme Court "require[s] a more searching or formal inquiry before permitting an accused to waive his right to counsel at trial than [it] require[s] for a Sixth Amendment waiver during postindictment questioning." Patterson v. Illinois, 487 U.S. at 299. "[W]arnings of the pitfalls of proceeding to trial without counsel . . . must be 'rigorous[ly]' conveyed." Iowa v. Tovar, 541 U.S. at 89 (quoting Patterson v. Illinois, 487 U.S. at 298).

In addition, a defendant must assert her right to self-representation "clearly and unequivocally" and "in a timely manner." United States v. Callwood, 66 F.3d 980, 983-84 (10th Cir. 1999)(citing United States v. McKinley, 58 F.3d 1475, 1479-80 (10th Cir. 1995); United States v. Reddick, 22 F.3d 1504, 1510 (10th Cir. 1994); United States v. Nunez, 877 F.2d 1475, 1478 (10th Cir. 1989)). Trial courts need not inform defendants of the right to self-representation, unlike the right to counsel, "because 'the right to self-representation does not implicate constitutional fair trial considerations to the same extent as does an accused's right to counsel.'" Munkus v. Furlong, 170 F.3d 980, 983 (10th Cir. 1999)(quoting United States v. Martin, 25 F.3d 293, 295 (6th Cir. 1994)). Accordingly, "a waiver or a termination of the right to self-representation may occur without the defendant's consent or knowledge." Munkus v. Furlong, 170 F.3d 980, 983 (10th Cir. 1999).

"'[A] motion for self-representation is timely if it is made before the jury is impaneled,

---

reasonably calculated to ensure that the defendant understands his obligation to adhere to federal procedural and evidentiary rules.

United States v. Hansen, 929 F.3d 1238, 1257-58 (10th Cir. 2019)(footnote omitted).

unless it is a tactic to secure delay.'" United States v. Simpson, 845 F.3d 1039, 1053 (10th Cir. 2017)(quoting United States v. Tucker, 451 F.3d 1176, 1181 (10th Cir. 2006)).  Whether such a motion manifests "dilatory intent," turns on "such considerations as the actual delay that would be caused by granting the motion, whether the delay could have been avoided if the defendant had made the request for self-representation earlier, and whether the defendant had good reasons for not making the motion in a more timely manner." United States v. Tucker, 451 F.3d 1176, 1181-82 (10th Cir. 2006).  The Tenth Circuit has thus accepted as timely a motion for pro-se representation that was filed the day of voir dire but that indicated no intent to delay, see United States v. Tucker, 451 F.3d 1176, 1181-82 (10th Cir. 2006), and rejected as untimely a motion filed six days before trial but that indicated an intent to delay, see United States v. Smith, 413 F.3d 1253, 1281 (10th Cir. 2005)(overruled on other grounds by United States v. Hutchinson, 573 F.3d 1011 (2009)).

A defendant must also "'clearly and unequivocally'" assert her right to self-representation. United States v. Miles, 573 F.3d 832 (10th Cir. 2009)(quoting United States v. Treff, 924 F.2d 975, 978 (10th Cir. 1991)).  The rationale for this requirement is twofold: (i) "an equivocal demand" supplies "a potential ground for appellate reversal no matter how the district court rules," United States v. Treff, 924 F.2d 975, 979 (10th Cir. 1991)(emphasis in original), and; (ii) "a waiver of the right to counsel should not be lightly inferred," United States v. Miles, 573 F.3d 832 (10th Cir. 2009)(citing Brewer v. Williams, 430 U.S. 387, 404 (1977)).  In keeping with these interests, the Tenth Circuit has found a range of conduct insufficiently clear to assert the pro-se right.  See, e.g., United States v. Miles, 572 F.3d 832, 837 (10th Cir. 2009)(filing of two pro-se motions was "not an unequivocal signal" because "it is not at all uncommon for defendants represented by counsel to submit their own pleadings").  Defendants may, however,

assert their right to self-representation at a later stage, even when it has either not been properly invoked or rejected at an earlier stage. See, e.g., United States v. Pryor, 842 F.3d 441, 450 (6th Cir. 2016)("[D]efendants may assert the right to self-representation later in proceedings, where the assertion is timely and not an attempt to delay or manipulate proceedings.").

### 4. <u>Waiver of Conflicts of Interest.</u>

It is possible for a criminal defendant to waive his or her right, under the Sixth Amendment, to conflict-free counsel. See Mickens v. Taylor, 535 U.S. at 173 ("In those cases where the potential conflict is in fact an actual one, only inquiry will enable the judge to avoid all possibility of reversal by either seeking waiver or replacing a conflicted attorney."). See also Peretz v. United States, 501 U.S. 923, 936 (1991)("The most basic rights of criminal defendants are . . . subject to waiver."); United States v. Hunt, 62 F. App'x 272, 276 (10th Cir. 2003)("Nevertheless, a defendant may knowingly and intelligently waive the right to conflict-free counsel."). To effect a valid waiver, a trial court should "affirmatively participate in the waiver decision by eliciting a statement in narrative form from the defendant indicating that he fully understands the nature of the situation and has knowingly and intelligently made the decision to proceed with the challenged counsel." United States v. Winkle, 722 F.2d at 611 (citations omitted). A district court "should also determine whether the defendant understands the facts underlying the conflict and the dangers and risks associated with waiving the conflict." United States v. Hunt, 62 F. App'x at 276 (citing Eden v. Hannigan, 87 F.3d 1109, 1118 (10th Cir. 1996)). Where a colloquy does not reflect that the defendant understood those risks, and knowingly and intelligently waived the conflict, the Tenth Circuit has held that there is a Sixth Amendment violation where the conflict adversely affected counsel's performance. See Eden v. Hannigan, 87 F.3d at 1112, 1118.

A court can, however, "decline a proffer of waiver, and insist that defendants be separately

represented." United States v. Wheat, 486 U.S. at 162.  Courts can refuse proffered waivers "not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." Wheat v. United States, 486 U.S. at 163.  The Supreme Court explains that,

> while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.

Wheat v. United States, 486 U.S. at 159.  Accordingly the defendants' "right to choose their own counsel is circumscribed in several important respects." Wheat v. United States, 486 U.S. at 159. One such limitation on a defendant's right to counsel of their choice is a federal court's "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." Wheat v. United States, 486 U.S. at 160.  See United States v. McKeighan, 685 F.3d at 968 ("Courts have the duty to 'balance a defendant's constitutional right to retain counsel of his choice against the need to maintain the highest standards of professional responsibility, the public's confidence in the integrity of the judicial process and the orderly administration of justice.'" (quoting United States v. Collins, 920 F.2d 619, 626 (10th Cir. 1990))).  Permitting defendants to proceed with conflicted counsel "'is also detrimental to the independent interest of the trial judge to be free from future attacks over the adequacy of the waiver or the fairness of the proceedings in his own court.'" United States v. Wheat, 486 U.S. at 162 (quoting United States v. Dolan, 570 F.2d 1177, 1184 (3d Cir. 1978)).

## ANALYSIS

Mr. Romero asked the Court to conduct a hearing under Faretta, 422 U.S. 806, "to

determine his continued status as Mr. Nissen's counsel," Motion at 1, and at that hearing, Nissen asserted his desire to represent himself, see Tr. at 34:25-25:3 (Court, Nissen)(Court: "You really want me to fire Mr. Romero and let you represent yourself?" Nissen: "Of course I want . . . to do that."). The Court then attempted to conduct the standard colloquy that a court must conduct to determine whether a defendant has knowingly and intelligently waived his right to counsel and proceed to represent himself pro-se. See Tr. at 25:2-26:21 (Court, Nissen). See also Faretta, 422 U.S. at 807; Fed. Judicial Ctr., Benchbook for U.S. District Court Judges at 6-7 (6th ed. 2013). Nissen, however, was not willing to answer the Court's colloquy questions which the Court addressed to Nissen, the Defendant, even after the Court explained that he had to answer the Court's questions if he wanted to represent himself and only reiterated his refrain that "I'm not Mr. Nissen . . . . [I'm] Freedom Rings," "Mr. Nissen is not here to answer that question," "I can't represent something I'm not," and "I can't speak for a dead man." Tr. at 25:6-29:1 (Nissen). The Court was and is concerned that Nissen, the Defendant, would not engage in the standard colloquy to waive representation; the Court also was and is concerned that Nissen, the Defendant, could not represent "Freedom Rings" -- the entity Nissen claimed was the Defendant in the courtroom -- because Nissen is not a lawyer. The Court also was and is concerned that Freedom Rings cannot represent Nissen, the Defendant, because Freedom Rings is not a lawyer. Finally, the Court is also concerned that Freedom Rings cannot represent Nissen, because Nissen, not Freedom Rings, is the Defendant in this case, and Freedom Rings is not charged with a crime and is not receiving a sentence. The Court concludes, therefore, that Nissen's refusal to provide answers to the Court's colloquy waived Nissen's right to self-representation. In short, the Court could not get Nissen to engage in the standard colloquy that the Court must conduct to determine whether a defendant has knowingly and intelligently waived his right to counsel and proceed to represent himself pro se.

Indigent defendants are entitled to refuse the assistance of appointed counsel and, instead, to represent themselves.  See Faretta, 422 U.S. at 807; United States v. Hansen, 929 F.3d 1238, 1248-49 (10th Cir. 2019)("'[T]he Constitution does not force a lawyer upon a defendant. He may waive his Constitutional right to assistance of counsel if he knows what he is doing and his choice is made with eyes open.'")(quoting Adams v. United States ex rel. McCann, 317 U.S. 269, 279 (1946)).  Defendants must, however, "'knowingly and intelligently'" relinquished their right to counsel.  Faretta, 422 U.S. at 835 (quoting Johnson v. Zerbst, 304 U.S. 458, 465 (1938), and citing Von Moltke v. Gillies, 332 U.S. 708, 723-724 (plurality opinion of Black, J.)).

Typically, courts "conduct a two-part test to determine whether a defendant has effectively waived his right to counsel."  United States v. Williamson, 859 F.3d 843, 862 (10th Cir. 2017). The first issue is whether a defendant voluntarily waived his or her right to counsel.  See United States v. Hansen, 929 F.3d at 1249 (citing United States v. Williamson, 859 F.3d at 862).   This issue "turns on whether the defendant's objections to his counsel are such that he has a right to new counsel."  United States v. Taylor, 113 F.3d at 1140 (citing United States v. Padilla, 819 F.2d 952, 955-56 (10th Cir. 1987)).  For the waiver to be voluntary, a court "must be confident the defendant is not forced to make a 'choice' between incompetent counsel or appearing pro se." United States v. Taylor, 113 F.3d at 1140 (quoting United States v. Silkwood, 893 F.2d 245, 248 (10th Cir. 1989)).

Here, Nissen's desire to represent himself is voluntary, because he seeks to advance legal theories that his current counsel "cannot ethically advocate."  Motion at 2 ("Undersigned counsel respectfully disagrees with Mr. Nissen's position that his pro se legal arguments constitutes pertinent, much less binding, legal authority in his case. As such, undersigned counsel cannot ethically advocate such positions before the Court.").  Nissen stated at the hearing his reason for

wanting to represent himself:

> I do have a right to speak on behalf of Mr. Nissen, whoever that individual is. That's not me. And I claim that from day one. I'm the living man of the flesh and blood. I'm the private agent, lawful sole heir. That's my right. I'm the agent. I can run the office as I see necessary. And Mr. Romero appointed as the assistance of counsel and defense of Mr. Nissen, whoever that is, didn't do as I was asking . . . .
>
> . . . .
>
> This Court has no choice but to release Joe Romero, Esq. as the private agent is also the CEO that can release, discharge any trustees at any time that they fail to carry out their judiciary responsibilities in good faith and merit for the Cestui Que trust estate. In conclusion, Joe Romero, Esq, you're fired for professional malconduct.

Tr. at 9:10-19 (Nissen); id. at 2-21:13-20 (Nissen). The Court has some difficulty discerning the

distinctions between Nissen's "living man,"[7] "flesh and blood,"[8] and other sovereign citizen[9]

_____

[7]According to the Court's research, Nissen's "living man" legal theory argues that the Cestui Que Vie Act of 1666, which the British Parliament enacted, declared all people dead and that a person must therefore declare that they are a "living man" to divest a court of its jurisdiction. E.g., Harris Park, Understanding Cestui Que Vie Act 1666, available at https://societyandnature.org/cqv.pdf (last visited July 21, 2021)(presenting an example of the living man theory articulated by an adherent).

[8]The flesh and blood defense has its origins in the Posse Comitatus movement:

At the peak of its popularity among midwestern and Great Plains farmers in the 1970s and '80s, adherents to the Posse Comitatus movement held that the Founding Fathers intended to create a "Christian Republic" of individually sovereign citizens. In a democracy, they believed, the poor could vote to create social welfare programs, whereas in a republic, "the individual [is] sovereign and the government ha[s] no power to enact laws that will loot and plunder the wealth produced by the sovereign individual." The loosely organized group encouraged members to return identification cards and other government-issued documents in an effort to "reclaim their sovereignty." In one of its more bizarre holdings, the Posse believed that Social Security numbers represented "secret government account[s]" through which the American populace was put up as collateral against the national debt. Further, they asserted that one's name on the Social Security card and secret government account, spelled in all capital letters, represented a fictional legal construct, not "them-natural, live, flesh and blood men."

. . . .

Its name meaning "[p]ower of the [c]ounty" in Latin, the Posse Comitatus looked to ancient English common law to support its convictions that there were no legitimate forms of government higher than the county, no legitimate law enforcement authorities higher than the sheriff, and no legitimate judicial authorities higher than the Justice of the Peace. The organization also derived inspiration from the Posse Comitatus Act of 1878, which constrained the federal government's ability to use the military on domestic soil to protect African-Americans, a move that ushered in the Jim Crow era. Although the organization did respect a strict construction of the Constitution, believing it to be derived from God, Posse members did not believe any amendments passed after the Bill of Rights were legitimate because Jews and other minorities had ostensibly corrupted the government.

The Posse found many sympathetic ears across the country. A 1976 FBI report estimated the movement had 12,000 to 50,000 members encompassing seventy-eight chapters in twenty-three states, as well as at least ten times as many

> casual supporters.  As the agricultural economy soured in the 1980s, the Posse was increasingly successful in peddling its theories in middle America.
>
> . . . .
>
>    As the agricultural economic crisis of the 1980s corrected itself, and as Posse Comitatus leaders died or were locked up, the movement sputtered. However, the beliefs advanced by the Posse remained deeply rooted in middle America, often under the banner of the "patriot movement," which included the bombers of the Murrah Federal Building in Oklahoma City in April 1995.

James Erickson Evans, Note, The "Flesh and Blood" Defense, 53 Wm. & Mary L. Rev. 1361, 1365-68 (2012)(footnotes omitted).  The Honorable Robert Scott Davis, United States District Judge for the United States District Court for the District of Maryland, notes that flesh and blood and similar jurisdictional arguments, "[a]lthough unique by conventional legal standards . . . are not new."  United States v. Mitchell, 405 F. Supp. 2d 602, 604 (D. Md. 2005)(Davis, J.).  Judge Davis quotes a website describing the theory:

>    The defendants' protestations echo the sentiments included in the following excerpt from an essay found on an Internet website:
>
>>    There appears to be general misunderstanding by people in general as to the difference between a natural person and an artificial person. This document will explain that difference.
>>
>>    John Joseph Smith, is a natural, flesh and blood, person, created by God. JOHN JOSEPH SMITH, is a U.S. corporate artificial person, U.S. citizen, created by the government. In basic English grammar, a name spelled in upper and lower case, such as John Joseph Smith, is indicative of a flesh and blood man, a natural person . . . .  On the other hand, a name spelled in all caps, such as JOHN JOSEPH SMITH, is indicative of an artificial person.
>
> See http://www.usa-t he-republic.com/revenue/true_ history/AffTruth.html (visited December 16, 2005).

United States v. Mitchell, 405 F. Supp. 2d at 603 n.4.  A reporter for the Washington Monthly covered United States v. Mitchell and expanded on the background to the flesh and blood arguments on which the defendants were relying:

>    In the previous year, nearly twenty defendants in other Baltimore cases had begun adopting what lawyers in the federal courthouse came to call "the flesh-and-blood defense."  The defense, such as it is, boils down to this: As officers of the court, all defense lawyers are really on the government's side, having sworn an oath to uphold a vast, century-old conspiracy to conceal the fact that most aspects of the

federal government are illegitimate, including the courts, which have no constitutional authority to bring people to trial.  The defendants also believed that a legal distinction could be drawn between their name as written on their indictment and their true identity as a "flesh and blood man."

Judge Davis and his law clerk pored over the case files, which led them to a series of strange Web sites.  The flesh and- blood defense, they discovered, came from a place far from Baltimore, from people as different from [the defendant in United States v. Mitchell] as people could possibly be.  Its antecedents stretched back decades, involving religious zealots, gun nuts, tax protestors, and violent separatists driven by theories that had fueled delusions of Aryan supremacy and race war in gun-loaded compounds in the wilds of Montana and Idaho.  Although [the defendant] and his peers didn't know it, they were inheriting the intellectual legacy of white supremacists who believe that America was irrevocably broken when the 14th Amendment provided equal rights to former slaves.  It was the ideology that inspired the Oklahoma City bombing, the biggest act of domestic terrorism in the nation's history, and now, a decade later, it had somehow sprouted in the crime-ridden ghettos of Baltimore.

Kevin Carey, Too Weird for The Wire, Washington Monthly (May/June/July 2008 issue), also available at https://washingtonmonthly.com/magazine/mayjunejuly-2008/too-weird-for-the-wire-2/ (last visited August 9, 2021).

[9]The Sixth Circuit has described the thrust of these arguments:

Many sovereign citizens believe that by entering into a contract with the federal government, they lose their status as sovereign citizens and provide courts with jurisdiction over them. See Francis X. Sullivan, Comment, The "Usurping Octopus of Jurisdictional/Authority": The Legal Theories of the Sovereign Citizen Movement, 1999 Wis. L. Rev. 785, 802 ("Once the Sovereign Citizen contracts with the federal government, he unknowingly surrenders his personal sovereignty and agrees to be bound by the illegitimate federal law.").  Indeed, a number of sovereign citizens believe that using a lawyer also constitutes acceptance of the jurisdiction of the court via contract with the government. See, e.g., Charles E. Loeser, From Paper Terrorists to Cop Killers: The Sovereign Citizen Threat, 93 N.C. L. Rev. 1106, 1126 (2015); Taj Tarik Bey, 6–Week Civics Class: Class 4, at 2, http://rvbeypublications.com/sitebuildercontent/sitebuilderfiles/webcivicsclass4.pdf (last visited on Oct. 27, 2016)("If one hires a Lawyer or an Attorney of the Bar Association (A.B.A.) to 're-present' you, then you have surrendered your Birthrights to that officer of the court!  Jurisdiction is then assumed, and the officers of the court go straight to Adjudicating against you with sanctions, fines, and jail time, or both!").

United States v. Pryor, 842 F.3d 441, 446 (6th Cir. 2016).  Similarly, the Judge Davis describes the sovereign citizen "movement's" history:

[C]ourts have encountered these claims before, namely, in the antics and writings of extremists who wish to dissociate themselves from the social compact undergirding this nation's democratic institutions, including the independent judicial branch of government.  See The Anti-Government Movement Guidebook, National Center for State Courts (1999), downloadable at http://www.ticket slayer.com/beta_ts_2/anti-gov_handbook.pdf and by purchase from the National Center for State Courts at http://library.ncsc. dni.us/uhtbin/cgisir si.exe.  There, the authors have described activities and arguments made by others not unlike those employed by the defendants in this case:

> Though the precise contours of their philosophy differ among the various groups, almost all antigovernment movements adhere to a theory of a "sovereign" citizen.  Essentially, they believe that our nation is made up of two types of people: those who are sovereign citizens by virtue of Article IV of the Constitution, and those who are "corporate" or "14th Amendment" citizens by virtue of the ratification of the 14th Amendment.  The arguments put forth by these groups are generally incoherent, legally, and vary greatly among different groups and different speakers within those groups.  They all rely on snippets of 19th Century court opinions taken out of context, definitions from obsolete legal dictionaries and treatises, and misplaced interpretations of original intent. One of the more cogent[,] in the sense that it is readily followed-arguments[,] is that there were no United States citizens prior to the ratification of the 14th Amendment.  All Americans were merely citizens of their own state and owed no allegiance to the federal government. As a result of that amendment, however, Congress created a new type of citizen-one who now enjoyed privileges conferred by the federal government and in turn answered to that government.
>
> One of the ramifications of this belief is the dependent belief that, unless one specifically renounces his federal citizenship, he is not the type of citizen originally contemplated by the Constitution.  And, in their view, the Constitution requires all federal office holders to be the original or sovereign type of citizen, a state citizen rather than a United States citizen.  As a result, all federal officers are holding office illegally and their laws and rules are thus constitutionally suspect.

Id. at 51.

. . . .

The NCSC monograph further describes some of the ideas behind jurisdictional challenges to the proper exercise of judicial authority as follows:

arguments.  E.g., Michael Crowell, A Quick Guide to Sovereign Citizens, Admin. Just. Bull. (UNC

Sch. of Gov't, Chapel Hill, N.C., Nov. 2015).  These arguments, however, regardless of their form,

---

Members of the anti-government movement will often attempt to avoid conferral of jurisdiction onto a court by refusing to identify themselves or denying that they are the person named in a warrant or summons.  This refusal may come from any one of or even several of the following bases.  Often, antigovernment adherents will refuse to come forward simply to waste time, or out of a more general refusal to recognize or submit to the court's jurisdiction.   Some parts of the anti-government movement however, will refuse to come forward on the ground that their name is misspelled, or even because their name is in all capital letters.  This particular objection comes from a number of "sources".  Some believe that the spelling (or misspelling, or use of all capital letters) of their name is a sign of the movement toward "one world government."  Others believe that all capital letters denotes a corporation, and that answering as a corporation subjects them to the illegitimate laws of the American judicial system.  Some believe that all capital letters denotes "the Mark of the Beast," or that it is a denotation of a "war name."

Finally, some members of the movement believe that they only "own" their first and middle names, and that their last name reveals their family. They use their middle name in place of a last name, or go by their first and middle name from the family of their last name. Attached to this particular issue may be a desire to be referred to as "Sir" or "Sovereign," because of a belief that this title more effectively conveys their status as a "sovereign citizen."  It is the belief of members of the movement that they can file a document renouncing their citizenship to become a nation subject only to their own local common-law, and not subject to the law of their state or the federal government. Another ground for a follower's refusal to identify himself may be his refusal to recognize himself as a "person."  This particular objection comes from what appears to be a somewhat mystical distinction between a "person" and a "human being" according to the anti-government movement's philosophy.

Id. at 63.

United States v. Mitchell, 405 F. Supp. 2d 602, 605-06 (D. Md. 2005)(Scott, J.).

lack a sound basis in applicable law and the relevant facts, and are arguments the Court has denied before.  See, e.g., United States v. Gutierrez, No. CR 15-3955 JB, 2021 WL 2589127, at *5 (D.N.M. June 24, 2021)(Browning, J.)(rejecting these arguments in the context of taxpayer avoidance).  See also United States v. Palmer, 699 F. App'x 836, 838 (10th Cir. 2017)("As for [the defendant's] sovereign state citizen argument, reasonable jurists could also not disagree that the claim is plainly frivolous."); Charlotte v. Hansen, 433 F. App'x 660, 661 (10th Cir. 2011)("We note that an individual's belief that her status as a 'sovereign citizen' puts her beyond the jurisdiction of the courts 'has no conceivable validity in American law.'")(quoting United States v. Schneider, 910 F.2d 1569, 1570 (7th Cir. 1990)); United States v. Benabe, 654 F.3d 753, 767 (7th Cir. 2011)("Regardless of an individual's claimed status of descent, be it as a 'sovereign citizen,' a 'secured-party creditor,' or a 'flesh-and-blood human being,' that person is not beyond the jurisdiction of the courts.  These theories should be rejected summarily[] however they are presented."); United States v. My Dr. Suggests LLC, No. 2:20-CV-0279 DBB, 2021 WL 662442, at *2 (D. Utah Feb. 19, 2021)(Barlow, J.)("Theories about lack of jurisdiction based on sovereign citizenry should be rejected summarily."); Osorio v. Connecticut, No. 3:17-CV-1210 (CSH), 2018 WL 1440178, at *5 (D. Conn. March 22, 2018)(Haight, J.)(listing cases, and noting: "Numerous Circuits have noted the rise of this movement and rejected its underlying premise that federal courts lack jurisdiction over all 'living men.'")(no citation for quotation).  Here, Nissen's counsel, Mr. Romero, is competent and one of the best defense counsel in the district; he is a former Assistant United States Attorney; and unsurprisingly, he refuses to advance these arguments.  See Motion at 2.  Accordingly, the Court the concludes that Nissen's desire to proceed pro se is voluntary, because the Court is "confident the defendant is not forced to make a 'choice' between incompetent counsel or appearing pro se."  United States v. Taylor, 113 F.3d at 1140 (quoting

United States v. Silkwood, 893 F.2d 245, 248 (10th Cir. 1989)).

The second step of the test asks the Court "to determine whether the defendant's waiver of his right to counsel was made knowingly and intelligently.'" United States v. Hansen, 929 F.3d 1238, 1249 (10th Cir. 2019)(quoting United States v. Williamson, 859 F.3d at 862). See Faretta, 422 U.S. at 835 (stating that "the accused must 'knowingly and intelligently' forgo" those benefits traditionally "associated with the right to counsel")(citing Johnson v. Zerbst, 304 U.S. at 464-65). At this juncture, courts generally conduct a standard colloquy -- also known as a Faretta hearing -- to "ensure the defendant is 'aware of the dangers and disadvantages of self-representation.'" United States v. Williamson, 859 F.3d at 862 (quoting Maynard v. Boone, 468 F.3d 665, 676 (10th Cir. 2006)). See Faretta, 422 U.S. at 835; United States v. Vann, 776 F.3d at 763 (10th Cir. 2015)(stating that the "tried-and-true method" is for a district court to conduct a waiver hearing -- often called a Farretta hearing -- to "ensure[] the defendant is not unwittingly or impulsively disposing of his constitutional right to counsel."). At such a hearing, the Court determines whether "the defendant is aware of the nature of the charges, the range of allowable punishments and possible defenses, and is fully informed of the risks of proceeding pro se," United States v. Williamson, 859 F.3d at 862, and whether the defendant "apprehend[s]" of "'the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter.'" United States v. Weninger, 624 F.2d 163, 164 (10th Cir. 1980)(quoting Von Moltke v. Gillies, 332 U.S. 708, 724 (1948)).

Here, the Court attempted to conduct the standard colloquy, however, Nissen refused to answer the Court's questions:

> The Court:    [Let's] see if we can waive [the] right to counsel and have him represent himself. I'm not as optimistic we're going to get a clean

record here, but we'll give it a try.

. . . .

The Court:      All right, I'm going to call you Mr. Nissen.  And Mr. Nissen --

Mr. Nissen:     I'm not Mr. Nissen.  You can call me Freedom Rings.

The Court:      No, I'm going to call you --

Mr. Nissen:     Or Freedom for short.  But I can bring the evidence to the table in your own written law of the Cestui Que Vie Act, which clearly explains it.

The Court:      Mr. Romero --

Mr. Nissen:     But I don't think I need to do that.  You are a professional.  You've been at it far longer than I have.

The Court:      Mr. Nissen, shut up.

Mr. Nissen:     I will.

The Court:      Shut up right now.  Don't say a word.  Listen to me.  I'm going to call you Mr. Nissen.  And if you cannot the answer these questions, Mr. Romero is going to continue to be your counsel, okay.  So let me tell you a few things about your constitutional right to be represented by an attorney at every stage of proceedings.  Do you understand, Mr. Nissen, that have that right?

Mr. Nissen:     Mr. Nissen, is not here to answer that question.

The Court:      So Mr. Romero, I hate to do that to you, but we're just going to leave you in place.  I can't even get a clean colloquy with him to represent himself.

Mr. Nissen:     I can't represent something I'm not.

The Court:      Well, you're not an attorney.

Mr. Nissen:     I'm not going to volunteer for somebody I'm not.

The Court:      You're not on an attorney.  You can't represent anybody but yourself.

Mr. Nissen:     I'm capable of doing this. That's in the Cestui Que Act.  I'm competent, as I've been found for the fifteenth time.

The Court:     All right.  Motion to relieve Mr. Romero as counsel is denied.  You will continue to have Mr. Romero as your counsel.  You either cooperate with him --

Mr. Nissen:     I'm not going to cooperate.

Tr. at 25:2-26:21 (Court, Nissen).  The Court concludes that Nissen's non-answers and refusal to engage in the Court's colloquy do not amount to a knowing and intelligent waiver of his right to counsel.  See United States v. Williamson, 859 F.3d at 862.  Even though he properly invokes the right to represent himself, see Tr. at 24:25-25:3 (Court, Nissen), Nissen cannot represent himself, because Nissen refuses to respond to the Court's efforts to conduct the standard colloquy that a court must conduct to determine whether a defendant has knowingly and intelligently waived his right to counsel and proceed to represent himself pro se.   See Tr. at 24:2-26:6 (Court, Nissen).  See also Fed. Judicial Ctr., Benchbook for U.S. District Court Judges at 6-7 (6th ed. 2013)(listing questions for a district judge to ask a defendant if the defendant does not want counsel).  Nissen met the Court's colloquy questions only with contentions that he is not Nissen, that Nissen is dead, that the person in the courtroom is an entity, that the Court should call him "Freedom Rings," and that he does not "know what Mr. Nissen is.  I can't speak for somebody I'm not. . . .  I can't speak for a dead man. . . .  I'm not Mr. Nissen. . . .  I'm the private living man flesh and blood, which is in the Cestui Que Vie Act."  Tr. at 24:21-26:6 (Court, Nissen).  The Court concludes, therefore, that, despite the Court's efforts to conduct the standard colloquy, Nissen has not knowingly and intelligently waived his right to counsel.

In a similar context, the United States Court of Appeals for the Sixth Circuit concluded that a defendant's "refusal to provide answers to the colloquy is similar to a refusal to attend proceedings, and the court may treat it as a waiver of the right to self-representation."  United States v. Pryor, 842 F.3d 441, 450 (6th Cir. 2016).  In United States v. Pryor, the defendant raised

sovereign citizen arguments and refused to engage with the magistrate judge about his desire to represent himself, other than reiterating his argument that the court lacked jurisdiction.  See 842 F.3d at 449.

> [T]he magistrate judge, after his attempts to have [the defendant] expressly state he wished to represent himself, clearly warned [the defendant] that failure to respond to the question would result in the appointment of [an] attorney.  [The defendant's] answer was nonresponsive, and so the magistrate judge permissibly appointed counsel and ended the colloquy.

842 F.3d at 450.  The Sixth Circuit noted that "[a] court facing such resistance can hardly be expected to proceed through the questions in anticipation that the defendant may change his mind and begin responding."  842 F.3d at 449.  The Sixth Circuit analogized the defendant's behavior to the defendant's behavior in Illinois v. Allen, 397 U.S. 337, 343-44 (1970) and in Faretta, 422 U.S. at 834 n.46, and concluded: "If a defendant may be removed from a courtroom for his disorderly behavior and waive his right to be present at trial, so too can he waive his right to act pro se and thus have appointed counsel act in his stead while he is removed from the courtroom." United States v. Pryor, 842 F.3d at 450.

Here, as in United States v. Pryor, Nissen has "waived his self-representation right . . . by reason of his nonanswers . . . ."  United States v. Pryor, 842 F.3d at 451.  During the hearing, the Court gave Nissen ample time to raise and develop his arguments.  See Tr. at 8:23-16:18 (Nissen); id. at 17:8-21:20 (Nissen).  After Nissen asserted his desire to represent himself, the Court attempted to start the standard colloquy, but before the Court could even ask its first question, Nissen interrupted the Court multiple times to inform the Court that "I'm not Mr. Nissen."  Tr. at 25:6 (Nissen).  The Court warned Nissen that, if he could not "answer these questions, Mr. Romero is going to continue to be your counsel."  Tr. at 25:20-21 (Nissen).  Despite the Court's warning, in response to the Court's first question whether Nissen understood that he had the right to counsel, Nissen again stated: "Mr. Nissen is not here to answer that question."  Tr. at 26:1-2 (Nissen).

Nissen's behavior and arguments during this exchange reflect Nissen's unwavering commitment to his arguments that the defendant in the courtroom is an entity and that Nissen is in fact dead, and the Court is confident that further questioning would lead to similar non-answers that Nissen is "the living man.  I don't know what Mr. Nissen is.  I can't speak for somebody I'm not. . . .  I can't speak for a dead man."  Tr. at 28:20-29:1 (Nissen).  See United States v. Pryor, 842 F.3d at 449 ("A court facing such resistance can hardly be expected to proceed through the questions in anticipation that the defendant may change his mind and begin responding.").  The Court's explanation to Nissen that he can represent only himself and not anyone else unless he is an attorney, in response Nissen's repeated assertion that "I can't represent something I'm not" was met with continued resistance.  Tr. at 26:7-24 (Nissen, Court).  Because Nissen refuses to respond to the Court's efforts to conduct the standard colloquy that a court must conduct to determine whether a defendant has knowingly and intelligently waived his right to counsel and proceed to represent himself pro se, see Tr. at 24:2-26:6 (Court, Nissen); Fed. Judicial Ctr., Benchbook for U.S. District Court Judges at 6-7 (6th ed. 2013), the Court concludes, as in United States v. Pryor, that Nissen's "refusal to provide a straight answer" amounts to "a rejection of further inquiry into his waiver of counsel and justified the [court's] conclusion of the colloquy."  842 F.3d at 449.  The Court concludes, therefore, that Nissen has not knowingly and intelligently waived his right to counsel.  Accordingly, Mr. Romero will continue to represent Nissen.

In the end, whether Nissen represents himself, or whether Mr. Romero represents him likely has no real-world effect.  He invoked his right to self-representation after trial, only briefly before his sentencing.  The Court has allowed Nissen to file his own pro se motions and objections, and dutifully and fully considered them all thoroughly.  See, e.g., April 21 MOO, 2020 WL 1929526, at *4.  The Court let Nissen speak at length at his sentencing.  See Draft Transcript of

Sentencing  (taken June 18, 2021)(Nissen).  In the end, Nissen enjoyed the best of both worlds: a great counsel, and Nissen got to say everything that he wanted to say.

**IT IS ORDERED** that: (i) Joe Romero's, counsel for Defendant Michael Nissen, Motion to Determine Counsel, filed April 20, 2021 (Doc. 170), is denied; (ii) Defendant Michael Nissen's oral motion to represent himself is denied; and (iii) Mr. Romero will continue to represent Nissen.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Fred J. Federici
   Acting United States Attorney
Paul J. Mysliwiec
Alexander M.M. Uballez
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Joe M. Romero, Jr.
Romero & Winder, PC
Albuquerque, New Mexico

     *Attorney for the Defendant*