IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 19-cr-00077 JB |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL NISSEN, | ) | |
| | ) | |
| Defendant. | ) | |

### UNITED STATES' MOTION TO COMPEL THE TAKING OF FINGERPRINTS AND PHOTOGRAPHS

The United States of America moves for an Order compelling Defendant Michael Nissen (hereafter "Defendant") to allow government agents to collect all necessary information for a full booking submission, including submitting to fingerprinting and photographs, with Defendant's counsel present if desired. In support of its motion, the Government states:

1.  On November 2, 2018, the Defendant received tickets for his expired registration and lapsed insurance coverage from a New Mexico State Police ("NMSP") officer. Presentence Report ("PSR") at ¶ 6. Thirty minutes later, Nissen called NMSP dispatch and threatened to shoot the officer next time Nissen encountered him. Nissen made approximately five additional calls to the dispatcher, threatening that the "next time someone violates me like that on the road, I'm going to put a bullet in that fucking pig's head." *Id.* at ¶ 7. On November 26, 2018, Nissen again threated to shoot a NMSP employee in the head. *Id.* at ¶ 8. On December 13, 2018, Nissen contacted the Bernalillo County Sheriff's Office ("BCSO") and claimed to carry a concealed revolver in order to protect himself from "rogue state cops." *Id.*

2. On August 7, 2019, a federal jury found the Defendant guilty of two violations of 18 U.S.C. § 875(C) relating to this conduct. Doc. 73.

3. On June 8, 2021, the Honorable United States District Judge James O. Browning found that the Defendant's "extreme overvalued beliefs relating to the sovereign citizen movement, while taking on an organizing function and occupying a central role in his life, are best understood as an extremist political philosophy and not as a psychotic belief system." Doc. 199.

4. On June 14, 2021, the Defendant was sentenced to 41 months of incarceration followed by three years of supervised release. Doc. 213. He was further required to reside at a halfway house for 6 months upon release among other probation compliance requirements. *Id*. During that hearing, the Defendant promised future non-compliance.

5. On November 15, 2021, the Defendant was to be released to begin his term of supervised release. Doc. 255. On that date, the Defendant refused to accept any paperwork related to his sentence and conditions of release, claiming that he "is not Michael Nissen; however, and agent for Michael Nissen." *Id.* The Defendant further refused a COVID-19 test, and advised he would not reside at a halfway house, would not submit to urine screening, counseling, or any other condition of supervision. *Id.* A warrant issued for his arrest and the Defendant was booked on a violation of his term of supervised release. Doc 257.

6. According to Supervisory Deputy United States Marshal Anthea D. Nevarez, the Defendant has now refused to voluntarily participate in standard booking procedures, including refusing to be fingerprinted or photographed. He claims that his name is "Freedom Reigns," and that he is not Michael Nissen.

7. In *Maryland v. King*, 569 U.S. 435 (2013) United States Supreme Court recognized the independent government interest served by routine administrative procedures incident to

booking. "The validity of the search of a person incident to a lawful arrest has been regarded as settled from first enunciation, and has remained virtually unchallenged." *United States v. Robinson*, 414 U.S. 218, 224, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). Individual suspicion is not necessary, because "[t]he constitutionality of a search incident to an arrest does not depend on whether there is any indication that the person arrested possesses weapons or evidence. The fact of a lawful arrest, standing alone, authorizes a search." *Michigan v. DeFillippo*, 443 U.S. 31, 35, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979).

8. The interests are further different when an individual is formally processed into police custody. The "governmental interests underlying a station-house search of the arrestee's person and possessions may in some circumstances be even greater than those supporting a search immediately following arrest." *Illinois v. Lafayette*, 462 U.S. 640, 645 (1983). The "routine administrative procedure[s] at a police station house incident to booking and jailing the suspect" derive from different origins and have different constitutional justifications the search of a place. *Illinois v. Lafayette*, 462 U.S. 640, 643, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983). First, "[i]n every criminal case, it is known and must be known who has been arrested and who is being tried." *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.*, 542 U.S. 177, 191, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004). "An individual's identity is more than just his name or Social Security number, and the government's interest in identification goes beyond ensuring that the proper name is typed on the indictment . . . [i]n fact, a name is of little value compared to the real interest in identification at stake when an individual is brought into custody." *King*, 569 U.S. at 450. Second, "[k]nowledge of identity may inform an officer that a suspect is wanted for another offense, or has a record of violence or mental disorder. On the other hand, knowing identity may help clear a suspect and allow the police to concentrate their efforts elsewhere." *Hiibel*, 542 U.S. at 186. Third,

"the Government has a substantial interest in ensuring that persons accused of crimes are available for trials." *Bell v. Wolfish*, 441 U.S. 520, 534 (1979). This is relevant to identity because "a person who is arrested for one offense but knows that he has yet to answer for some past crime may be more inclined to flee the instant charges, lest continued contact with the criminal justice system expose one or more other serious offenses." *King*, 569 U.S. at 453. Fourth, proper identify helps identify past criminal conduct, and "an arrestee's past conduct is essential to an assessment of the danger he poses to the public, and this will inform a court's determination whether the individual should be released on bail." *Id.* Finally, "the identification of an arrestee as the perpetrator of some heinous crime may have the salutary effect of freeing a person wrongfully imprisoned for the same offense." *Id.* at 455. This final point is particularly salient in the case of Michael Nissen who claims to not be the Defendant. The taking of fingerprints, for example, could exonerate a wrongly incarcerated individual.

9. The practice of photographing a defendant is well established and long supported. As the Supreme Court described in *King*:

> Police had been using photography to capture the faces of criminals almost since its invention." S. Cole, Suspect Identities 20 (2001). Courts did not dispute that practice, concluding that a "sheriff in making an arrest for a felony on a warrant has the right to exercise a discretion ..., [if] he should deem it necessary to the safe-keeping of a prisoner, and to prevent his escape, or to enable him the more readily to retake the prisoner if he should escape, to take his photograph." *State ex rel. Bruns v. Clausmier*, 154 Ind. 599, 601, 603, 57 N.E. 541, 542 (1900). By the time that it had become "the daily practice of the police officers and detectives of crime to use photographic pictures for the discovery and identification of criminals," the courts likewise had come to the conclusion that "it would be [a] matter of regret to have its use unduly restricted upon any fanciful theory or constitutional privilege." *Shaffer v. United States*, 24 App.D.C. 417, 426 (1904).

*King*, 569 U.S. at 457.

10. The practice of taking fingerprints is similarly well-founded. From the advent of this technique, courts had no trouble determining that fingerprinting was a natural part of "the

administrative steps incident to arrest." *County of Riverside v. McLaughlin*, 500 U.S. 44, 58, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991). In the seminal case *United States v. Kelly*, 55 F.2d 67 (2nd Cir. 1932), the Second Circuit found:

> Finger printing seems to be no more than an extension of methods of identification long used in dealing with persons under arrest for real or supposed violations of the criminal laws. It is known to be a very certain means devised by modern science to reach the desired end, and has become especially important in a time when increased population and vast aggregations of people in urban centers have rendered the notoriety of the individual in the community no longer a ready means of identification.
>
> . . .
>
> We find no ground in reason or authority for interfering with a method of identifying persons charged with crime which has now become widely known and frequently practiced.

*Id.*, at 69–70.

11.     As the Supreme Court concluded in *King*:

> In sum, there can be little reason to question "the legitimate interest of the government in knowing for an absolute certainty the identity of the person arrested, in knowing whether he is wanted elsewhere, and in ensuring his identification in the event he flees prosecution." 3 W. LaFave, Search and Seizure § 5.3(c), p. 216 (5th ed. 2012). To that end, courts have confirmed that the Fourth Amendment allows police to take certain routine "administrative steps incident to arrest—i.e., ... book[ing], photograph[ing], and fingerprint[ing]." McLaughlin, 500 U.S., at 58, 111 S.Ct. 1661.

*King*, 569 U.S. at 461.

12.     Supervisor Deputy United States Marshal Anthea D. Nevarez has advised that the Standard Operating Procedures of the USMS allow the following:

> If a prisoner/arrestee refuses to have fingerprints taken, the deputy may use necessary and reasonable force to obtain the fingerprints. If the prisoner has not been taken before the United States Magistrate prior to refusing to be fingerprinted, the United States Magistrate should be informed.

In an effort to avoid the use of reasonable force, and upon the well-established authority described above, the United States respectfully requests this Court issue an order directing the Defendant, by any alias, to submit to standard booking procedures.

13. Given the originating incident for this request, the Defendant's opposition is presumed.

WHEREFORE, the United States requests an Order from this Court compelling Defendant to cooperate with the routine booking procedures as required by the United States Marshal Service including fingerprinting and photographing.

RESPECTFULLY SUBMITTED this 17th day of November, 2021.

FRED J. FEDERICI
Acting United States Attorney

/s/
Alexander M.M. Uballez
Assistant United States Attorney
201 3rd Street N.W., Suite 900
Albuquerque, NM 87103-0607
(505) 346-7274

## CERTIFICATE OF SERVICE

I hereby certify that on November 17, 2021, I filed the foregoing document electronically through the CM/ECF system.  Pursuant to the CM/ECF Administrative Procedures Manual, §§ 1(a), 7(b)(2), such filing is the equivalent of service on parties of record.

/s/
Alexander M. M. Uballez
Assistant United States Attorney